## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| SANDOZ INC. | ) |
|   506 Carnegie Center, Suite 400 | ) |
|   Princeton, New Jersey  08540 | ) |
| | ) |
|                Plaintiff, | ) |
| | ) |
|       v. | ) |
| | ) |
| MICHAEL O. LEAVITT, | ) |
|   in his official capacity as | ) |
|   Secretary of Health and Human Services | )     C.A. No. |
|   200 Independence Avenue, S.W. | ) |
|   Washington, D.C.  20201, | ) |
| | ) |
|             and | ) |
| | ) |
| LESTER M. CRAWFORD, JR., D.V.M., | ) |
|   in his official capacity as | ) |
|   Commissioner of Food and Drugs | ) |
|   Food and Drug Administration | ) |
|   5600 Fishers Lane | ) |
|   Rockville, Maryland  20857, | ) |
| | ) |
|             Defendants. | ) |

_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE ACTION

1.      This is an action for declaratory and injunctive relief arising from the Defendants'

violation of, and failure to take timely action under:  the Federal Food, Drug, and Cosmetics Act

("FD&C Act"), 21 U.S.C. §§ 321-394; the Food and Drug Administration's ("FDA") policies

and regulations implementing the FD&C Act; and the Defendants' violation of the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-553, 706.  Specifically, this action

seeks redress for the Defendants' failure to perform their nondiscretionary statutory duty to act upon the fully FDA-reviewed new drug application ("NDA") filed by Plaintiff Sandoz Inc. ("Sandoz") for the new drug product Omnitrope™, recombinant human growth hormone (BC rhGH; EP2000, somatropin/somatotropin).

2.      Sandoz' Omnitrope NDA is complete and was perfected in accordance with every consultation with and guidance from the professional FDA clinical and chemistry review staff responsible for reviewing the application.  The Agency's professional scientific and review staff have fully completed their review, in the course of which all information requests put forward by the professional staff were answered by Sandoz to the FDA's full satisfaction, which FDA's Director of the Center for Drug Evaluation and Research again informally confirmed as recently as September 9, 2005.

3.      Sandoz' perfection of the Omnitrope NDA ensured a timely review could be completed, and indeed was completed by FDA's professional scientific and review staff without the identification of any deficiencies, such that final Agency action could be taken on or before the statutorily-established date for Agency action of August 31, 2004.

4.      Despite completion of the review and the absence of any deficiencies, the Defendants have refused to render the one and only action supported by the Administrative Record of the NDA, namely, the statutorily-compelled decision approving the application.  Similarly, even though they lack any basis in fact or law upon which to deny approval of the NDA, the Defendants have failed to issue an order refusing to approve the application.  The Defendants' failure to take one or the other statutorily-mandated action (approval or refusal to approve) is in direct contravention of (1) the FD&C Act; (2) the performance goals that are part of the

statutorily-mandated user fee program administered by FDA; and (3) the APA, 5 U.S.C.

§§ 551-553, 555(e), 706.

## JURISDICTION AND VENUE

5.      The causes of action alleged herein arise under 5 U.S.C. §§ 702, 704, and 706.  The

declaratory, injunctive, and other relief requested by Plaintiff is authorized by 5 U.S.C. §§ 702

and 706, and 28 U.S.C. §§ 1361, 1651, 2201-2202, and this Court's general equitable powers.

6.      This Court has jurisdiction pursuant to 28 U.S.C. 1331, 1361.

7.      Venue in this Court is proper under 28 U.S.C. § 1391(e).

8.      The Defendants' actions on and failure to approve the Omnitrope NDA constitute final

agency action.  Sandoz has exhausted its available administrative remedies.  It is futile for

Sandoz to seek any further administrative relief, and any new or further administrative

proceedings before the Agency also would be futile, as the Defendants have confirmed as

recently as September 12, 2005, that no timetable will be given by or for FDA to act on the

Omnitrope NDA.

9.      The Defendants' actions on and failure to deny the pending Citizen Petition filed on

May 14, 2004, by Morgan, Lewis & Bockius on behalf of Pfizer, Inc. ("Pfizer") asking FDA to

deny approval of NDA 21-426 for Omnitrope, FDA Docket No. 2004P-0231/CP1 (hereinafter

"PFIZER 2004 OMNITROPE PETITION"), and the Defendants' constructive granting of Pfizer's

petition, constitutes final agency action.  Sandoz has exhausted its available administrative

remedies.  It is futile for Sandoz to seek any further administrative relief with respect to the

Defendant's constructive granting of the PFIZER 2004 OMNITROPE PETITION.

10.     An actual and justiciable controversy exists between Plaintiff and Defendants.

## PARTIES

11.     Plaintiff Sandoz is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz, a member of the worldwide Sandoz group, is a leading developer and manufacturer of both pharmaceuticals and biologic medicines, ranging from small-molecule drugs that have been approved by FDA as being interchangeable with marketed brand-name drugs (commonly known as generic drugs), to more complex large-molecule biologics that are significantly more difficult to develop and manufacture (such as the growth hormone product at issue here, Omnitrope).  Sandoz is part of the Novartis Group of companies, the world's leading innovator in drug research and development ("R&D").  Novartis has positioned its Sandoz companies as an essential part of the solution to healthcare issues facing an aging population, such that Sandoz acts as a stimulus to further innovation by promoting competition in various prescription drug segments.

12.     Defendant Michael Leavitt is Secretary of Health and Human Services.  Secretary Leavitt is statutorily charged with administering the FD&C Act, including the drug-approval provisions of 21 U.S.C. § 355.  Secretary Leavitt has delegated his authority under the FD&C Act to the Commissioner of Food and Drugs.  Secretary Leavitt is sued in his official capacity as Secretary of Health and Human Services.

13.     Lester M. Crawford, Jr., D.V.M., is Commissioner of Food and Drugs.  In that capacity, Dr. Crawford has the authority and responsibility for administering FDA and the FD&C Act, including matters delegated by the Secretary of Health and Human Services relating to drug approvals.  Dr. Crawford is sued in his official capacity as Commissioner of FDA.

14.     The Department of Health and Human Services ("HHS") and FDA are each an "agency" of the government within the meaning of the APA.  5 U.S.C. § 701(b)(1).

## STATUTORY AND REGULATORY BACKGROUND

*Drug Approval Process – A Broad Range Of Section 505(b)(2) New Drug Applications Have A Long History Of Being Accepted And Approved By FDA*

15.      The FD&C Act prohibits the sale of a "new drug" unless it has been proven safe and effective.  21 U.S.C. § 355(a).  The R&D necessary to secure approval of a new drug generally requires an extensive battery of analytical tests, animal studies, and human clinical safety and efficacy trials, takes many years, and is extremely costly.  Based upon its R&D, a sponsor submits an NDA consisting of manufacturing information and all analytical, preclinical, and clinical data.  21 U.S.C. § 355(b).

16.      Section 505(b)(2) of the FD&C Act was codified in 1984 as part of the Drug Price Competition and Patent Term Restoration Act of 1984 ("the Hatch-Waxman Amendments").

17.      Section 505(b)(2) is a statutory pathway for approval of modifications in approved drugs when such modifications require submission of preclinical and/or clinical data.  21 C.F.R. § 314.54(a).  Under the provisions of Hatch-Waxman, a 505(b)(2) application is considered a "full NDA," just as a Section 505(b)(1) "stand-alone" application is considered a full NDA.

18.      From the time Congress enacted Section 505(b)(2), FDA has consistently adopted the same approach to its implementation of Section 505(b)(2).  FDA also has consistently rejected the notion that a voluminous Section 505(b)(1) NDA was required for modifications requiring submission of preclinical and/or clinical data because a 505(b)(1) development program would unnecessarily duplicate the basic safety and efficacy research that already had been completed.

19.      Thus, shortly after enactment, FDA set forth what has been its consistent policy over the past 20 years:  a 505(b)(2) applicant may rely on FDA's prior approval of a Section 505 drug "to the extent that such reliance would be allowed under section 505(j) to establish the safety and effectiveness of the underlying drug," such that "the 505(b)(2) application can rely on the finding

of safety and effectiveness of the listed drug only to the extent the product seeking approval and

the listed drug are the same.  To the extent the products are different, the 505(b)(2) application,

like a stand alone NDA, must include sufficient data to demonstrate that the product with those

different aspects meets the statutory approval standard for safety and effectiveness."  FDA

CONSOLIDATED RESPONSE TO PFIZER ET AL. PETITIONS, FDA DOCKET NOS. 2001P-0323/CP1

& C5, 2002P-0447/CP1, AND 2003P-0408/CP1, October 14, 2003, at 3 (hereinafter "2003 PFIZER

PETITION DENIAL").

20.     Accordingly, when FDA initiated rulemaking in 1989 to implement Section 505(b)(2), it

adopted this approach from the outset:

> In addition to applications supported by literature reports or a combination of
> literature reports and new clinical investigations, FDA is proposing to treat as a
> 505(b)(2) application an application for a change in an already approved drug
> *supported by a combination of literature or new clinical investigations and the
> agency's finding that a previously approved drug is safe and effective*. . . . [T]hese
> applications will rely on the approval of the listed [previously approved] drug
> together with the data needed to support the change.  *The applicant will thus be
> relying on the approval of the listed drug only to the extent that such reliance
> would be allowed under section 505(j) of the act:  to establish the safety and
> effectiveness of the underlying drug.*

54 Fed. Reg. 28872, 28891, 28892 (July 10, 1989) (emphasis added).

21.      As the Agency indicated in 1989, a fundamental premise of Section 505(b)(2) – and,

indeed, the "linchpin of FDA's interpretation of 505(b)(2)" – is that a sponsor can rely upon

FDA's prior determination or "finding" that a previously approved drug cited in the 505(b)(2)

NDA is safe and effective.  2003 PFIZER PETITION DENIAL at 14.

22.     That longstanding and consistently applied policy was reaffirmed in October 2003 by

FDA, when it rejected a prior attempt to block all 505(b)(2) NDA approvals:

> "Similarly, when reviewing a 505(b)(2) application that relies in part on the
> earlier approval of a listed drug, FDA may rely on its earlier conclusions
> regarding safety and effectiveness to whatever extent the conclusions are

> appropriate for the drug under review in the 505(b)(2) application. Although reliance on an FDA finding of safety and effectiveness for an NDA is certainly indirect reliance on the data submitted in the original NDA, reliance on the conclusions supported by that data is not the same as manipulating those data to reach new conclusions not evident from the existing approval."

2003 PFIZER PETITION DENIAL at 10 n.14.

23.    Most recently, on August 12, 2005, FDA once again reiterated this longstanding policy in appropriately rejecting yet another petition seeking to block approval of yet another 505(b)(2) NDA:  "A 505(b)(2) application is similar to an ANDA as well because it may rely on the FDA finding that the listed drug it references is safe and effective as evidence in support of its own safety and effectiveness. . . . FDA's long-standing interpretation of section 505(b)(2) is intended to permit the pharmaceutical industry to rely, to the greatest extent possible under the law, on what is already known about a drug."  RECOMBINANT CALCITONIN PETITION DENIAL TO BUC & BEARDSLEY, FDA Docket No. 2004P-0015/PDN1 (Aug. 12, 2005), at 2, 3 ("RECOMBINANT CALCITONIN PETITION DENIAL").

24.    The Agency's longstanding and consistent intention in permitting 505(b)(2) applicants to rely on FDA's prior safety and efficacy determination is straightforward:  it permits the "industry to rely to the greatest extent possible under the law [and to the extent such reliance is scientifically justified] on what is already known about a drug" in order "to avoid requiring drug sponsors to conduct and submit studies that are not scientifically necessary" thereby allowing the sponsor "to target drug development resources to studies needed to support the proposed difference or innovation from the previously approved drug product on which it seeks to rely."  2003 PFIZER PETITION DENIAL at 10 n.14; RECOMBINANT CALCITONIN PETITION DENIAL at 3.

25.    As FDA succinctly put it:  "The conduct and review of duplicative studies would (1) divert industry resources that could be used to undertake innovative research, (2) increase

drug costs, (3) strain FDA review resources, and (4) slow the process for drug approval with no corresponding benefit to public health.  In addition, the conduct of duplicative studies raises ethical concerns because it could subject human beings and animals to medically or scientifically unjustified testing."  Id. at 3-4; RECOMBINANT CALCITONIN PETITION DENIAL at 3.

26.    FDA must approve a Section 505(b)(2) NDA so long as all necessary data are submitted or referenced to establish the safety and effectiveness of the product.

27.    FDA has a non-discretionary statutory obligation to act on 505(b)(2) applications within 180 days after filing by the applicant.

28.    The Agency can only fulfill that statutory mandate by approving the application (if none of the specified grounds for denying approval apply), or by giving the applicant an opportunity for a hearing on the question of whether the NDA is in fact approvable.  21 U.S.C. § 355(c).

29.    By law, therefore, the Defendants must approve an application like the Omnitrope 505(b)(2) NDA unless the Defendants find one of the following grounds for denial:  "(1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b) of this section, do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; or

-8-

(5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof; or (6) the application failed to contain the patent information prescribed by subsection (b) of this section; or (7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular." 21 U.S.C. §§ 355(d)(1)-(7).

*Section 505(b)(2) Does Not Distinguish Between Chemical Drugs And Biologic Drugs*

30.    In the case of 505(b)(2) NDAs, the statute and FDA's implementing regulations do not make any distinctions between small-molecule "chemical drugs" and what are commonly referred to as macro-molecule "biologic drugs" produced through recombinant technology.

31.    Accordingly, the requirements for biologic drugs regulated under Section 505 are not qualitatively different from those applied to chemical drugs regulated under Section 505.

32.    A modification to a biologic drug regulated under Section 505 is eligible for review and approval by FDA based upon a sponsor's submission of a complete Section 505(b)(2) NDA that meets the statutory and regulatory requirements for approval.

33.    On August 12, 2005, FDA reaffirmed in the context of a 505(b)(2) NDA for a product produced through recombinant genetic technology that Section 505(b)(2) applies to biologic drugs: "[A]n applicant may submit an NDA under section 505(b)(2) of the Act when the proposed drug product contains an active ingredient derived from recombinant technology…." RECOMBINANT CALCITONIN PETITION DENIAL at 7.

34.    Nonetheless, because Section 505 biologic drugs often, but not always, have greater complexity than Section 505 chemical drugs, it may be that the extent of the data submitted to

secure approval of a Section 505(b)(2) NDA for a biologic drug might be greater in some cases than that required to secure approval of a Section 505(b)(2) NDA for a chemical drug.

35.     In the case of a biologic drug product like Omnitrope, therefore, FDA may require more data in a 505(b)(2) NDA to demonstrate comparability between the product that is the subject of the application and that of the innovator, to explain any differences, or to substantiate their absence, than FDA might in the case of a traditional chemical drug.

36.     The additional data that FDA might require of a Section 505(b)(2) NDA biologic drug applicant in those areas where a sufficient demonstration of comparability is lacking can include the applicant's own supplemental pre-clinical and/or clinical data necessary to demonstrate the product's safety and efficacy.

37.     The only permissible grounds for FDA to refuse to approve a 505(b)(2) NDA are listed in Section 505(d) of the FD&C Act, and repeated in FDA's codified regulation, 21 C.F.R. § 314.125, and none of these grounds distinguish between biologic drugs and chemical drugs regulated under Section 505 of the FD&C Act.

*Drug Approval Process – Sections 735/736 User Fee Program*
*Requires FDA To Meet Its Commitment With Respect To The Omnitrope NDA*

38.     In 1992, Congress enacted the Prescription Drug User Fee Act ("PDUFA").  The user fee program that was established pursuant to that authority has since been reauthorized twice, in 1997 and 2002.

39.     The purpose of the user fee program is to "improve the agency's review of drug and biologic applications."  In this respect, PDUFA generally has proven successful; after just the first five years, drug review times were reduced by 13.7 months, from an average of 29.2 months in 1992 to 15.5 months in 1996.  H. Rep. 105-310, accompanying H.R. 1411, October 7, 1997, at 35.

40.     The definitions and fee provisions of PDUFA are codified in Sections 735 and 736 of the FD&C Act, 21 U.S.C §§ 379g and 379h.

41.     Congress last reauthorized and amended the user fee program in Title V of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, P.L. 107-188 (the "Bioterrorism Act").

42.     Important user fee provisions enacted in the Bioterrorism Act were not codified in the FD&C Act, but are critical to understanding the user fee scheme and the full array of legal requirements to which FDA is subject in completing and acting upon the Agency's review of applications like Sandoz' 505(b)(2) NDA for Omnitrope.

43.     Among these uncodified provisions is the Congressional finding that the "prompt approval of safe and effective new drugs and other therapies is critical to the improvement of the public health so that patients may enjoy the benefits provided by these therapies to treat and prevent illness and disease." Bioterrorism Act, Section 502(1).

44.     In addition, a key feature of each successive PDUFA reauthorization has been Congressionally-authorized performance goals and procedures ("Performance Goals").

45.     As referenced and incorporated in Section 502(4) of the Bioterrorism Act, in the form of a June 4, 2002, letter from former-HHS Secretary Tommy Thompson to the Chairmen of the House Energy and Commerce and Senate HELP Committees, these include:  (1) a goal of speeding up NDA actions as a result of FDA acting on 90 percent of standard NDA applications within 10 months of receipt (see Performance Goal I.A); and (2) a goal aimed at simplifying action letters, by requiring FDA to "provide for the issuance of either an 'approval' (AP) or a 'complete response' (CR) action letter at the completion of a review cycle for a marketing application" (see Performance Goal XIII.A.).

46.     The intent of the second goal continues to be defined by the same definition of the term "review and act on" that was adopted with the first PDUFA reauthorization in 1997.  As defined in that statute, "review and act on" is *understood to mean the issuance of a complete action letter after the complete review of a filed complete application.  The action letter, if it is not an approval, will set forth in detail the specific deficiencies and, where appropriate, the actions necessary to place the application in condition for approval.*"  See Performance Goal XIV.A (emphasis added).

47.     PDUFA was enacted to provide FDA with adequate resources through the implementation of a user fee system to ensure that the Agency's professional career staff is able to conduct expert reviews of NDAs on a timely basis, and thereby meet PDUFA's Performance Goals.

48.     As a result of PDUFA and the user fees paid by NDA sponsors like Sandoz, FDA has adequate resources to take PDUFA- and FD&C Act-mandated actions and meet PDUFA's Performance Goals.

49.     At no time relevant to this Complaint has FDA lacked the resources necessary to take PDUFA- and FD&C Act-mandated actions on the Omnitrope NDA.

50.     As recently as September 9, 2005, FDA's Director of the Center for Drug Evaluation and Research informally confirmed again, in a meeting between Sandoz and its counsel and the Office of the Commissioner, that FDA had the necessary resources available to take the statutorily-mandated final action on the Omnitrope NDA.

51.     Upon information and belief, FDA's own Administrative Record of the Omnitrope NDA reflects that, at no time relevant to this Complaint, did FDA state to Sandoz that it lacked the resources necessary to take PDUFA- and FD&C Act-mandated actions on Sandoz' application.

## FACTUAL BACKGROUND

*Recombinant Human Growth Hormone*

52.    Recombinant human growth hormone ("rhGH") is a "drug" regulated under Section 505 of the FD&C Act.

53.    Recombinant drugs like rhGH commonly are referred to as "biologic drugs" even though regulated under the FD&C Act.

54.    All rhGH products approved to date by FDA have been approved as drugs pursuant to the Section 505 pathway, to which Section 505(b)(2) applies.

55.    The Agency has over twenty (20) years' experience regulating the development and marketing of rhGH products approved by FDA based upon NDAs from various sponsors.

56.    One of those rhGH products previously approved by FDA is the Genotropin product cited as the reference listed drug ("RLD") in Sandoz' Omnitrope NDA.

57.    Almost 10 years ago, on August 24, 1995, FDA approved the first Genotropin application, which had been submitted by Pharmacia and Upjohn ("Pharmacia").

58.    The most notable feature of the Genotropin approval - which it shares in common with all other human growth hormone products approved by FDA - is that it was based upon an NDA under Section 505(b) of the FD&C Act.

59.    As a result, Genotropin, and all other rhGH products, is regulated as a drug under the Section 505 of the FD&C Act.

60.    Because of its status as a Section 505 drug, all the market exclusivity and patent protection benefits of that Section 505 drug status apply to Genotropin.

-13-

61.    Because of the Section 505 status of Genotropin, neither Pfizer nor the Defendants can dismiss the statutory liabilities that concurrently attach to that status relating to the review, approval, and market entry of safe and effective competing products.

62.    As FDA itself recognized long ago, approval of an rhGH product like Omnitrope that would compete against a product like Genotropin is a relatively straightforward matter:  "the products are non-glycosylated and highly purified and there are no isoforms; the primary structure, including disulfide bonds, has been unequivocally proven; physico-chemical tests are available for secondary and tertiary structure determination; there are clinically relevant bioassays; the mechanism of drug action is known; and there are validated biomarkers available."  *Generic Somatropin NDAs Would Require Human Immunogenicity Tests – FDA*, F-D-C Reports, The Pink Sheet, 64(16); (Apr. 22, 2002) at 14.

63.    The Agency's longstanding scientific assessment of somatropin as a well-characterized product is reinforced by the very detailed and comprehensive somatropin compendial specifications adopted by the European Pharmacopoeia.

64.    The expert analysis of somatropin by FDA's professional scientists and reviewers also is reinforced by the new compendial specifications recently published by the U.S. Pharmacopoeia (effective date April 1, 2005; announced as available May 5, 2005).

65.    Currently, USP has yet to make available a somatropin reference standard pursuant to USP's new compendial specifications in that new monograph against which the sponsor of a marketed product like Genotropin or the sponsor of a pending application like Sandoz can test its product.

*Sandoz' 505(b)(2) NDA For Omnitrope Meets All Criteria Required For Approval*

66.     On July 30, 2003, during Fiscal Year 2003, Plaintiff Sandoz, as U.S. Agent for Sandoz GmbH, submitted its NDA No. 21-426 to FDA pursuant to section 505(b)(2) of the FD&C Act seeking approval of Omnitrope (somatropin [rDNA origin] for injection) after extensive discussions with FDA's professional scientists and reviewers in the Reviewing Division responsible for approving metabolic and endocrine drug products like Omnitrope.

67.     This application is based upon (i) Sandoz' rigorous analytical program, preclinical testing, comparability testing, and clinical trials, (ii) comprehensive references from extensive published literature in the public domain, and (iii) FDA's prior determination on the public record of the safety and efficacy of the RLD cited in the NDA, Pharmacia's (now Pfizer's) Genotropin (somatropin [rDNA origin] for injection).

68.     On the basis of Sandoz' thorough and complete application, NDA 21-426 seeks FDA approval of Omnitrope for:  (i) long-term treatment of pediatric patients who have growth failure due to an inadequate secretion of endogenous growth hormone; and (ii) long-term replacement therapy in adults with growth hormone deficiency of either childhood or adult-onset etiology (tentative approval, protected under orphan drug exclusivity).

69.     In the Omnitrope NDA, Sandoz' only reference to Genotropin is to FDA's prior public finding of safety and effectiveness.

70.     As documented in NDA 21-426, Sandoz has applied a recognized panel of methods to characterize Omnitrope and Genotropin.  This allowed an accurate and complete comparison between Omnitrope and Genotropin, such that, based upon Sandoz' valid analysis of the products, FDA's professional scientists and reviewers could evaluate the comparability of

Omnitrope and Genotropin based on Sandoz' own data, and those expert FDA reviewers completed that review in August 2004.

71.    Accordingly, in conducting the review of NDA 21-426 that they completed in August 2004, FDA's professional scientists and reviewers have not needed and have not referenced or used any confidential commercial or trade secret information belonging to the Genotropin NDA owner in reviewing Sandoz' NDA for Omnitrope or in evaluating the comparability of Omnitrope.

72.    In reviewing NDA 21-426, FDA's professional scientists and reviewers have not needed and have not referenced or used any non-public data in the NDA for the RLD, Genotropin, and especially has not needed to rely on any data in the Genotropin CMC section, in reviewing Sandoz' NDA for Omnitrope or in evaluating the comparability of Omnitrope.

73.    Sandoz does not reference, use or need any confidential commercial or trade secret information belonging to the Genotropin NDA owner in its application for Omnitrope.

74.    The Omnitrope application was submitted as a Section 505(b)(2) NDA rather than a Section 505(j) abbreviated NDA ("ANDA") at FDA's suggestion.

75.    FDA's suggestion of a 505(b)(2) NDA submission was based upon the Agency's recognition at the Omnitrope pre-IND meeting that the 505(b)(2) pathway was necessary and most appropriate for approval.  Specifically, FDA told Sandoz, "Due to the difficulty of establishing pharmaceutical equivalence with the innovator product, we recommend submitting a 505(b)(2) application."  Biochemie Minutes, November 30, 1998, Pre-IND Meeting, Page 1.

76.    Specifically, FDA foresaw that a Section 505(b)(2) NDA would allow Sandoz to submit, and the professional FDA scientists and reviewers to evaluate, additional data demonstrating pharmaceutical equivalence that could not be submitted and reviewed in an ANDA.

77.     Furthermore, "[FDA] reinforced that, as clinical immunogenicity data were desired by the agency, therefore the submission needs to be a 505(b)(2)."  (Biochemie Minutes, November 30, 1998, Pre-IND Meeting, Page 2).  The full immunogenicity data expressly sought by the Agency in the Omnitrope 505(b)(2) submission were included in Sandoz' application.

78.     The fact that the Omnitrope application was submitted and filed as a 505(b)(2) NDA, and is still pending at the Agency as a 505(b)(2) NDA, has been widely reported in the trade press and lay media.  This information has not been released by Sandoz (or Novartis).

79.     The 505(b)(2) status of this NDA also has been addressed in the Paragraph IV Patent Certification that Sandoz provided to Pfizer, the sponsor of the Genotropin NDA.

80.     There is no valid and enforceable patent that would be infringed by the Sandoz Omnitrope product.

81.     NDA 21-426 contains extensive data generated in the course of multiple studies undertaken by Sandoz based upon guidance received from FDA's professional scientists during the pre-IND and development phases of Omnitrope.

82.     The proprietary Sandoz data, generated from Sandoz-conducted studies and other work by Sandoz in support of this application, includes the following Sandoz data elements: Chemistry Section; Nonclinical Pharmacology And Toxicology Section including pharmacology studies, pharmacotoxicokinetics, and toxicology studies; Human Pharmacology And Toxicology Section, including reports of human pharmacology and bioequivalence studies; and ClinStat Section.

83.     The Sandoz-generated data supplied by Sandoz demonstrate that Omnitrope is indistinguishable from Genotropin and that Omnitrope is safe and effective.

-17-

84.    This showing was made despite the absence of definitive specifications, or even the availability of a compendial (USP) standard, because it was two years after Sandoz submitted its application, and almost one year subsequent to the completion of FDA's review of Omnitrope, that USP published a new USP monograph for somatropin.

85.    The pending Omnitrope NDA seeks approval of a modified dosage form compared to the RLD Genotropin, and thus Omnitrope is not a generic product eligible for an "A" rating classifying it as an interchangeable product, and thus Omnitrope could not be substituted at the pharmacy level post-approval without physician intervention.

86.    In addition to data from Sandoz-conducted studies, Sandoz included in its NDA exhaustive references to and copies of almost 250 published medical and scientific journal articles from literature in the public domain (187 of which refer to Clinstat).

87.    Together, the consolidated Sandoz and public domain data demonstrate that Omnitrope is safe and effective for its intended use.

88.    Together, the consolidated Sandoz and public domain data submitted to FDA and fully reviewed by FDA's professional career scientists and reviewers, demonstrate that NDA 21-426 contains adequate and robust data to support a positive Agency action under Section 505(b)(2).

89.    The Administrative Record of NDA 21-426 unambiguously supported a positive Agency action.

90.    By law, that action was required to be taken no later than the August 31, 2004, extended Action Date.

91.    The Defendants failed to take that action, despite statutory mandates requiring the Defendants to fulfill their non-discretionary duty in doing so with respect to the Omnitrope NDA.

92.    As set forth in Paragraphs 112 through 134, the Defendants failed to take any of the statutory-compelled actions on the Omnitrope NDA.

93.    Shortly after the August 31, 2004, extended action date for Omnitrope, on September 29, 2004, the Therapeutic Goods Administration ("TGA") of the Australian Government granted the approval of the registration of Omnitrope pursuant to the Australian Therapeutic Goods Act 1980, representing the first marketing authorization of Omnitrope in the world.  The TGA is a leading international health authority, and it is responsible for the quality, safety, efficacy, and timely availability of drugs and medical devices in Australia.

94.    Like the NDA review process FDA has applied to Omnitrope in the U.S., the TGA's regulatory process involves a resource-intensive evaluation of the data supplied by a sponsor in order to provide science-based regulatory accountability when drugs are made available to patients in Australia.  Consistent with the TGA's rigorous premarket approval process, the relevant portion of the TGA's mission is "to ensure the safety, quality and efficacy of therapeutic goods available in Australia at a standard equal to that of comparable countries."

95.    The TGA's approval of Omnitrope is consistent with the review of Omnitrope completed by FDA's professional scientific staff  in August 2004, when FDA's expert reviewers reached precisely the same scientific conclusion regarding the quality, safety, and efficacy of Omnitrope based upon the same dossier (i.e., application) having been submitted to the TGA and FDA.

*Defendants Breached FDA's User Fee Obligations To Sandoz In Connection With Omnitrope*

96.    Pursuant to PDUFA, as reauthorized by the Bioterrorism Act, Sandoz paid $533,400.00 in user fees to FDA in connection with the Omnitrope NDA.

97.    Sandoz paid its PDUFA user fees to FDA in connection with its submission of its Omnitrope NDA during Fiscal Year 2003.

98.    The PDUFA user fees Sandoz paid to FDA in connection with its Omnitrope NDA constitute appropriated funds of the general Treasury of the United States.

99.    The appropriated funds resulting from Sandoz' payment of its PDUFA user fees in connection with its Omnitrope NDA submission during Fiscal Year 2003 were effectively expended by the Defendants when the FDA professional scientists and reviewers fully completed their review of the Omnitrope NDA in August 2004.

100.    Pursuant to PDUFA, once the FDA professional scientists and reviewers fully completed their review of the Omnitrope NDA in August 2004, the Defendants, having expended the appropriated funds resulting from the PDUFA user fees paid by Sandoz, were statutorily obligated under PDUFA, and thereby implicitly contractually and equitably obligated to Sandoz to fulfill their non-discretionary, statutorily-imposed mandate to issue the requisite Action Letter on the NDA.

101.    The Defendants' intransigence in continuing to improperly defer the statutorily-required action on the Omnitrope NDA have left the application frozen in perpetual limbo subject to some as-yet unidentified consideration unrelated to the pertinent statutory authorities.

102.    Because the Defendants have informed Sandoz, through its counsel, that no timetable has been or can be established for issuance of the requisite Action Letter on Sandoz' NDA, the Defendants, upon information and belief, will defer final action on the NDA until after the commencement of Fiscal Year 2006, which begins on October 1, 2005.

103.    Upon information and belief, legislation governing the Defendants' expenditure of FDA's appropriated funds during Fiscal Year 2006 potentially may be amended prior to enactment to include some form of a prohibition on FDA's expenditure of appropriated funds for

the review and approval of any Section 505(b)(2) NDA for any biologic drug like human growth hormone (and thus Omnitrope) that FDA regulates under the FD&C Act.

104.    In seeking to resolve this dispute with the Defendants without the necessity for filing the instant action, Sandoz discussed with Federal Defendant FDA Commissioner Crawford and FDA's Office of the Chief Counsel the prospects for such limitations on the Defendants' expenditure of FDA's appropriated funds during Fiscal Year 2006, and the Defendants did not dispute (or confirm) that such legislation might be adopted or that the Defendants might support adoption of such legislation.

105.    The PDUFA user fees paid by Sandoz by statute are required to be "dedicated towards expediting the drug development process and the process for the review" of Sandoz' human drug application for Omnitrope.  Bioterrorism Act, Section 502(1-4); PDUFA User Fee Rates Established for Fiscal Year 2003, 67 Fed. Reg. 50448 (August 2, 2002).

106.    The Omnitrope 505(b)(2) NDA extended PDUFA Action Date of August 31, 2004, was based upon, inter alia, a major chemistry amendment Sandoz submitted to FDA at FDA's request on or about March 31, 2004.  (Letter from Monika Johnson, Pharm.D., FDA, to Beth Brannon, Sandoz, May 17, 2004).

107.    One year after the August 31, 2004, extended PDUFA Action Date, the Defendants have yet to act upon the Omnitrope application by issuing as required under the FD&C Act and the user fee statutes a complete Action Letter either approving the product, or detailing specific deficiencies and any actions necessary to clear the way for an approval.

108.    Indeed, there has been no substantive correspondence from the Defendants to Sandoz relating to NDA 21-426 since August 31, 2004, despite Sandoz' two Resubmissions and Renewed Requests for Approval of its application.

109.    Upon information and belief, at no time relevant to this Complaint has FDA considered or characterized Omnitrope or the Omnitrope NDA to be one of the 10% of applications for which FDA had failed to meet its PDUFA performance goals.

110.    Upon information and belief, at no time relevant to this Complaint has FDA identified Omnitrope or the Omnitrope NDA in any PDUFA performance report or similar Agency-generated documentation to be one of the 10% of applications for which FDA had failed to meet its PDUFA performance goals.

111.    FDA's failure to identify any remaining scientific or technical issues with regard to the Omnitrope NDA reflect that the Defendants' failure to either approve or disapprove the Omnitrope application is not based upon scientific, technical, or any other statutorily-recognized considerations.

*The August 31, 2004 Omnitrope Letter To Sandoz*
*Did Not Cite Any Statutorily-Cognizable Issues And All Non-Statutory Grounds Cited*
*Have Been Resolved And No Longer Can Justify The Defendants' Continuing Failure To Act*

112.    In the letter the Defendants caused to be issued to Sandoz on August 31, 2004, FDA's professional scientific and review staff in the Reviewing Division did not cite any deficiencies that had been identified during review of NDA 21-426.

113.    The August 31st letter did not state that the Omnitrope NDA was not approvable, and did not provide Sandoz the opportunity for a hearing on the question of whether the NDA is not-approvable as is statutorily required in the event of a not-approvable action by FDA.

114.    Instead, the August 31st letter stated that the Reviewing Division was "unable at this time to reach a decision on the approvability of the application because of unresolved scientific and legal issues that relate to [the] NDA."

115.    None of the purported "issues" cited in the August 31st letter involves any technical, scientific, or regulatory deficiency in the NDA itself.

116.    None of the purported "issues" cited in the August 31st letter involves a statutorily-recognized basis pursuant to which the Defendants are authorized to withhold approval of an NDA.

117.    Instead, the August 31st letter cited five (5) purported "issues" involving general scientific and legal considerations relating to so-called follow-on protein products (FOPPs).

118.    First, the letter cited the "legal and scientific challenges to the agency's ability to rely, even in part, on a prior finding of safety and effectiveness for one recombinant protein product in order to approve another such product" presented in various petitions filed by third parties.

119.    Second, the letter cited FDA's August 16, 2004 public announcement of the Agency's September 14-15, 2004, Public Workshop on FOPPs.

120.    Third, the letter cited the "subjects expected to be addressed in that workshop and by comments submitted to the docket closing on November 12".

121.    Fourth, the letter cited FDA's intention "to co-sponsor a scientific workshop early in 2005 on these issues".

122.    Fifth, the letter cited the then-Paragraph III (now-Paragraph IV) Patent Certification on file in NDA 21-426 for a listed patent (U.S. Patent No. 5,633,352) for the RLD, Genotropin.

123.    As set forth in Sandoz' two separate Resubmissions in response to the August 31st letter, developments with respect to each of these five purported "issues" that had occurred following the issuance of the August 31st letter demonstrate that each of these "issues" has been fully and adequately addressed in the manner anticipated in the August 31st letter.

124.    First, with respect to the challenges in the petitions cited in the August 31st letter, even though FDA has continued to grant more than ample time and opportunity for the petitioners to support their contentions in a meaningful way beyond the arguments and evidence available to the Defendants at the time the August 31st letter was issued to Sandoz, the petitioners have failed to do so.  Indeed, in the case of two of the petitions cited in the August 31st letter, no new issues relevant to NDA 21-426 have been presented that were not already addressed in Sandoz' application prior to August 31st, and, in the case of the third petition, the Agency had issued its Consolidated Response to that petition in October 2003, the petitioners' opportunity to file a Petition For Reconsideration lapsed, the petitioners did not sue the Agency, and no other person has presented any new information to that docket that is relevant to NDA 21-426.  Although various third parties have attempted to supplement the records for the cited petitions, the Administrative Records of those petitions were effectively closed several months ago.  In any case, no new information has been placed in those records that raises any new issue with respect to NDA 21-426 that has not already been resolved in Sandoz' application.  Therefore, these petitions provide no basis for withholding action on Sandoz' NDA.

125.    Second, with regard to the cited Public Workshop, FDA held the Workshop on September 14-15, 2004, during which testimony was presented on behalf of the Novartis Group of companies (among other participants), and none of the testimony presented by other parties at the Public Workshop included any new scientific data or related information that raises any new issue with respect to NDA 21-426 that has not already been resolved in Sandoz' application. Therefore, the Public Workshop provides no basis for withholding action on Sandoz' NDA.

126.    Third, with respect to the cited Scientific Considerations public docket, FDA opened the docket (Docket No. 2004N-0355) following the September 14th-15th Public Workshop.  Prior to

the initial closure of that docket on November 12, 2004, a few submissions were made to the docket by a few interested parties, including a submission on behalf of the Novartis Group of companies. On February 16, 2005, FDA took the extraordinary step of re-opening that public docket (70 Fed. Reg. 7950) ninety (90) days after it was properly closed by the Agency – a decision with which Sandoz did not concur. None of the submissions to that public docket made prior to its initial closure on November 12, 2004, or prior to its final closure on March 16, 2005, include any new information that raises any new issue with respect to NDA 21-426 that has not already been resolved in Sandoz' application. Therefore, this public docket provides no basis for withholding action on the Omnitrope NDA.

127.     Fourth, with respect to the cited Public Workshop, FDA held the Workshop on February 14-16, 2005, and a presentation was made on behalf of the Novartis Group of companies (among other participants). At this Public Workshop, professional career scientists and reviewers from FDA highlighted the Agency's past prior use of the 505(b)(2) pathway to approve biologic drug applications like NDA 21-426 for Omnitrope. In particular, in a detailed presentation reviewing the history of such approvals, the Agency appropriately identified menotropins, glucagons, and hyaluronidase as having been submitted and approved pursuant to Section 505(b)(2) NDAs. See http://www.fda.gov/cder/meeting/followOn/kozlowski.ppt (presentation by Steven Kozlowski, M.D., Acting Director, Division of Monoclonal Antibodies, Office of Biotechnology Products, CDER). Those prior biologic drug 505(b)(2) NDA approvals are indistinguishable from NDA 21-426 at issue in this action in terms of the regulatory approval pathway utilized. Since that time, yet another recombinant biologic drug, Fortical, has been approved in a 505(b)(2) NDA, by virtue of which all the scientific and legal considerations alluded to in the August 31st letter have been resolved. Other than the information from the

Agency's professional scientists further supporting approval of the Omnitrope NDA, none of the testimony presented by third parties at the Public Workshop included any new scientific data or other information that raises any new issue with respect to NDA 21-426 that has not already been resolved in the application. Therefore, this Public Workshop also provides no basis for withholding action on Sandoz' NDA.

128.    Fifth, with regard to the patent cited in the August 31st letter, immediately prior to FDA's issuance of its August 31st letter, U.S. Patent No. 5,633,352 ("the '352 patent") listed for the RLD and cited in the August 31st letter was declared invalid and unenforceable in two decisions dated August 3, 2004, by the U.S. District for the District of Delaware. On November 29, 2004, Sandoz submitted a Paragraph IV Patent Certification to NDA 21-426 asserting that the '352 patent is invalid and unenforceable, and will not be infringed by the Sandoz product. Sandoz also notified the patent owner and RLD NDA holder (Pfizer) of its Paragraph IV Patent Certification on November 29, 2004. The statutory 45-day period following the patent owner's and NDA holder's receipt of those notifications ran and expired on January 16, 2005, without the filing of any lawsuit by the patent owner or RLD NDA holder against Sandoz, thus statutorily making NDA 21-426 eligible for immediate approval. Sandoz submitted to the Reviewing Division on February 10, 2005, a certification that no legal action had been filed in response to its Paragraph IV Patent Certification. Accordingly, the potential expiration of the '352 patent in 2015 is no longer the date on which approval is sought. Instead, immediate final approval is sought pursuant to the Paragraph IV Patent Certification provisions of 21 U.S.C. § 355(b)(2) et seq. (as amended).

129.    Accordingly, there are no "issues" outstanding any longer that have any relationship to or impact on NDA 21-426, and the Defendants' statutorily-required action on the application is required to proceed forthwith.

130.    Based upon NDA 21-426, the August 31st letter with respect thereto, and Sandoz' initial Resubmission and second Resubmission, no further submission of any additional substantive data is necessary or required in order for the Defendants to take action on NDA 21-426, and action must be taken on the NDA in order to ensure that the Defendants comply with the relevant statutory requirements.  21 U.S.C. §§ 355(c)-(d).

131.    In a meeting between Sandoz and its counsel and Federal Defendant FDA Commissioner Crawford on September 9, 2005, FDA's Director of the Center for Drug Evaluation and Research informally confirmed again that Sandoz had provided all necessary and appropriate information and that no further information was required for final action to be taken on the Omnitrope NDA.

132.    In the August 31st letter, the Defendants committed to "provide [Sandoz] with further updates on [FDA's] plans for review of the application. . . ."

133.    The Defendants have failed to provide Sandoz any such further update as specified in the August 31st letter.

134.    Through their counsel, the Defendants informally communicated to Sandoz' counsel on September 12, 2005, that no timetable would be established for final action on the Omnitrope NDA.

*Pfizer's Citizen Petition Seeking To Block Omnitrope Approval Lacks Merit*

135.    Immediately prior to the original PDUFA Action Date for Omnitrope (May 31, 2004), the PFIZER 2004 OMNITROPE PETITION was filed with FDA on May 14, 2004, challenging the Omnitrope NDA and asking, inter alia, that FDA not approve Sandoz' application.

136.    The PFIZER 2004 OMNITROPE PETITION was seriously flawed both on the law and the science.

137.    The most fundamental flaw in the PFIZER 2004 OMNITROPE PETITION is the error it made in the presumed molecular weight of Omnitrope, which is a flawed premise that underlies many of the erroneous assertions Pfizer made about what Pfizer expected to be differences between the two products.

138.    Many of the assertions in the PFIZER 2004 OMNITROPE PETITION were based upon conjecture.

139.    None of the claims in the PFIZER 2004 OMNITROPE PETITION were scientifically substantiated by data because Pfizer does not have access to Omnitrope to actually undertake any scientific studies.

140.    The fundamental arguments advanced in the PFIZER 2004 OMNITROPE PETITION were premised on assumed and incorrect information from a draft version of a confidential Sandoz clinical trial protocol, the erroneous nature of which should have been clearly evident to anyone competent in the science of rhGH or in basic regulatory principles.

141.    More importantly, the professional FDA scientists and reviewers who have complete access to all of Sandoz' data are fully aware of the misstatements contained in the PFIZER 2004 OMNITROPE PETITION and know that it is based upon flawed evidence.

142.    Upon information and belief, the professional FDA staff assigned to respond to the PFIZER 2004 OMNITROPE PETITION are prepared to issue a formal, final response to the Petition, but the Defendants have not yet permitted them to do so.

143.    To date, the Defendants have not issued a formal, final response to the PFIZER 2004 OMNITROPE PETITION, which is still pending before the Agency.

144.    Despite the continued pendency of the PFIZER 2004 OMNITROPE PETITION, the Defendants have constructively granted the Petition and granted Pfizer the relief it sought in its Petition by withholding approval of Sandoz' Omnitrope NDA.

*FDA Approvals Of 505(b)(2) NDAs For A Range Of Complex Biologic Drugs Have Been Issued Reflecting Disparate Treatment In The Defendants' Inaction on the Omnitrope NDA*

145.    The Omnitrope application is not the first Section 505(b)(2) NDA submitted to or reviewed by FDA's professional scientific and review staff.

146.    The Omnitrope application is not the first Section 505(b)(2) NDA seeking approval of a biologic drug produced through recombinant technology.

147.    Just three weeks prior to the original Action Date for the Omnitrope NDA, on May 6, 2004, FDA approved Ista Pharmaceuticals' 505(b)(2) NDA for Vitrase (hyaluronidase for injection), a naturally-sourced, protein-based biologic drug that has not been thoroughly characterized.

148.    FDA subsequently approved a second hyaluronidase drug product through the 505(b)(2) pathway exactly two months after the extended Action Date for Omnitrope, when the Defendants improperly failed to approve Sandoz' NDA.

149.    Specifically, on October 26, 2004, FDA approved Amphastar's 505(b)(2) NDA for Amphadase (hyaluronidase injection, USP), a bovine-source hyaluronidase product.

150.    In addition to the two separate 505(b)(2) NDAs for hyaluronidase that "book-ended" the original and extended Omnitrope Action Dates, FDA on June 22, 1998, approved Novo Nordisk's 505(b)(2) NDA for GlucaGen (glucagon [rDNA origin] for injection).

151.    FDA's prior approval of biologic drugs also includes the January 1997 approval of a Section 505(j) ANDA for a menotropins product derived from mammalian urine, an approval that was judicially-confirmed in litigation in this Circuit, and the August 1999 approval of a Section 505(b)(2) NDA for a menotropins product.

152.    Most recently, in August 2005, the Defendants approved a 505(b)(2) NDA, submitted upon information and belief at or at about the same time as the Omnitrope NDA, for a 32 amino acid recombinant calcitonin product marketed under the trade name Fortical.  "The Fortical NDA, submitted in 2003, relied in part on the finding of safety and effectiveness for Miacalcin NS".  RECOMBINANT CALCITONIN PETITION DENIAL at 4.

153.    There is no reasonable, rational, or lawful basis upon which to distinguish the Fortical 505(b)(2) NDA from the Omnitrope 505(b)(2) NDA in terms of their approvability under the FD&C Act.

154.    There is no reasonable, rational, or lawful basis upon which to distinguish the decision FDA rendered concurrent with the Fortical approval denying the third-party petition seeking to block approval of Fortical, see RECOMBINANT CALCITONIN PETITION DENIAL, and the opposition Sandoz filed in response to Pfizer's unsupported Petition on Omnitrope.

155.    The legal/regulatory rationale in FDA's decision denying the Fortical petition, see RECOMBINANT CALCITONIN PETITION DENIAL, applies with direct and equal force to the PFIZER 2004 OMNITROPE PETITION.

## Harm Caused By Unlawful Agency Actions

156.    Sandoz is irreparably injured by the Defendants' past and continuing failure to render one of the statutorily-mandated decisions on the Omnitrope NDA.

157.    The Defendants' failure to fulfill their non-discretionary statutory obligation and issue an Action Letter on the Omnitrope NDA based upon information in the public domain and Sandoz' own proprietary data – which Sandoz generated and compiled on the basis of years of detailed consultations with FDA's professional scientific staff, and following investments of tens of millions of dollars in Omnitrope research and development, and following investment of tens of millions of dollars in Omnitrope-specific manufacturing and related technology infrastructure – deprives Sandoz of the opportunity to market a product that otherwise could be lawfully marketed in the United States, and thereby deprives Sandoz of the opportunity to begin recouping its substantial investment in this product.

158.    In addition, the Defendants' failure to render the statutorily-mandated decision on Omnitrope following Sandoz' payment of a substantial, statutorily-mandated user fee payment – upon receipt and processing of which the Defendants were statutorily-obligated to fulfill certain statutorily-mandated PDUFA obligations – deprives Sandoz of the value of that user fee payment, and it deprives Sandoz of the statutorily conferred rights and benefits conferred by Congress on a 505(b)(2) NDA sponsor like Sandoz that has remitted a user fee payment to the Agency.

159.    Furthermore, the Defendants' failure to render the statutorily-mandated decision on Omnitrope places Sandoz at a competitive disadvantage vis-à-vis similarly-situated pioneer biopharmaceutical manufacturers and vis-à-vis therapeutic alternatives and other products that

might compete against products in the rhGH segment that were previously approved by FDA, and thereby causes competitive injury to Sandoz.

160.     Sandoz also faces the threat of recurring competitive and procedural harm.  The Defendants' actions here are likely to at least indirectly impact follow-on versions of other recombinant proteins currently approved under the FD&C Act as well as the 505(b)(2) pathway.

161.     Specifically, the Defendants' actions could result in the effective institution of an uncodified policy that the existing 505(b)(2) NDA pathway cannot be used prospectively for protein-based biologics regulated under Section 505.  Thus, Sandoz' ongoing substantial investments necessary to file other 505(b)(2) NDAs for other Section 505 biologic drugs – comparable to the investment Sandoz has made over the past seven years in support of this application – could be futile and become valueless as a result of the Defendants' failure to render the statutorily-compelled decision on Omnitrope for other than clearly-articulated, well-documented scientific reasons, which FDA's professional scientific and review staff have determined do not, in fact, exist.  Sandoz would suffer irreparable harm as a result of the squandering of its existing substantial investments, which would be lost and could not be redirected, as a result of the Defendants' implicit adoption or application of such a policy.

162.     Sandoz also is irreparably injured by the damage caused to the standing, reputation, and goodwill of Sandoz and its biopharmaceuticals research and development operations as a result of the questions and doubts caused in the minds of health care professionals, industry trade associations, competing biopharmaceutical companies, and other public organizations as a direct and proximate cause of Defendants' continuing failure to approve Omnitrope and thereby validate Sandoz scientific and technical expertise.  The lingering doubts about Sandoz, about Sandoz' R&D and manufacturing of biologics, and about Sandoz' own expert biologics

researchers and scientists as a result of the Defendants' actions complained of herein has impaired the value of the hundreds of millions of dollars Sandoz has invested in biopharmaceuticals to date, and has impaired the value of the resulting biopharmaceuticals business generated from those investments.

163.    Furthermore, Sandoz is irreparably injured by the damage caused because the Omnitrope product for which approval is sought in NDA 21-426 would be the first biopharmaceuticals product Sandoz would market in the United States, and the Defendants' actions complained of herein are preventing the lawful launch of the Sandoz biopharmaceuticals business in the United States.

164.    Accordingly, Sandoz presently seeks declaratory and permanent injunctive relief against the Defendants as a result of the actions the Defendants have taken and failed to take with regard to Sandoz' Omnitrope NDA and the PFIZER 2004 OMNITROPE PETITION.

### PLAINTIFF'S CLAIM FOR RELIEF

**Count I**
**Violation Of The FD&C Act And The APA**
**-Inaction On The Omnitrope 505(b)(2) NDA In Violation Of The FD&C Act-**

165.    Sandoz realleges and incorporates herein by reference Paragraphs 1 through 164 of this Complaint.

166.    Section 505(c)(1) of the FD&C Act states, "within one hundred and eighty days after the filing of an application under subsection (b) of this section, or such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve the application if he then finds that none of the grounds for denying approval specified in subsection (d)."  21 U.S.C. § 355(c)(1).

167.    The Secretary therefore must approve an application like the Omnitrope 505(b)(2) NDA unless the Secretary finds one of seven (7) specified "grounds for denying approval" set forth in Section 505(d) applies.  21 U.S.C. §§ 355(c)(1), 355(d)(1)-(d)(7).

168.    If one or more of the seven conditions specified in Section 505(d) applies, FDA "shall issue an order refusing to approve the application."  21 U.S.C. § 355(d).

169.    Otherwise, FDA "shall approve the application".  21 U.S.C. § 355(c)(1).

170.    None of the seven conditions specified in Section 505(d) applies to Omnitrope.

171.    FDA has not identified any of the seven conditions specified in Section 505(d) as a basis for refusing to approve the Omnitrope 505(b)(2) NDA.

172.    The professional FDA scientists and reviewers in the Reviewing Division responsible for reviewing the Omnitrope NDA have not determined that "(1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b) of this section [505], do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof".  21 U.S.C. § 355(d)(1).

173.    The professional FDA scientists and reviewers in the Reviewing Division responsible for reviewing the Omnitrope NDA have not determined that "(2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions."  21 U.S.C. § 355(d)(2).

174.    The professional FDA scientists and reviewers in the Reviewing Division responsible for reviewing the Omnitrope NDA have not determined that "(3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity".  21 U.S.C. § 355(d)(3).

175.    The professional FDA scientists and reviewers in the Reviewing Division responsible for reviewing the Omnitrope NDA have not determined that "(4) upon the basis of the information submitted to [FDA] as part of the application, or upon the basis of any other information before [FDA] with respect to such drug, [FDA] has insufficient information to determine whether such drug is safe for use under such conditions".  21 U.S.C. § 355(d)(4).

176.    The professional FDA scientists and reviewers in the Reviewing Division responsible for reviewing the Omnitrope NDA have not determined that "(5) evaluated on the basis of the information submitted to [FDA] as part of the application and any other information before [FDA] with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof".  21 U.S.C. § 355(d)(5).

177.    The professional FDA scientists and reviewers in the Reviewing Division responsible for reviewing the Omnitrope NDA have not determined that "(6) the application failed to contain the patent information prescribed by subsection (b) of this section".  21 U.S.C. § 355(d)(6).

178.    The professional FDA scientists and reviewers in the Reviewing Division responsible for reviewing the Omnitrope NDA have not determined that "(7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular."  21 U.S.C. § 355(d)(7).

179.    There have been no updates from the Defendants as had been promised concerning the approvability of the Omnitrope application for over 12 months following FDA's issuance of its August 31, 2004, letter.

180.    The Defendants apparently believe they can keep the Omnitrope application in perpetual limbo, having stated in the August 31, 2004 letter that FDA "cannot be certain when the Agency will be prepared to make a decision regarding the approvability of NDA 21-426."

181.    The Defendants were statutorily required to act within 180 days and render a decision on the approvability of the Omnitrope NDA, and the Defendants' failure to fulfill this statutory mandate violates the FD&C Act and the APA.

182.    The effect of the Defendants' continuing failure to give Sandoz a timeframe by which it will act on the Omnitrope NDA – coupled with the passage of over 12 months following the completion of the NDA review by the professional FDA scientific staff in the Reviewing Division – is that the Defendants have violated the express provisions of the FD&C Act without articulating any legally-permissible reason for having done so.

183.    Accordingly, the Defendants' actions with respect to the Omnitrope NDA must be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and in excess of statutory jurisdiction, authority, or limitations, and without observance of procedure required by law, in violation of the APA.  5 U.S.C. §§ 706(2)(A), (C), (D).

<u>**Count II**</u>
<u>**Violation Of The APA**</u>
**-Defendants' Failure To Act On The Omnitrope 505(b)(2) NDA In Violation Of The APA-**

184.    Sandoz realleges and incorporates herein by reference Paragraphs 1 through 183 of this Complaint.

185.    The APA, 5 U.S.C. § 551(13), defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

186.    The APA, 5 U.S.C. § 555(e), requires an agency to give "[p]rompt notice of the denial of a written application, petition, or other request made in connection with any agency proceeding. The notice shall be accompanied by a brief statement of the grounds for denial."

187.    The APA, 5 U.S.C. § 555(e), imposed on the Defendants a clear, nondiscretionary duty to provide a prompt and timely response to Sandoz' 505(b)(2) NDA and, in the case of denial, to provide the grounds for denial.

188.    Sandoz has no other avenues of relief to compel the Defendants to render a decision on the approvability of the Omnitrope NDA.

189.    The Defendants' failure to act on the Omnitrope 505(b)(2) NDA violates the APA, and must be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, in violation of the APA. 5 U.S.C. §§ 706(2)(A), (D).

## Count III
## Violation Of The APA
### -Unreasonable Delay In Defendants' Decision On Omnitrope In Violation Of The APA-

190.    Sandoz realleges and incorporates herein by reference Paragraphs 1 through 189 of this Complaint.

191.    5 U.S.C. § 555(b) mandates that agencies decide matters in a reasonable time, specifically providing, "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."

192.    Additionally, 5 U.S.C. § 706(1) grants a court the discretion to compel an agency to act when its delay (or inaction) is deemed unreasonable, providing, "The reviewing court shall--(1) compel agency action unlawfully withheld or unreasonably delayed….,"

193.    The Defendants have continued to delay action on Omnitrope, almost a year after FDA assigned itself an extended Action Date of August 31, 2004.

194.    The Defendants also allowed two subsequent Action Dates for Omnitrope to lapse without taking the statutorily-required action.

195.    On December 1, 2004, Sandoz filed its initial Resubmission And Renewed Request for Approval based upon FDA's August 31, 2004, letter, and the Action Date on that Resubmission expired on February 1, 2005.

196.    On March 22, 2005, Sandoz filed a Second Resubmission And Renewed Request for Approval based upon FDA's August 31, 2004, letter, and the Action Date on that Resubmission expired on May 22, 2005.

197.    The Defendants have not notified Sandoz or explained to Sandoz the reason for this extremely lengthy delay or the lapse of these subsequent Action Dates without action on Sandoz' pending NDA.

198.    The Defendants' unreasonable delay has singled out Sandoz and Omnitrope for inaction, despite the Agency's concurrent approval of a number of similarly-situated products, including biologic drugs under the 505(b)(2) drug-approval pathway, in violation of 5 U.S.C. § 555(b), and must be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, in violation of the APA. 5 U.S.C. §§ 706(2)(A), (D).

## Count IV
## Violation Of The APA
### -Arbitrary And Capricious Disparate Treatment Of Omnitrope In Violation Of The APA-

199.    Sandoz realleges and incorporates herein by reference Paragraphs 1 through 198 of this Complaint.

200.    The Omnitrope NDA has been treated disparately by the Defendants when compared to similarly-situated products, such as the recently approved recombinant calcitonin, hyaluronidase, glucagon, and menotropins 505(b)(2) NDAs.

201.    Omnitrope is a well-characterized complex molecule whose active moiety has been shown to be indistinguishable from a previously-approved rhGH, namely, the RLD Genotropin.

202.    In contrast, hyaluronidase, an uncharacterizable, more complex protein-based biologic drug, received approval under Section 505(b)(2) concurrent with FDA's failure to approve Omnitrope.

203.    As a 505(b)(2) NDA applicant seeking approval of a biologic drug, Sandoz is indistinguishable from the sponsors of the approved 505(b)(2) NDAs for recombinant calcitonin, hyaluronidase, glucagon, and menotropins.

204.    As a legal, regulatory, and scientific matter, the Omnitrope 505(b)(2) NDA is indistinguishable from the approved 505(b)(2) NDAs for recombinant calcitonin, hyaluronidase, glucagon, and menotropins.

205.    The Defendants have failed to apply the same standards that have been applied to similarly-situated 505(b)(2) NDA applicants and to similarly-situated biologic drug products to Omnitrope.

206.    The Defendants' disparate treatment of Sandoz and its Omnitrope 505(b)(2) NDA must be set aside under 5 U.S.C. § 706(2)(A) because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

**Count V**
**Violation Of The APA**
**-Unsupported Constructive Granting Of Pfizer Petition In Violation Of The APA-**

207.    Sandoz realleges and incorporates herein by reference Paragraphs 1 through 206 of this

Complaint.

208.    Pursuant to 21 C.F.R. § 10.3(2), FDA "shall furnish a response to each petitioner within

180 days of receipt of the petition.  The response will either (i) Approve the petition, in which

case the Commissioner shall concurrently take appropriate action (e.g., publication of a *Federal*

*Register* notice) implementing the approval; (ii) Deny the petition; or (iii) Provide a tentative

response."

209.    The only overt action the Defendants have taken is the issuance of a perfunctory form

letter interim response dated November 10, 2004, which provides no indication of when FDA

will resolve the PFIZER 2004 OMNITROPE PETITION.

210.    The PFIZER 2004 OMNITROPE PETITION asks FDA, *inter alia*, not to approve the

Omnitrope 505(b)(2) NDA.

211.    There is inadequate support in the PFIZER 2004 OMNITROPE PETITION and in the

Administrative Record of the Petition to permit the Defendants to affirmatively or constructively

grant Pfizer any of the relief Pfizer has requested.

212.    There is flawed evidence in the PFIZER 2004 OMNITROPE PETITION and in the

Administrative Record of the Petition that precludes the Defendants from affirmatively or

constructively granting Pfizer any of the relief Pfizer has requested.

213.    The Defendants have constructively granted the PFIZER 2004 OMNITROPE PETITION by

failing to approve the Omnitrope NDA as specifically requested by Pfizer despite the absence of

any statutory or other valid basis for refusing to approve the Omnitrope application.

214.    The Defendants' constructive granting of the PFIZER 2004 OMNITROPE PETITION is based upon flawed evidence in the record, lacks a reasonable basis in the record, and must be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, in violation of the APA.  5 U.S.C. §§ 706(2)(A), (D).

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Sandoz respectfully requests that this Court:

215.    Enter a declaratory judgment that the none of the seven conditions specified in Section 505(d) has been identified as applicable to Omnitrope or to the Omnitrope 505(b)(2) NDA No. 21-426;

216.    Enter an order setting aside and vacating FDA's August 31, 2004, letter to Sandoz regarding the Omnitrope 505(b)(2) NDA, or, alternatively, declaring FDA's August 31, 2004, letter to Sandoz to constitute a full and final approval letter under the FD&C Act;

217.    Enter an order permanently enjoining the Defendants from enforcing FDA's August 31, 2004, letter to Sandoz regarding its Omnitrope 505(b)(2) NDA, or, alternatively, directing the Defendants to enforce FDA's August 31, 2004, letter to Sandoz as a full and final approval letter under the FD&C Act;

218.    Enter a declaratory judgment that the Defendants have failed to act within the statutorily-prescribed time limits on Sandoz' Omnitrope 505(b)(2) NDA;

219.    Enter a declaratory judgment that the Defendants have failed to provide a prompt and timely response to Sandoz' Omnitrope 505(b)(2) NDA;

220.    Enter a declaratory judgment that the Defendants' continued failure to provide the statutorily required Action Letter in response to Sandoz' Omnitrope 505(b)(2) NDA constitutes agency action unlawfully withheld or unreasonably delayed;

221.    Enter a declaratory judgment that the Defendants' have engaged in the disparate treatment of Sandoz and Sandoz' Omnitrope 505(b)(2) NDA;

222.    Enter a declaratory judgment that the Defendants' constructive granting of the PFIZER 2004 OMNITROPE PETITION is based upon flawed evidence in the record and lacks a reasonable basis in the record;

223.    Enter an order setting aside and vacating the Defendants' constructive granting of the PFIZER 2004 OMNITROPE PETITION;

224.    Enter a declaratory judgment that the Section 505(b)(2) NDA pathway can be used for protein-based biologic drugs regulated under Section 505 of the FD&C Act;

225.    Enter an order compelling FDA to issue the statutorily-required Action Letter to Sandoz in response to Sandoz' Omnitrope 505(b)(2) NDA as mandated by the FD&C Act and PDUFA;

226.    Award plaintiff the costs of this action; and

227.    Grant plaintiff such other and further relief as the Court may deem just and proper.

Respectfully submitted,


_____/s/_____
JOHN M. ENGEL (D.C. Bar No. 443628)
Engel & Novitt, LLP
Market Square
Suite 620
801 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 207-3303 (tel)
(202) 207-3318 (fax)
jengel@engelnovitt.com (email)
September 13, 2005                    Attorneys for Plaintiff Sandoz Inc.