# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SANDOZ INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | Case No. 1:05CV01810 (RMU) |
| Health and Human Services, and | ) | |
| ANDREW C. VON ESCHENBACH, M.D., | ) | |
| Acting Commissioner, Food and Drug | ) | |
| Administration, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION OF SANDOZ INC.
FOR SUMMARY JUDGMENT ON ALL COUNTS IN ITS COMPLAINT
AND REQUEST FOR ORAL HEARING ON THE MOTION**

JOHN M. ENGEL (DCBN 443628)
Engel & Novitt, LLP
Market Square
Suite 620
801 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone: (202) 207-3303
Fax: (202) 207-3318
E-Mail: jengel@engelnovitt.com
Attorneys for Plaintiff Sandoz Inc.

Date:    January 17, 2006

# TABLE OF CONTENTS

Page

Table of Contents ................................................................................................i

Table of Authorities ...........................................................................................v

INTRODUCTION ..............................................................................................1

STATEMENT OF FACTS AND LAW ..............................................................3

I.      FDA Recommended And Then Accepted Sandoz' Omnitrope NDA
        For Filing Under Section 505(b)(2) Of The FD&C Act ..........................3

II.     Defendants Failed To Act By The Statutorily-Mandated Action Date
        And Continue To Refuse To Act ..............................................................4

        A.      Section 505(c) Of The FD&C Act Mandates
                A Defined Period For Action .........................................................4

        B.      PDUFA Statutory Performance Goals ...........................................5

        C.      FDA's August 31, 2004 Letter Does Not Constitute Agency Action
                Satisfying Either The FD&C Act 505(c) Deadline Or The PDUFA
                Performance Goals ........................................................................7

III.    This Is Not A Conventional Administrative Law Case; If Summary
        Judgment Is Not Granted, FDA Must Be Ordered To Produce The
        Supplemented Administrative Record And Provide Discovery To
        Shed Light On The Defendants' Unreasonable Delay And Failure To Act ........................8

        A.      The Omnitrope Review Was Completed Long Ago, And No Statutorily-
                Recognized Matters Prevent Action On The NDA As Required By Law ................8

        B.      If Summary Judgment Is Not Granted To Sandoz, FDA Must Be
                Compelled To Produce The Full Administrative Record, and Provide
                Discovery Relevant To Sandoz' Claims Of Failure To Act And
                Unreasonable Delay ......................................................................9

IV.     The Pfizer Citizen Petition Provides No Justification For FDA's
        Failure To Act On The Omnitrope NDA ................................................11

STATUTORY BACKGROUND ON SECTION 505(b)(2) ..............................13

STANDARDS AND FITNESS FOR REVIEW ................................................................15

I.     RIPENESS     ............     .............................................................................15

       A.  Defendants' Failure To Act Upon And Unreasonable Delay In
           Taking Final Action On The Omnitrope NDA Warrants Judicial Intervention ...................15

       B.  Defendants' Failure To Act Upon And Unreasonable Delay Of The Omnitrope
           Application Is Ripe For Review, And This Inaction Has Finality.........................................16

           1.  The Particular Issues Raised In This Case Are "Fit" For Judicial Review......................18

           2.  Sandoz Has Been And Continues To Be Harmed By FDA's Inaction............................18

II.    SUMMARY JUDGMENT STANDARD..............................................................................20

ARGUMENT     ............     .............................................................................21

I.     AS ALLEGED IN COUNT I, DEFENDANTS HAVE FAILED TO ACT
       BY THE 505(c) DEADLINE AND HAVE VIOLATED THE APA.........................................21

       A.  Sandoz' Omnitrope Application Requires Action Under The
           505(b)(2) NDA Review Pathway And The 505(c) Deadline
           For Such Applications     ..................................................................22

           1.  Defendants Have Failed to Make Any Decision Regarding
               The Sandoz NDA That Is Entitled To Deference By This Court ..............................23

           2.  Defendants Are Obligated To Act Within The Statutory
               505(c) Deadline     ...........................................................25

           3.  FDA's August 31, 2004 Letter Was An Abdication Of Its
               Statutory Obligations     ...................................................28

       B.  Although Statutorily Required To Do So, FDA's August 31, 2004, Letter
           Failed To List Any Reasons For Failing To Approve The Omnitrope NDA .......................28

       C.  The FD&C Act Requires Timely FDA Action On NDAs To Assist
           Waiting Patients And Facilitate Drug Research and Development ......................................29

II.    AS ALLEGED IN COUNT II, DEFENDANTS HAVE VIOLATED
       THE EXPRESS APA MANDATE THAT AN AGENCY ACT
       WHEN STATUTORILY REQUIRED TO DO SO...............................................................30

III.   AS ALLEGED IN COUNT III, DEFENDANTS HAVE VIOLATED
       THE APA MANDATE FOR ACTION WITHIN A REASONABLE

TIME PERIOD AND WITHOUT UNDUE DELAY ..........................................................31

    A.    The Length of the Delay ...........................................................33

    B.    Statutory Context     ...............................................................34

    C.    Consequences.     ...............................................................35

IV.    AS ALLEGED IN COUNT IV, DEFENDANTS HAVE INEXPLICABLY
AND ARBITRARILY AND CAPRICIOUSLY ENGAGED IN DISPARATE
TREATMENT OF SANDOZ AND ITS OMNITROPE 505(b)(2) NDA ...........................35

V.    AS ALLEGED IN COUNT V, DEFENDANTS HAVE CONSTRUCTIVELY
AND UNREASONABLY GRANTED PFIZER'S CITIZEN PETITION ON
THE BASIS OF FLAWED EVIDENCE IN THE RECORD ................................................42

CONCLUSION     ............     ..........................................................................45

EXHIBITS
Plaintiff's Exhibits 1-11

# **TABLE OF AUTHORITIES**

Page

*Federal Cases*

Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967) .................................................. 16-17

Abigail Alliance v. McClellan, No. 03-1601(RMU) (2004) .................................... 16-18

Action for Children's Television v. FCC, 59 F.3d 1249 (D.C. Cir. 1995) .................................. 17

Admiralty Fund v. Hugh Johnson & Co., 677 F.2d 1301(9th Cir. 1982) ...................................... 21

Airmark Corp. v. FAA, 758 F.2d 685 (D.C. Cir. 1985) ............................................. 35

Allergan, Inc. v. Shalala, No. 94-1223, 6 Food and Drug Rep. 389  (D.D.C. Nov. 10, 1994) ...... 39

American Petr. Inst. v. EPA, 216 F.3d 50 (D.C. Cir. 2000) ........................................... 29

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........................................... 20-21

ANR Pipeline Co. v. FERC, 71 F.3d 897 (D.C. Cir. 1995) ........................................... 41

Association of Am. Physicians & Surgeons ("AAPS") v. FDA,
226 F. Supp. 2d 204 (D.D.C. Oct. 17, 2002) .................................................. 24

Bracco Diagnostics, Inc. v. Shalala, 963 F. Supp. 20 (D.D.C. 1997) .................................. 39, 41

Branch v. Smith, 538 U.S. 254 (2003) .......................................................... 24-25

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...................................................... 20-21

Chadmoore Communications, Inc. v. FCC, 113 F.3d 235 (D.C. Cir. 1997) ........................... 39-40

Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., , 467 U. S. 837 (1984) ......... 24

Christensen v. Harris County, 120 S.Ct.1655 (2000) .................................................. 24

Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236 (4th Cir. 1989) ........................................ 36

Comsant Corp. v. FCC, 77 F.3d 1419 (D.C. Cir. 1996) .............................................. 17

Contractors Transport Corporation v. United States, 537 F.2d 1160 (4th Cir. 1976) ...................38

Dominion Resources, Inc. v. FERC, 286 F.3d 586 (D.C. Cir. 2002) ...........................................41

EDF v. EPA, 852 F.2d 1316 (D.C. Cir. 1988) ...............................................................................35

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000) ...........................................24

Forest Guardians v Bruce Babbit, 174 F.3d 1178 (10th Cir. 1998)..............................................28

Fresno Mobile Radio, Inc. v. FCC, 165 F.3d 965 (D.C. Cir. 1999) ............................................39

Frost v. Wenie, 157 U.S. 46 (1895) ...............................................................................................26

George E. Warren Corp. v. EPA, 159 F.3d 616 (D.C. Cir. 1998) .................................................17

Independent Petroleum Ass'n of Amer. v. Babbitt, 92 F.3d 1248 (D.C. Cir. 1996).....................39

In Re: American Rivers and Idaho Rivers United, 372 F.3d 413 (D.C. Cir. 2004)...........15, 32, 33

In re Barr Labs, 930 F.2d at 74-76................................................................................... 26-27

Marshall County Health Care Authority v. Shalala, 988 F.2d 1221 (D.C. Cir. 1993)...............36, 44

Mary Carter Paint Co. v. FTC, 333 F.2d 654 (5th Cir. 1964).......................................................38

MCI Telecomms. Corp. v. FCC, 627 F.2d 322 (D.C. Cir. 1980) ..................................................34

Midwest Gas Users Ass'n v. FCC, 833 F.2d 341 (D.C. Cir. 1987) ...............................................34

National Congress of Hispanic American Citizens v. Marshall, 626 F.2d 882 (D.C. Cir. 1979)..33

Natural Resources Defense Council, Inc. v. EPA, 22 F.3d 1125 (D.C. Cir. 1994) .......................18

New Orleans Channel 20, Inc. v. FCC, 830 F.2d 361 (D.C. Cir. 1987).......................................40

Norton v. Southern Utah Wilderness Alliance, 124 S.Ct. 2373  ...................................................30

Ohio Forestry Ass'n v Sierra Club, 523 U.S. 726 (1998)..............................................................17

Petroleum Communications, Inc. v. FCC, 22 F.3d 1164 (D.C. Cir. 1994)....................................40

Portland Audubon Soc'y v. Or. Lands Coalition, 1993 U.S. App. LEXIS 2051(9th Cir. 1993) ...24

Public Citizen Health Research Group v. Auchter, 702 F.2d 1150 (D.C. Cir. 1983)................ 32-33

Public Citizen Health Research Group v. Chao, 314 F.3d 143 (3d Cir. 2002)................................32

Public Citizen Health Research Group v. FDA, 740 F.2d 21 (D.C. Cir. 1984)........................ 32-34

Public Citizen v. Heckler, 602 F. Supp. 611(D.D.C. 1985) ............................................................35

R-C Motor Lines, Inc. v. United States, 350 F. Supp. 1169 (M.D. Fla. 1972)..............................38

Reliable Automatic Sprinkler Co. v Consumer Prod. Safety Comm'n,
324 F.3d 726 (D.C. Cir. 2002) ........................................................................................................18

Role Models Am., Inc. v White, 317 F.3d 327 (D.C. Cir. 2003)....................................................18

Sierra Club v. Thomas, 828 F.2d 783 (D.C. Cir. 1987) ..................................................................32

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983)....................44

Trac, 750 F.2d 70, 76-77, 79 (D.C. Cir. 1984) ........................................................................27, 32

Tummino v FDA (CV-05-366 (ERK) (VVP)) (E.D. N.Y. 2005)...................................................26

U.S. v. Borden Co., 308 U.S. 188 (1939) .......................................................................................26

U.S. Teleph. Ass'n v. FCC, 28 F.3d 1232 (D.C. Cir. 1994)....................................................... 39-40

United States v. Mead Corp., 533 U.S. 218 (2001) .......................................................................24

## Federal Statutes And Regulations

5 U.S.C. 551(13) .................................................................................................................... 30-31
5 U.S.C. 555(b) ...............................................................................................................................32
5 U.S.C. 555(e) ...............................................................................................................................30
5 U.S.C. 702 ....................................................................................................................................31
5 U.S.C. 704 ....................................................................................................................................31
5 U.S.C. 706 ....................................................................................................................................28
5 U.S.C. 706(1) .............................................................................................................. 15, 25, 31-32
5 U.S.C. 706(A)(2)..........................................................................................................................38
5 U.S.C. 706(2)(A)........................................................................................................................39, 44
5 U.S.C. 706(2)(D)..........................................................................................................................44

1. Federal Food, Drug, and Cosmetic Act (FD&C Act)
505(b) .....................................................................................................................13, 22, 30, 37
505(b)(1) ...................................................................................................................................13, 14

505(b)(1)(A)..................................................................................................13
505(b)(2) ...........................................................3,8,12,14-15,20, 22, 27, 35-39,41-42
505(b)(2)(A)..................................................................................................14
505(c), 21 U.S.C. 355(c) .................................................. 4-8, 15, 18, 21-26, 28, 30-32
505(c)(1), 21 U.S.C. 355(c)(1) ......................................................4-5, 18, 25, 29-30
505(d) .............................................................................................. 7, 28-29
505(j)..........................................................................................................13
735 ..............................................................................................................5
736..............................................................................................................5
903(b), 21 U.S.C. 393(b) ..............................................................................32

Title V of the Public Health Security and Bioterrorism  ........................................5
Preparedness and Response Act of 2002, P.L. 107-188

Section 502(1)..................................................................................................6
Section 502(4)..................................................................................................6

21 C.F.R. 10.30(e)(2)..................................................................................11, 12, 42
21 C.F.R. 10.35 ..............................................................................................11

## <u>PLAINTIFF SANDOZ INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS</u>

Plaintiff Sandoz Inc. ("Sandoz") submits this memorandum of points and authorities in support of its Motion For Summary Judgment On All Counts.  This case seeks judicial review under the Administrative Procedure Act ("APA") of the Food and Drug Administration's ("FDA's") failure to act in compliance with the Agency's non-discretionary, statutorily-imposed mandate to approve or disapprove Sandoz' new drug application ("NDA") for its recombinant human growth hormone drug product, Omnitrope.

Sandoz' Complaint alleges that Defendants' failure to act is not the result of statutorily-cognizable factors or even of valid medical or scientific or legal issues, but instead is the result of the Defendants' application of extra-statutory considerations beyond the statutory function Congress has delegated to the Agency.  Accordingly, this Court is respectfully requested to grant summary judgment to Sandoz, and to take a range of actions to resolve this failure to act, including entering an order compelling Defendants to issue the statutorily-required Action Letter that either approves the Omnitrope NDA, or denies approval based upon one or more of the statutorily-permissible grounds for denying approval.

Defendants have admitted that "there has been no decision" on the Omnitrope NDA, and furthermore deny that "the continuation of the review process" contravenes the law.  <u>See</u> Fed. Defs.' Answer To Comp. at ¶ 4 (hereinafter "Answer at ¶ –").  Moreover, there is not a scintilla of evidence in what Defendants have presented as their view of the Administrative Record in this case – as to which Sandoz' Motion To Compel has presented and preserved its sound objections – that supports Defendants' failure to act on the Omnitrope NDA.  For all of these reasons, the legal issues in this case are sharply defined, and the basis for this Court to grant summary judgment to Sandoz is clear.  Defendants' ongoing failure to act contravenes the Federal Food,

Drug, and Cosmetic Act ("FD&C Act"), the Prescription Drug User Fee Act ("PDUFA"), and the APA. Moreover, Defendants have no discretion under the FD&C Act, PDUFA, or the APA to choose to refuse to act, or to continue unreasonably delaying action indefinitely.

Defendants' failure to act through FDA is not without consequences. Because of this improper agency action, the statutory rights of Sandoz (as well of patients and payors who would benefit from the enhanced competition that Omnitrope could stimulate) are being violated on a continuing and ongoing basis. Millions of dollars in drug development costs invested in this particular NDA threaten to be lost to Sandoz. Defendants have improperly precluded Sandoz from recouping that investment by erecting an illicit and artificial barrier to entry that is thwarting marketing of a competing drug product. Defendants' continued unlawful obstruction of the marketing of Sandoz' product threatens to cause Sandoz irreparable economic and reputational harm– particularly now that nearly two years have passed since the original Action Date by which Sandoz either should have been allowed to market its drug, or have been apprised by FDA why its application was not approvable. Defendants' failure to act also injures patients and their doctors by denying them access to a new recombinant human growth hormone, while denying the American healthcare system access to a competitive product that could reduce costs.

For the reasons set forth herein, therefore, Sandoz respectfully requests that this Court find this indefinite and ongoing withholding of compulsory final action to be illegal, vacate FDA's non-action letter, and compel FDA to move forward, post haste, on a lawful basis to take a statutorily-permissible final action on the Omnitrope NDA.

## STATEMENT OF FACTS AND LAW[1]

I.    **FDA Recommended And Then Accepted Sandoz' Omnitrope NDA For Filing Under Section 505(b)(2) Of The FD&C Act**

On July 30, 2003, Sandoz submitted NDA No. 21-426 pursuant to Section 505(b)(2) of the FD&C Act, seeking approval of Omnitrope (somatropin [rDNA origin] for injection). This application was based upon (i) Sandoz' rigorous analytical program, preclinical testing, comparability testing, and clinical trials, (ii) comprehensive references from extensive published literature in the public domain, and (iii) FDA's prior determination of the safety and efficacy of the reference listed drug ("RLD") cited in the NDA, Genotropin (somatropin [rDNA origin] for injection). The application was submitted as a 505(b)(2) NDA at FDA's request based upon FDA's view, expressed at a pre-application meeting, that the 505(b)(2) pathway was necessary and most appropriate for approval: "Due to the difficulty of establishing pharmaceutical equivalence with the innovator product, we recommend submitting a 505(b)(2) application. … reinforced [by the fact] that, as clinical immunogenicity data were desired by the agency, therefore the submission needs to be a 505(b)(2)". Biochemie Minutes, November 30, 1998, Pre-IND Meeting, at 1; 2; AR at 002795-043000.[2]

---

[1]    In accordance with LCvR 7(h), Sandoz' Motion For Summary Judgment On All Counts is accompanied by the requisite Statement Of Material Facts Not in Dispute. Nonetheless, because of the crucial nature of the facts in this case, Sandoz has summarized the most salient facts here at some length, together with an overview of the key applicable law. The "Administrative Record" ("AR") references in the instant brief relate to the documents FDA has produced to Sandoz' counsel based upon what FDA considers the Administrative Record in this case, as to which Sandoz' disagreement is detailed in its pending Motion To Compel. Sandoz presents its case in the instant Motion based upon what is presently available from that record and relevant public sources. Because FDA has refused to produce the remainder of the APA-mandated complete Administrative Record, Sandoz cannot delineate the full effect of its non-production on the instant Motion beyond the issues raised in its pending Motion To Compel.

[2]    FDA agreed to produce to counsel for Sandoz, by December 19, 2005, some 90-plus as-yet unitemized volumes of Sandoz' confidential and trade secret Omnitrope NDA submissions under the parties' agreed-upon proposed Protective Order. See Joint Meet and Confer Agreement (Dec. 6, 2005). In various notifications, counsel for Defendants has notified counsel for Sandoz that this production has been delayed and that no definitive production timeline can be provided. Most recently, counsel for

On these bases, NDA 21-426 was submitted by Sandoz on July 30, 2003, and

subsequently accepted by the Agency for filing, seeking FDA approval of Omnitrope for:

(i) long-term treatment of pediatric patients who have growth failure due to an inadequate

secretion of endogenous growth hormone; and (ii) long-term replacement therapy in adults with

growth hormone deficiency of either childhood or adult-onset etiology (tentative approval,

protected under orphan drug exclusivity).  AR at 002795-043000.

II.     **Defendants Failed To Act By The Statutorily-Mandated Action Date And Continue
        To Refuse To Act**

        A.      <u>Section 505(c) Of The FD&C Act Mandates A Defined Period For Action</u>

Section 505(c)(1) of the FD&C Act imposes a nondiscretionary duty on FDA to act

"[w]ithin one hundred and eighty days" of the NDA submission date, "or such additional period

as may be agreed upon . . . ." (hereinafter referred to as the "505(c) deadline").  The action

required under that provision is either to approve the application (if none of the statutorily-

enumerated grounds for denying approval apply), or to deny approval and give the applicant an

opportunity for a hearing.  The only statutorily-authorized basis for adding *any* additional time to

the 180-day period arises when an additional period is "agreed upon by the Secretary and the

applicant."  21 U.S.C. § 355(c)(1).  The only such agreed-upon extension in this case arises from

the PDUFA performance goal arising from Sandoz' payment to FDA of a $533,400.00 user fee

for review of the Omnitrope NDA in accordance with PDUFA (discussed *infra*).  Because

---

Defendants indicated on January 13, 2006 that, "Personnel at FDA are currently involved in bate
stamping and marking as confidential all of the Omnitrope NDA."  As a result, counsel for Sandoz still
does not have these materials in possession for purposes of filing this motion pursuant to the parties'
agreed-upon schedule (although FDA has suggested their availability on-site at the agency).  Moreover,
until this Court enters the parties' proposed Protective Order currently before this Court, any such
materials cannot be filed under seal.  As an interim step, so that Sandoz can continue its demonstrated
good faith abidance by the parties' agreed-upon schedule, counsel for Sandoz took the initiative of
requesting the bates stamp range for these NDA submissions.  It is that AR range that is cited in the main
text above.  When FDA completes production of these materials, Sandoz intends to file relevant portions
as sealed exhibits to the instant motion, and will seek leave as appropriate from this Court to do so.

Sandoz has not agreed to extend the statutory review period beyond the PDUFA action date,[3] and in fact has objected to FDA's continuing failure to act, FDA is in clear violation of the statutory deadline codified in Section 505(c)(1) of the FD&C Act.

**B.     PDUFA Statutory Performance Goals**

In 1992, Congress established a user fee program to provide additional resources for the review and approval of NDAs.  The program, known as PDUFA, has its definitional and fee-collection provisions codified in Sections 735-736 of the FD&C Act.  PDUFA is unanimously considered a success story by industry, Congress, and FDA alike.  Indeed, a recent FDA White Paper reflects that PDUFA funds have allowed FDA to increase the number of full-time equivalent staff devoted to the NDA review process from 1,277 in 1992 to 2,503 in 2004.  Access to these additional resources has enabled FDA to "dramatically reduce the time to approval for new drugs and biologics and provide the American public with access to these medical treatments more quickly" in ways that diverge significantly from this case:

> "The [PDUFA] program is the cornerstone of modern FDA drug review.  User fees currently fund about half of new drug review costs.  By providing needed funds, ***PDUFA ended slow and unpredictable review and approval of new drug applications***, while keeping FDA's high standards."[4]

PDUFA was last reauthorized and amended in 2002, by Title V of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, P.L. 107-188 (the

---

[3]     Of course, under the plain terms of Section 505(c)(1) of the FD&C Act, NDA sponsors may *agree* to continuing review by FDA, and this no doubt explains why FDA review and PDUFA statistics include action dates beyond 180-days, or the 10-month PDUFA goal for standard NDAs.  However, the provision in the law for sponsors to voluntarily extend the 505(c) statutory review period does not condone FDA's unilateral deferral of action and delay as has occurred in this case.

[4]     FDA White Paper, "PDUFA – Adding Resources and Improving Performance in FDA Review of New Drug Applications," Nov. 22, 2005, pp. 1, 5 (emphasis added), available at http://www.fda.gov/cder/pdufa/whitePaper.pdf (last accessed Jan. 15, 2006).

"Bioterrorism Act").[5]  As with its initial establishment in 1992 and subsequent reauthorization in 1997, the 2002 reauthorization included key statutory requirements not codified in the FD&C Act, but which are critical to understanding the user fee system and the full array of legal requirements to which FDA is subject in completing and acting upon NDAs like that for Sandoz' Omnitrope.  Among these uncodified provisions is the Congressional finding that the "prompt approval of safe and effective new drugs and other therapies is critical to the improvement of the public health so that patients may enjoy the benefits provided by these therapies to treat and prevent illness and disease."  Bioterrorism Act, Section 502(1).

Most significant among the uncodified statutory requirements are the Congressionally-authorized performance goals and procedures ("Performance Goals").[6]  These Performance Goals include an objective of speeding up NDA review, even in circumstances where sponsors have agreed to extend the review period beyond the 180-days specified in 505(c), by having FDA "review and act on" 90 percent of standard NDA applications within 10 months of receipt.  See Performance Goal I.A.  Another key goal established by Congress was to assure that when FDA does act, the "action letter" is unambiguous, requiring FDA to issue either an "approval" of the NDA, or a non-approval.[7]  This latter requirement is critical to the instant case because it clarifies exactly what action Congress expects from FDA.  However, just as it fails to meet the statutorily-codified requirements, FDA's August 31, 2004, letter does not begin to fulfill this

---

[5]    See Bioterrorism Act (also known as the Prescription Drug User Fee Amendments of 2002), available at http://www.fda.gov/oc/pdufa/amendments.html (last accessed Jan. 15, 2006).

[6]    These are incorporated by reference in Section 502(4) of the Bioterrorism Act, in the form of a June 4, 2002, letter from the HHS Secretary to the Chairs of the House Energy and Commerce and Senate HELP Committees, available at http://www.fda.gov/oc/pdufa/transltr.html and http://www.fda.gov/oc/pdufa/PDUFAIIIGoals.html, respectively (last accessed Jan. 15, 2006).

[7]    See Performance Goal XIII.A.  See also Performance Goal XIV.A ("The action letter, if it is not an approval, will set forth in detail the specific deficiencies and, where appropriate, the actions necessary to place the application in condition for approval.").

requirement either.  It contains no approval, to be sure, but it also fails to specify a non-approval and does not delineate any deficiencies or actions necessary for Sandoz to secure NDA approval.

In the case of Omnitrope, the original PDUFA Action Data was May 31, 2004.  AR at 002795-043000.  The PDUFA-extended Action Date was August 31, 2004.  This extended timetable included a single, statutorily-authorized three-month extension agreed to by Sandoz (beyond the normal 10-month action date for review of a "standard" NDA such as the Omnitrope application).  Id.  In other words, under any statutory construction, applying the basic 505(c) deadline as modified by agreement, and because Sandoz has not agreed to any later time period, FDA was required to act by August 31, 2004.  That date encompasses the 180 days after the July 30, 2003 submission, plus the 218 additional days contemplated by the terms of PDUFA Performance Goals even as agreed to by Sandoz.  Yet, today (January 17, 2006), 504 days – nearly 1.5 years – *after* the PDUFA Action Date deadline, and 901 days following submission of the Omnitrope application, the Defendants still have yet to act.

### C.    FDA's August 31, 2004 Letter Does Not Constitute Agency Action Satisfying Either The FD&C Act 505(c) Deadline Or The PDUFA Performance Goals

The August 31, 2004, letter from FDA does not constitute a decision approving or disapproving the Omnitrope NDA, as FDA admits.  See Answer at ¶ 4.  If it were a statutorily-compliant Action Letter, it would have to either approve the application, or identify one or more of the seven statutorily-permissible grounds for denying approval as enumerated in Section 505(d) of the FD&C Act (see Argument Section I.B, *infra*).  Yet, Defendants refuse to take this nondiscretionary action, and instead they "deny that the continuation of the review process is in direct contravention" of the FD&C Act, PDUFA, and the APA.  Answer at ¶ 4.  Contrary to this FDA view, it takes *both* parties to agree to continue the review process under Section 505(c), and that has not occurred here beyond the deadline of the August 31, 2004 PDUFA Action Date.

**III.    This Is Not A Conventional Administrative Law Case; If Summary Judgment Is Not Granted, FDA Must Be Ordered To Produce The Supplemented Administrative Record And Provide Discovery To Shed Light On The Defendants' Unreasonable Delay And Failure To Act**

**A.    The Omnitrope Review Was Completed Long Ago, And No Statutorily-Recognized Matters Prevent Action On The NDA As Required By Law**

This is not a run-of-the-mill APA case of an administrative agency agonizing over some as-yet unresolved scientific or technical issue, which might or might not justify a court-imposed schedule for action.  In this case, there are **NO** outstanding requests for information from the applicant, and **NO** scientific or technical questions yet to be resolved.  AR at 002795-043000. Moreover, FDA asserts that neither the FD&C Act 505(c) deadline (within which "the Secretary shall either" approve or deny the application), nor PDUFA (which has a 10-month window for FDA decision on standard applications), nor the APA, constrains the Agency to act on this application – *ever* (Answer, ¶4).  Consistent with the canons of statutory construction, Sandoz is concerned that only Congress is authorized to redefine the meaning of the term "shall" in a federal statute, and that, in the absence of judicial intervention in this case, FDA will prevail in its view that the Agency has effectively unlimited discretion in deciding whether, when, or even if, to act on 505(b)(2) NDAs with 505(c) deadlines, for which PDUFA user fees have been paid.

Sandoz submitted the type of application requested by FDA (i.e., a 505(b)(2) NDA), containing all of the supporting data and analysis requested by FDA.  AR at 002795-043000. Long before the agreed August 31, 2004, Action Date, all requested data and analyses were provided by Sandoz,[8] AR at 002795-043000, yet action has yet to be taken.  How much of an

---

[8]    As set forth in the main text above, the Omnitrope application was submitted as a 505(b)(2) NDA at FDA's suggestion based upon FDA's recognition that the 505(b)(2) pathway was necessary and most appropriate for approval.  AR at 002795-043000.  In addition to following that pivotal request, Sandoz followed FDA's guidance that it "consider requesting non-AB rating upon resubmission."  FDA minutes, November 4, 2002, Pre-Submission Meeting, at 5, AR at 002795-043000.  Accordingly, as requested by

aberration is this failure to miss (much less by a wide and growing margin) the PDUFA and

FD&C deadlines?  When FDA last reported to Congress in June 2005 on all of the NDAs

submitted during FY2003, which presumptively would have included the Omnitrope NDA, all

but two (84 of 86) had been reviewed and acted upon within *10 months* – with those two outlier

cases not then being characterized by FDA as being overdue because of agreed-to three month

extensions.  If one accepts this report at face value, it does not even acknowledge the existence

of Sandoz NDA No.21-426.  Clearly, as of June 2005, there had been no approval of said NDA.

Moreover, by June 2005, the one agreed-to extension relating to that NDA had been expired for

over 10 months.  It is puzzling to Sandoz that not only have the Defendants failed to act upon its

NDA, but it appears that the Defendants have extinguished it from existence as well in their

statutorily-mandated report to Congress.  If FDA were to update that report to Congress today,

Sandoz wonders whether the Omnitrope NDA would appear this time.  Clearly if it did, it would

have to be reported as overdue, and not acted upon.[9]

### B. If Summary Judgment Is Not Granted To Sandoz, FDA Must Be Compelled To Produce The Full Administrative Record, and Provide Discovery Relevant To Sandoz' Claims Of Failure To Act And Unreasonable Delay

Sandoz believes that even the incomplete Administrative Record available to date in this

case establishes sufficient basis for the Court to find that FDA's indefinite and ongoing

withholding of final action is illegal, and to compel FDA to act by taking a statutorily-

---

FDA, Sandoz has requested non-AB-rating (i.e., not equivalent or interchangeable) for the Omnitrope product for which Sandoz is seeking U.S. marketing approval in its application.  AR at 002795-043000.

[9]    See FY 2004 Performance Report to Congress on PDUFA (posted June 29, 2005), available at http://www.fda.gov/ope/pdufa/report2004/default.htm (last accessed Jan. 14, 2006).  The Report on FY 2003 and 2004 PDUFA Goals embodied within the above-referenced FY 2004 Performance Report contains the statistics on FDA's timely review and action on 84 of 86 FY2003 standard applications as of September 30, 2004.  See text accompanying n.3, available at http://www.fda.gov/ope/pdufa/report2004/rpt0304goals1.html (last accessed Jan. 14, 2006).

permissible final action on the Omnitrope NDA. Prompt disposition of this Summary Judgment Motion also is appropriate in light of FDA's extraordinary failure to act, now about to pass 30 months (when the automatic statutory deadline, absent sponsor agreement, is six months). However, in the event the Court should decide not to proceed with immediately granting Summary Judgment to Sandoz, Sandoz believes the Court should hold all dispositive motions in abeyance. Most importantly, by filing this Summary Judgment Motion, Sandoz has no intention of waiving and does not waive its well-preserved objections to FDA's persistent failure to produce the complete Administrative Record, as well as Sandoz' sound claim (should it prove necessary and appropriate) to proceed with discovery.

As detailed in previous Motions that remain pending before this Court, the parties have irreconcilable differences about the proper scope of the requisite Administrative Record, as well as the scope of discovery that is appropriate in a case such as this one involving claims of failure to act, unreasonable delay, disparate treatment, and the abuse of the Federal user fee program. See, e.g., Joint Meet and Confer Agreement (Dec. 6, 2005) and Supplement (Dec. 19, 2005); Sandoz' Motion To Compel Production Of The Whole Administrative Record (Dec.16, 2005), and Sandoz' Unopposed Motion For An Expedited Status Conference (Jan. 3, 2006). Indeed, the instant Motion For Summary Judgment is filed without resolution of open issue regarding the Administrative Record and related discovery in order to maintain (and meet) the parties' agreed upon dispositive motion briefing schedule, which takes effect today. Sandoz is abiding by that agreed-upon schedule in good faith, cognizant of its outstanding Motions and of the most recent (and second) Reassignment of this case, which was placed on this Court's docket on January 13, 2006, in order to reinforce for this Court the urgency with which Sandoz views Defendants' regulatory inaction. In the event that this Court considers this Motion to be premature in light of

the other pending matters before it, Sandoz refers the Court to its Motion To Compel, which

provides further clarification on the underlying disagreements on discovery that have triggered

this Motion while preserving Sandoz' objections to FDA's Administrative Record.

**IV.  The Pfizer Citizen Petition Provides No Justification For FDA's Failure To Act On
The Omnitrope NDA**

Pfizer filed a Citizen Petition with FDA on May 13, 2004, which, like this lawsuit, asks

FDA to act on the Omnitrope NDA.  Specifically, Pfizer asked FDA to take a non-approval

action with respect to the Omnitrope NDA.  In this critical respect, the Pfizer petition effectively

supports Sandoz' prayer for relief in this matter, i.e., that FDA be compelled to take action

(albeit the parties have contrary views on the statutory action FDA should take based upon the

record before it).

It so happens that FDA has also failed to formally respond in a timely manner to the

Pfizer petition, although the Agency has constructively granted it.  The absence of a formal

response provides no basis upon which FDA can defend its inaction on Sandoz' NDA.  The

Agency's own regulations, 21 CFR § 10.30(e)(2), required FDA to respond within 180 days of

receipt of Pfizer's May 14, 2004 petition, <u>i.e.</u>, by November 10, 2004.  Regardless of the

underlying merits of Pfizer's petition, or whether FDA ever intends to respond to that petition, it

does not lawfully bear on FDA's statutorily-imposed duty to act upon the Omnitrope NDA.  As

FDA repeatedly has confirmed publicly, the simple fact of a filing of such Citizen Petitions

cannot be used to block Agency action on a pending application.  Indeed, the Agency's own

regulations make it clear that the filing of such petitions do not stay any pending FDA action,

including pending NDAs, particularly in the absence of a petition for administrative stay under,

21 CFR § 10.35, which Pfizer has not filed and thus is not pertinent to the Omnitrope NDA.  The

only provision upon which FDA can take action on the basis of a citizen petition is in the event a

petition is granted, in which case "the Commissioner shall concurrently take appropriate action. . . ." 21 C.F.R. § 10.30(e)(2). In this case, FDA effectively has granted Pfizer the relief it sought, i.e., inaction on the approval of the application – despite the absence of any valid outstanding scientific issue cited as a basis for non-approval of the NDA – which is the basis for Sandoz' claim that FDA has constructively granted Pfizer's Petition.

Although the substance of Pfizer's petition is not material to the Omnitrope NDA, and only relates to this Motion insofar as its improper constructive granting is at issue in Count V, it is important to note that it is facially and fundamentally flawed, since the entire rationale cited in opposition to the Omnitrope NDA was based upon a typographical error concerning the molecular weight of Omnitrope that was derived from a non-public draft document that somehow came into the possession of Pfizer. See AR at 001101-001121 (Pl. Ex. 1). In addition, many of Pfizer's assertions were, like the fanciful misstatement about the molecular weight, based upon conjecture, and none were scientifically substantiated since Pfizer does not have access to Omnitrope and thus cannot actually undertake any scientific studies of Omnitrope.

FDA has used the 505(b)(2) pathway now more than 100 times, including recently to approve several precedential 505(b)(2) NDAs for recombinant biologic drugs similarly-situated to Omnitrope. Regardless of whether and when FDA acts on Pfizer's petition, this Court must ignore its existence when determining the defendants' obligations to issue a decision on Sandoz' NDA within the statutory mandates. Count V of Sandoz' complaint illustrates the practical effects of both Pfizer's actions and the Defendants' failure to act – actions which raise the type of anticompetitive implications cautioned against by the Federal Trade Commission ("FTC").[10]

---

[10]     As noted by FTC staff in comments submitted to FDA on this very issue of Citizen Petitions:
• "there is a potential for anticompetitive abuse of FDA's citizen petition process."

## STATUTORY BACKGROUND ON SECTION 505(b)(2)

Section 505(b)(2) is a hybrid among the FD&C Act's drug approval provisions.  It expedites review of follow-on products that are similar in certain respects, but not necessarily identical to, reference products previously approved by FDA.  Section 505(b)(2) applies for those variations from approved drugs that do not qualify as a traditional "generic" drugs eligible for approval in an ANDA.[11]  Like the 505(b)(1) NDA, a 505(b)(2) application also requires the submission of "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use" pursuant to Section 505(b). 21 U.S.C. § 355(b)(1)(A).  The major difference between the 505(b)(1) NDA and  505(b)(2) NDA is that the 505(b)(1) NDA applicant has itself conducted or sponsored all of the studies and trials, while a Section 505(b)(2) NDA applicant also relies upon FDA's public and published finding of safety and efficacy basis upon the Agency's expert review of investigations leading to approval of the RLD cited in the 505(b)(2) NDA.[12]  Permitting reliance on FDA's public finding

---

- "[R]egulatory processes can provide an opportunity for anticompetitive abuses.  To delay competition may be a lucrative strategy for an incumbent, especially in an industry that is regulated, such as those regulated by the FDA . . . ."
- "There are exceptions to this [Noerr-Pennington] doctrine:  the Supreme Court has made clear that where one uses 'the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon,' the protection of the Noerr doctrine may not apply."

Comments of the Staff of the Bureau of Competition and of Policy Planning of the FTC at pp. 2, 4, 5 (footnotes omitted), submitted to FDA Docket No. 99N-2497 (Mar. 20, 2000), available at http://www.fda.gov/ohrms/dockets/dockets/04p0506/04p-0506-c000001-02-Tab-01-vol1.pdf (last accessed Jan. 14, 2006).

[11]     All NDAs under Section 505(b) of the FD&C Act require submission of evidence demonstrating safety and effectiveness.  Applications for traditional generic drugs, which are not the subject of this case, are submitted as abbreviated NDAs ("ANDAs") under Section 505(j).  The key difference between the ANDA and 505 (b)(2) approval routes is the degree to which the newly proposed drug differs from the reference listed drug. Where the ANDA requires proof of "sameness" (or an FDA-approved suitability petition for very limited types of differences), the 505 (b)(2) application may involve a product with more significant differences.

[12]     See 21 U.S.C. § 355(b)(2)(A) (Investigations relied upon "were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use").

of safety and efficacy based upon third-party data is consistent with the FD&C Act policy of avoiding unnecessary and unethical duplication of clinical trials, facilitating expedited review, and stimulating the market for competing medicinal products.  However the Section 505(b)(2) applicant must substantiate the "relevance and applicability" of the previous finding to its application and generally is required (as Sandoz was here) to supply clinical data addressing the differences ("the delta") between the new 505(b)(2) NDA drug and the previously-approved RLD.  Finally, Section 505(b)(2) is available to all small molecules, protein-based therapeutics, and biologics regulated under the FD&C Act and does not distinguish between chemical drugs and biologic drugs regulated under the FD&C Act.  See generally 21 U.S.C. § 355(b)(2).[13]

A 505(b)(2) NDA, like Sandoz' for Omnitrope, must include all pre-clinical and clinical data necessary to establish the safety and efficacy of the drug, notwithstanding the differences between it and the RLD.  In this regard, a 505 (b)(2) NDA is comparable to a 505(b)(1) NDA, in that both such applications must contain full reports of investigations of safety and efficacy. Unlike 505(b)(1) NDAs, though, 505(b)(2) NDAs may rely for some of that safety and efficacy data on studies "neither conducted by the applicant nor for which the applicant has obtained a right of reference."  For the past 20 years, FDA has consistently interpreted this statutory provision to mean that a 505(b)(2) NDA may rely not only on published studies or data otherwise in the public domain, but also on FDA's own prior finding of safety and effectiveness for a previously-approved RLD.  Thus, the areas of comparability, if any, sufficient to permit

---

[13]    "Biologic drug" is not a statutory or regulatory term of art.  Nonetheless, it is one that FDA itself coined almost twenty years ago, immediately prior to the codification of the Section 505(b)(2) NDA statutory provisions.  See Proposed New Drug, Antibiotic, and Biologic Drug Product Regulations, 48 Fed. Reg. 26720 (June 9, 1983).  See also New Drug, Antibiotic, and Biologic Drug Product Regulations, 52 Fed. Reg. 8802 (Mar. 19, 1987).  Biologic drug also is a term FDA has utilized in the context of FD&C Act regulatory actions.  See, e.g., FDA Warning Letter No. MIN 98-16 To Curative Health Services, Inc. From FDA Minneapolis District Office (Mar. 2, 1998) available at http://www.fda.gov/foi/warning_letters/d1554b.pdf (PDF file page 2 of 3) ("Your product, TIPR, is a biologic drug within the meaning of Section 201(g) of the Act") (emphasis added).

reliance on FDA's prior approval of (finding of safety and efficacy for) the RLD are identified, and, in those areas where sufficient comparability is lacking, the 505(b)(2) applicant submits its own analytical, pre-clinical, and/or clinical data necessary to demonstrate safety and efficacy.

## STANDARDS AND FITNESS FOR REVIEW

### I.    RIPENESS

#### C.    **<u>Defendants' Failure To Act Upon And Unreasonable Delay In Taking Final Action On The Omnitrope NDA Warrants Judicial Intervention</u>**

In refusing to act as required by the 505(c) deadline (<u>i.e.</u>, issuing an approval or non-approval decision), Defendants have rendered their inaction in this matter subject to judicial review.  The action that Sandoz is challenging is the Defendants' continued unreasonable delay and failure to act upon the Omnitrope NDA.  This extra-statutory action is both final and ripe for review, because Sandoz has no way to receive the statutorily-mandated action on its application while Defendants maintain their current posture.

As stated above, the APA defines "agency action" to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent denial thereof, or failure to act," which the APA grants courts the power to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. 706(1).  Thus, the APA authorizes courts to review agency decisions to refrain from taking action.  When administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief. <u>See</u> <u>In Re: American Rivers and Idaho Rivers United</u>, 372 F.3d 413, 420 (D.C. Cir. 2004).

In addition, the Defendants' inaction violates codified statutory mandates.  Congress has established that the period for final agency action on an NDA is 180 days (barring additional agreed-upon time, in this case totaling 13 months and ending on August 31, 2004).  Even under

PDUFA, the review here has been stretched, both unreasonably and improperly, with no basis in the record for any review period longer than the extended PDUFA action date of August 31, 2004. The FD&C Act provides the appropriate standard for judicial review of the Agency inaction at issue here. Consistent with the Act, FDA therefore must act in a "prompt" manner or be subject to judicial review. The agency's delay in acting on the Omnitrope NDA amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review.

**D. Defendants' Failure To Act Upon And Unreasonable Delay Of The Omnitrope Application Is Ripe For Review, And This Inaction Has Finality**

Defendants cannot credibly assert that this FDA inaction is not ripe for judicial review. As the Supreme Court has repeatedly explained, the "basic rationale" for the ripeness doctrine "is to prevent the courts from entangling themselves in abstract disagreements over administrative policies," and to protect "agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), rev'd on other grounds, Califano v. Sanders, 430 U.S. 99 (1977). The Court has instructed that the finality requirement be applied in a manner that is both "pragmatic" and "flexible," so that where "conformity to [agency regulations] causes injury cognizable by a court of equity, they are appropriately the subject of attack." Gardner, 387 U.S. at 149-50. Compare Abigail Alliance v. McClellan, No. 03-1601 (RMU), Slip Op. at 8 (D.D.C. Aug. 30, 2004). In this case, Sandoz' challenge to Defendants' unreasonable delay and inaction is ripe for review because the limbo into which Sandoz' NDA is cast having irreparable impacts on Sandoz' biopharmaceuticals business that it has felt concretely for 1.5 years (discussed *infra*), and that could continue endlessly if Defendants succeed in keeping the application in limbo.

For this very reason, there is a well-established body of law, founded on the text of the APA itself, that prolonged agency inaction constitutes final agency action, and an allegation that

final action has not yet taken place is not relevant to refuting a claim of unreasonable delay.  In both respects, the disagreement here is clear and concrete, not abstract, and is affecting Sandoz in the tangible manner contemplated by the Supreme Court as warranting a finding of ripeness. Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998) (quoting Gardner, 387 U.S. at 148-49 (1967), quoted in Abigail Alliance, Slip Op. at 6.

In Gardner the Court established a two-part test for assessing whether a particular controversy is "ripe":  first, whether the particular issues raised in the case are "fit" for judicial review; and second, "the hardship to the parties of withholding court consideration."  Id. at 136, 149.  Moreover, this Circuit recognizes that the reviewing court need not consider both of these factors in every case where a ripeness challenge is asserted.  Rather, "[u]nder the law of this circuit, once we have determined that an issue is clearly fit for review, there is no need to consider 'the hardship to the parties of withholding court consideration,' because there would be no advantage to be had from delaying review."  Action for Children's Television v. FCC, 59 F.3d 1249, 1258 (D.C. Cir. 1995); see also George E. Warren Corp. v. EPA, 159 F.3d 616, 621 (D.C. Cir. 1998), amended on other grounds, 164 F.3d 676 (D.C. Cir. 1999) ("'[w]here the first prong of the [Gardner] ripeness test is met'" then "'no purpose is served by proceeding to the second prong.'") (internal citation omitted); Comsant Corp. v. FCC, 77 F.3d 1419, 1422 (D.C. Cir. 1996) (same).  In any event, both prongs of the Abbott Labs test are easily satisfied.

Similarly, the finality aspects of the ripeness test are easily satisfied.  Since August 31, 2004, Sandoz has not agreed to any further prolongation of the review process, and has repeatedly requested action (through, *inter alia*, *two* NDA Resubmissions that FDA has never acknowledged).  AR at 002795-043000.  Because Sandoz' refusal to acquiesce to a prolongation of the review process occurred after the 180-day 505(c) deadline specified by Congress for FDA

to take its action, 21 U.S.C. § 355(c)(1), FDA's refusal to take action (either approving, or disapproving, the Omnitrope NDA), is appropriately final for purposes of judicial review, because it clearly "denies a right." <u>Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n</u>, 324 F.3d 726, 732 (D.C. Cir. 2002) (<u>citing</u> <u>Role Models Am., Inc. v. White</u>, 317 F.3d 327, 331-332 (D.C. Cir. 2003). <u>See also</u> <u>Abigail Alliance</u>, Slip Op. at 7. Here, the right denied is the right to a statutory-compelled action, making Defendants' failure to act ripe for review.

### 1. The Particular Issues Raised In This Case Are "Fit" For Judicial Review

The question as to whether an issue is "fit" for judicial resolution turns on whether it is "purely legal." <u>Natural Resources Defense Council, Inc. v. EPA</u>, 22 F.3d 1125, 1133 (D.C. Cir. 1994). As this memorandum makes clear, Sandoz is pursuing legal challenges to Agency inaction, <u>i.e.</u>, whether the inaction violates both the plain language and clear intent of the FD&C Act and the APA; and whether FDA adequately explained their rationale for failing to act upon the Omnitrope NDA. These are quintessential legal issues which this Court is fully capable of resolving and, indeed, they are the kinds of decisions that courts in this Circuit review routinely.

### 3. Sandoz Has Been And Continues To Be Harmed By FDA's Inaction

There is ongoing irreparable injury to Sandoz as a result of the reputational and economic damage flowing from the status of Omnitrope. As the first biopharmaceuticals product Sandoz would market in the U.S., Defendants' failure to act and constructive actions adverse to Sandoz are preventing the lawful launch of the Sandoz biopharmaceuticals business in the U.S.

The Defendants' failure to render a statutorily-compelled decision on Omnitrope based upon Sandoz' own proprietary data – which Sandoz generated and compiled on the basis of seven years of extensive consultations and detailed negotiations with FDA's expert scientific and medical staff , AR at  002795-043000 – deprives Sandoz of the opportunity either to market a

product that otherwise could be lawfully commercialized in the U.S., or to learn what reasons Defendants have for not approving the application. In either case, the Defendants continue to deprive Sandoz of the opportunity to begin recouping its substantial R&D investment in this product.

The need for judicial intervention on behalf of Sandoz is further evident from the irreparable harm that the Defendants would cause Sandoz if this application continues not to be acted upon as required by the statutory mandates governing FDA. Sandoz would lose all of its upfront investments, which to date were expected to have been part of a reasonable investment-based R&D enterprise prudently posited on FDA compliance with governing federal laws.[14]

In addition, the Defendants' failure to render the statutorily-mandated decision on Omnitrope following Sandoz' payment of a substantial, statutorily-imposed $533,400 user fee payment – upon receipt and processing of which FDA was statutorily-obligated to fulfill certain statutorily-mandated PDUFA obligations – deprives Sandoz of the value of that user fee payment. It also deprives Sandoz of the statutorily-conferred rights and benefits that Congress granted all 505(b)(2) NDA sponsors that have remitted a user fee payment to the Agency.

Furthermore, the Federal Defendants' failure to render the statutorily-mandated decision on Omnitrope places Sandoz at a competitive disadvantage vis-à-vis similarly-situated biopharmaceutical manufacturers and vis-à-vis therapeutic alternatives and other products that might compete against products in the rhGH segment that were previously approved by FDA,

---

[14]     These include but are not limited to scientific studies and investigations, and preparation of product for market introduction. In a situation where no credible reason for NDA non-approval exists, to allow the Defendants to sit back and thereby guarantee the loss of millions of dollars to a company that acted in good faith is unconscionable. The loss to Sandoz is already substantial; if the Defendants were never to act, Sandoz would forever lose its sunk costs as well as the benefits from commercially exploiting this growth hormone product. Moreover, there presently is no claim on which Sandoz could prevail against FDA that would compel the Agency to compensate Sandoz' for its substantial costs and investments.

and thereby causes competitive injury to Sandoz.  Sandoz also faces the threat of recurring

competitive and procedural harm.  The Defendants' actions here are likely to at least indirectly

impact versions of other recombinant proteins currently regulated under the FD&C Act as well

as the 505(b)(2) pathway.[15]  Therefore, FDA's failure to act has and will continue to have

tangible economic consequences for Sandoz, and thus warrants this Court's judicial intervention

to compel FDA to simply act and to do so in accordance with its statutory obligation.

## II.     SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the Court should grant summary

judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A genuine

issue of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Entry of summary judgment in favor of the moving party is appropriate when the non-moving

party has failed to produce evidence "sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden at trial."  Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986).

---

[15]     Specifically, FDA's actions could result in the effective institution of a new and uncodified
policy, reversing past Agency administrative precedents, that the longstanding 505(b)(2) NDA pathway
cannot be used prospectively for protein-based biologic drugs regulated under Section 505.  Thus,
Sandoz' ongoing substantial investments necessary to file other 505(b)(2) NDAs for other Section 505
biologic drugs – comparable to the investment Sandoz has made over the past seven years in support of
this application – could be futile and become valueless as a result of the Defendants' failure to render the
statutorily-compelled decision on Omnitrope for other than clearly-articulated, well-documented scientific
reasons, which do not, in fact, exist.  Sandoz would suffer irreparable harm as a result of the squandering
of its existing substantial investments, which would be lost and could not be redirected, as a result of the
Defendants' implicit adoption or application of such an invalid policy.

The moving party bears the initial burden of demonstrating that no genuine issue of material fact remains to be decided at trial. Celotex, 477 U.S. at 323. Once this burden has been met, the burden shifts to the non-moving party to demonstrate that, in fact, a genuine issue of material fact does exist. Id. at 324. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 248; Celotex, 477 U.S. at 323-24. A fact is not material unless it is identified by the controlling substantive law as an essential element that will affect the outcome of the suit. Id. See also Admiralty Fund v. Hugh Johnson & Co., 677 F.2d 1301, 1305-06 (9th Cir. 1982). An issue of material fact is not genuine if it is unsupported by the evidence, or if it is created by evidence that is "merely colorable" or "not significantly probative." Anderson, 477 U.S. at 250.

## ARGUMENT

## I. AS ALLEGED IN COUNT I, DEFENDANTS HAVE FAILED TO ACT BY THE 505(c) DEADLINE AND HAVE VIOLATED THE APA

The issue before the Court in Count I is a simple one. FDA is required by the FD&C Act to either approve an application, or disapprove an NDA and identify one or more of the statutory grounds for doing so, within 180 days or such additional time as may have been agreed by the applicant. In the instant case, this required FDA to take action as early as January 26, 2004 (180 days after the July 30, 2003 application date), but no later than August 31, 2004 (the agreed-upon action date under PDUFA). If either or both of these dates should have no meaning, as urged by FDA, it would defy federal statutes, undermine Congressional intent, and enable the Administration acting through agencies like FDA to have unfettered and essentially unreviewable discretion as to the nature and timing of required federal actions.

Because the Defendants' inaction is contrary to law, an abuse of discretion, and arbitrary and capricious, and has already caused Sandoz irreparable harm and threatens to continue to do so, entry of summary judgment in favor of Sandoz on Count I is the appropriate conclusion.

**D.  Sandoz' Omnitrope Application Requires Action Under The 505(b)(2) NDA Review Pathway And The 505(c) Deadline For Such Applications**

One of the central purposes of the modern FD&C Act is to provide pharmaceutical companies (including those seeking approval under Section 505(b)(2) as Sandoz has here) with a reliable and predictable mechanism to have their products approved or disapproved after undergoing a rigorous safety and efficacy review.  The drafters recognized the extraordinary financial investment made by companies in bringing a drug product to market, as well as the failure of the review process prior to the 505(b)(2) and generic drug provisions being added to the FD&C Act in 1984.  As is the case here, any unwarranted delay may result in losses of millions of dollars.

Congress accordingly balanced this considerable investment against the needs and interests of patients in securing access to safe and effective drug products without the necessity of redundant and potentially unethical research.  In doing so, Congress determined that the longstanding, statutory 505(c) deadline for NDA approval or disapproval is an appropriate period for FDA to render a decision on *any* Section 505(b) NDA for a drug product.  The Defendants, however, have taken the unprecedented step of vitiating that and other relevant statutory time limits by issuing a 'non-action" letter and thereby circumventing this statutory mandate.

Defendants have a legal responsibility to follow these statutory requirements.  Yet, FDA continues to prolong its inaction even though 901 days have now elapsed since the NDA was submitted on July 30, 2003, and 504 days have elapsed since the final PDUFA action date.  The only explanation given in its August 31, 2004 letter for its delay was that there continued to be

unresolved scientific and regulatory issues – *issues that were not disclosed in that letter, and have remained undisclosed to this day*.  What are the specifics of these unresolved issues?  What can Sandoz do to address them and secure approval?  What further scientific testing or analysis is required?  The Agency's non-action letter does not, as the law requires, spell out the answers to these questions.  Indeed, it effectively says they cannot, and will not, be answered except on FDA's own unstated timetable.  The Agency's unusual silence in managing the Omnitrope NDA review is without any statutory foundation, and, if left unredressed, threatens to undermine all notions of administrative regularity.

FDA does not have, and cannot be given without an express statutory enactment by Congress, the ability to choose not to act upon a NDA, thereby leaving its heavily-invested sponsor and the proposed drug product in perpetual limbo.  The agency's inaction is legally untenable in this respect for multiple reasons.[16]

### 1. Defendants Have Failed to Make Any Decision Regarding the Sandoz NDA That Is Entitled To Deference By This Court

The relevant statutory timetable provision is unambiguous.  FDA has a non-discretionary duty to approve an NDA like Sandoz' within the mandated 505(c) deadline unless FDA has statutorily-established reason(s) to deny it.  For the Agency to do nothing, and fail to fulfill this statutory mandate, is a clear and unambiguous violation of Sandoz' rights.  Only when FDA

---

[16]     Although statutorily required under the FD&C Act in order for it to be cognizable as a disapproval action, FDA's August 31, 2004, letter did not list a reason for not approving the Omnitrope NDA.  The FD&C Act requires FDA to act upon all NDAs within the 505(c) deadline (i.e., 180 days plus such time as mutually agreed, here August 31, 2004), so that a sponsor may either promptly market its medicine, or know what the deficiencies are so that the application may be perfected or allow scarce R&D resources to be redirected elsewhere.  The APA requires a government agency to act when statutorily required to do so, otherwise the Court may compel action in the face of inaction.  The APA commands action within a reasonable time period without undue delay.  The Agency has, by its failure to act on and unreasonable delay of the Omnitrope NDA, violated these plain provisions of the FD&C Act and APA.

takes a FD&C Act-compliant and PDUFA-compliant action would there be an agency action to which this Court can defer.

In this respect, Sandoz' Complaint presents substantive issues involving several types of statutory claims. Accordingly, this Court must analyze FDA's actions, and failure to act, under Chevron. Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). In construing the FD&C Act, "[u]nder Chevron, a reviewing court must first ask 'whether Congress has directly spoken to the precise question at issue.'. . . If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) (citations omitted). Only if the statute is ambiguous is there deference to an agency interpretation, and then only if it is "based on a permissible construction of the statute." Chevron, 467 U.S. at 843. See also Association of Am. Physicians & Surgeons v. FDA, 226 F.Supp. 2d 204 (D.D.C. Oct. 17, 2002). Moreover, regulations that are inconsistent with the provisions of the act they implement cannot stand. Chevron, 467 U.S. 837. See also Portland Audubon Soc'y v. Or. Lands Coalition, 1993 U.S. App. LEXIS 2051, *25 (9th Cir. 1993).[17]

An agency is not entitled to Chevron deference unless Congress has conferred, and the agency has actually exercised, authority to take actions that "carry the force of law." Christensen v. Harris County, 120 S.Ct.1655 (2000); Mead, 121 S.Ct. 2164 (2001). Thus, Chevron applies to

---

[17]    The Chevron approach to reviewing agency statutory interpretations bifurcates the judicial review. At the first stage of analysis, Chevron requires that the reviewing court examine whether the statute is ambiguous. The court, at the first step, investigates whether Congress "has directly spoken to the precise question at issue." If Congress has clearly done so, then the court "must give effect to the unambiguously expressed intent of Congress." Brown & Williamson, 529 U.S. at 132 (citations omitted). Only if the statute is ambiguous does the issue of the extent of any deference to agency interpretation arise, and then only if it is "based on a permissible construction of the statute." Chevron, 467 U.S. at 843. If, however, the statute at issue is either silent or ambiguous with respect to the specific question, a court is to move to Chevron's step two and apply traditional tools of statutory construction. "The second step of Chevron analysis and State Farm arbitrary and capricious review overlap, but are not identical." American Petr. Inst. v. EPA, 216 F.3d 50, 57 (D.C. Cir. 2000) (citations omitted).

agency interpretations that are expressed in legislative rules and formal adjudications. Congress has, in the FD&C Act, specifically delegated the responsibility to approve or disapprove NDAs. Section 505(c)(1) of the FD&C Act is clear when it states that "within one hundred and eighty days after the filing of an application under subsection (b)… the Secretary shall approve the application if he then finds that none of the grounds for denying approval specified in subsection (d)." FDA *must* therefore approve an NDA such as Sandoz' *unless* the Secretary finds one of the grounds for denial present.

### 2. Defendants Are Obligated To Act Within The Statutory 505(c) Deadline

Pursuant to Section 505(c) of the FD&C Act, 21 U.S.C. § 355(c), Defendants were required to reach a final decision within 180 days of the application (or as otherwise mutually agreed, in this case within 398 days, the PDUFA action date of August 31, 2004). The Agency likely will contend that (i) Sandoz' unreasonable delay claim under Section 706(1) of the APA must fail because there was no statutory deadline under which the FDA was compelled to act on the NDA or the Citizen's Petition, (ii) the PDUFA Performance Goals are themselves meaningless, and (iii) PDUFA moreover somehow implicitly overrides the FD&C Act's Section 505(c) deadline that Congress never amended during consideration or enactment of PDUFA. None of these contentions the Federal Defendants might advance are tenable.

PDUFA does not expressly repeal the mandatory language of Section 505(c) of the FD&C Act. Moreover, as previously noted, the purpose of PDUFA was to set up a fee schedule to provide FDA with additional resources to *expedite* the review of drug applications, *particularly* in those circumstances where sponsors have acquiesced to FDA taking specified additional time within the Performance Goals. The Supreme Court has made clear that repeals

by implication are not favored.[18]  Here, it is clear that Congress intended quite the opposite – to promote and expedite, not prolong, the drug review process.[19]  FDA has failed to meet its burden in explaining how either PDUFA is in irreconcilable conflict with or was intended as a substitute for Section 505(c) of the FD&C Act.  Therefore, FDA indeed is subject to the statutory deadlines and related requirements for action that Congress has established, and cannot be allowed to escape compliance with them.

The Agency's attempted reliance on In re Barr Labs, 930 F.2d at 74-76 (Fed. Defs'. Opp. To Mot. To Compel at 4), for the proposition that this Court "cannot act to assist one company in reordering the priorities of an administrative agency," is entirely misplaced.  In that case, the court held that "FDA's sluggish pace violated a statutory deadline," but refused to find for Barr because of the context surrounding this legislative duty based upon the six-factor test laid out in TRAC, 750 F.2d at 80, for the granting of injunctive relief.[20]

_____

[18]     "It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible.  The intention of the legislature to repeal 'must be clear and manifest.'  It is not sufficient as was said by Mr. Justice Story in Wood v. United States, 'to establish that subsequent laws cover some or even all of the cases provided for by (the prior act); for they may be merely affirmative, or cumulative, or auxiliary'.  There must be 'a positive repugnancy between the provisions of the new law and those of the old; and even then the old law is repealed by implication only, *pro tanto*, to the extent of the repugnancy'."  U.S. v. Borden Co., 308 U.S. 188, 198-99 (1939) (internal citations removed); see also Frost v. Wenie, 157 U.S. 46, 58 (1895) ("In other words, it must not be supposed that the legislature intended by a later statute to repeal a prior one on the same subject, unless the last statute is so broad in its terms, and so clear and explicit in its words, as to show that it was intended to cover the whole subject, and therefore to displace the prior statute."); Branch v. Smith, 538 U.S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute.").

[19]     Similarly, in an ongoing parallel case, Tummino v FDA (CV-05-366 (ERK) (VVP)) (E.D. N.Y. 2005), Chief Judge Korman found an identical FDA claim wholly unpersuasive, ruling that repeals by implication were not favored and FDA's position could not be rectified with the implied repeals standard.

[20]     The Barr Court explicitly relied on the fact that there was no evidence that FDA had improperly "singled … out [the plaintiff] for mistreatment," or that its treatment of the plaintiff was "egregious … [which] especially shabby treatment of one applicant would [indicate]."  Id. The Court further emphasized that this factor was relevant to the question of legitimacy of agency priorities:  "Where the agency has

It cannot be reasonably disputed that the instant case does not involve the adjudication of the equitable-factor test set forth in TRAC. Even if it did, Sandoz still prevails. The Court in applying those factors in Barr found that, because the approval process was under-funded, FDA lacked resources and could not be held to the legislated time-period. In construing Barr, it must be placed in historical context within an ANDA drug approval regulatory system at the time for which user fees *were not paid to FDA*. When Barr was decided in 1991, a court could reasonably find (as it did) that FDA might have lacked the requisite resources to timely act upon applications. That is no longer the case. Indeed, it is the very reason why Congress enacted PDUFA the following year.

In this case, which is so readily distinguishable from Barr, Sandoz already has paid a $533,400 user fee to alleviate, as intended by Congress, any question regarding Agency resource-allocation issues, and this case moreover involves a 505(b)(2) NDA and not an ANDA for a generic product. Notably, in Barr, during a time when the Agency claimed that it lacked resources, FDA stated that review time on *all* applications rested between 389 and 669 days. Barr, 930 F.2d at 74. In the instant case, Sandoz has now passed the 900-day mark, despite Sandoz having paid user fees in the amount of $533,400, as FDA has admitted. See Fed. Defs.' Answer at ¶ 96. In the absence of any resource constraints remotely akin to those in Barr, there continues to be no indication from FDA as to when the Agency will act, if ever. Finally, the court in Barr was quick to acknowledge the clear command of Section 706, that a reviewing court "shall compel agency action . . . unreasonably delayed". While the Barr court found such

---

manifested bad faith, as by singling someone out for bad treatment or asserting utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities. Accordingly, the absence of bad faith, as here, is relevant to the appropriateness of mandamus." Id. at 76. Sandoz' allegations that FDA has treated the Omnitrope NDA and Pfizer petition differently than it has other applications or petitions and delayed action on both of them for non-cognizable reasons clearly supports a finding of arbitrary mistreatment and an absence of good faith.

delay but elected not to compel FDA action in the specific circumstances of that case, once a court deems agency delay unreasonable, it must compel agency action. Forest Guardians v. Babbit, 174 F.3d 1178 (10th Cir. 1998) (applying Barr).

### 3. FDA's August 31, 2004 Letter Was An Abdication Of Its Statutory Obligations

As set forth above, FDA is statutorily obligated to have completed the review and approval process within 180 days, unless otherwise agreed. In this case, the PDUFA extended action date agreed-to by Sandoz was August 31, 2004. Yet, instead of providing the response required by Section 505(c) of the FD&C Act, consisting of either an approval or non-approval specifying the grounds for refusing to approve the application (as required by Section 505(d) of the FD&C Act), and instead of fulfilling the statutorily-required PDUFA Performance Goal XIII.A, which similarly requires FDA to either issue an approval or a non-approval letter detailing "the specific deficiencies and, where appropriate, the actions necessary to place the application in condition for approval," FDA issued its non-action letter. That *ultra vires* non-action letter specified *no* deficiencies and set forth *no* action by Sandoz that could cure the non-existent deficiencies. Such a non-action letter is facially inadequate to satisfy any of the applicable statutory requirements. It certainly provides an indefensible basis for FDA to defy Congress, indefinitely defer action on the Omnitrope NDA, and evade judicial review.

### E. Although Statutorily Required To Do So, FDA's August 31, 2004, Letter Failed To List Any Reasons For Failing To Approve The Omnitrope NDA

Section 505(c)(1) of the FD&C Act requires FDA to approve an NDA if FDA finds that none of the grounds for denying approval specified in subsection 505(d) apply. Therefore, FDA shall approve unless it finds one of seven enumerated grounds for denial:

> (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b) of this section, do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for

-28-

use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; or (5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof; or (6) the application failed to contain the patent information prescribed by subsection (b) of this section; or (7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular; he shall issue an order refusing to approve the application.

FDA's August 31, 2004, letter clearly states that the Agency has completed its review. The Agency found no grounds for denial, but rather simply alluded to amorphous, and entirely unspecified, scientific and regulatory "issues" seemingly unrelated to Omnitrope. AR at 000001-000004. Therefore, FDA was required to act upon the Omnitrope NDA and approve or disapprove it. Because FDA failed to do so, the Defendants clearly violated the FD&C Act. This Court cannot allow FDA to circumvent the basic statutory requirement of "acting" on a NDA. Given the open and notorious nature of the Agency's nonfeasance, and the delay that is beyond the scope of any statutorily-envisioned flexibility under either the FD&C Act or PDUFA, the only appropriate remedy is to preliminarily enjoin the agency to act on the Omnitrope application. The basic provisions of the FD&C Act as well as the APA compel this result.

F. **The FD&C Act Requires Timely FDA Action On NDAs To Assist Waiting Patients And Facilitate Drug Research and Development**

Section 505(c)(1) of the FD&C Act states that within one hundred and eighty days after the filing of an application under subsection (b), or such additional period as agreed-to by the NDA sponsor, FDA must act. This 505(c) deadline was arrived at by Congress after it weighed

patients' need for prompt medical care, the financial investment of sponsors, and the ultimate goal of patient access to safe and effective medicine. After much consideration and debate, Congress determined that this timeframe struck the proper equitable balance.

In this case, the Agency conduct or lack thereof is tantamount to voiding this plain Congressional mandate. Although directed by Congress to act on all NDAs within the 505(c) deadline, FDA has without explanation decided that the Omnitrope NDA is not subject to any statutory timetable for decision. However, FDA fails to recognize that this timeframe was not a permissive statement, but rather a statutory directive requiring Agency action within the given timeframe. Therefore, enjoining the Defendants from continuing to avoid this Congressional dictate is the necessary and appropriate relief. Accordingly, for all of the foregoing reasons, summary judgment on Count I should be entered in Sandoz' favor.

## III.   AS ALLEGED IN COUNT II, DEFENDANTS HAVE VIOLATED THE EXPRESS APA MANDATE THAT AN AGENCY ACT WHEN STATUTORILY REQUIRED TO DO SO

The Defendants have failed to act in accordance with the requirements of the APA. 5 U.S.C. 551(13) defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*" (emphasis added). 5 U.S.C. 555(e) requires an agency to give "[p]rompt notice of the denial of a written application, petition, or other request made in connection with any agency proceeding. The notice shall be accompanied by a brief statement of the grounds for denial." Thus, the APA imposes on the Defendants a separate but equally clear, nondiscretionary duty to take prompt action on Sandoz' NDA and, in the event of disapproval, to provide the grounds for such denial.

The Supreme Court in <u>Norton v. Southern Utah Wilderness Alliance</u>, 124 S.Ct. 2373 (YR), spoke directly to this very issue. It considered the extent to which private parties can sue

federal agencies to "compel agency action unlawfully withheld or unreasonably delayed." <u>Id.</u> at

2378 (<u>quoting</u> 5 U.S.C. § 706(1)).  Focusing on the scope of the APA generally, Justice Scalia

underscored that the APA permits suits by persons "suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute."  <u>Id.</u> (<u>quoting</u> 5 U.S.C. § 702).  In this context, the Court considered what "agency

action" is for APA purposes pursuant to 5 U.S.C. § 551(13).  Justice Scalia parsed specific

language of the APA, including the definition of the term "agency action" and concluded,

"Sections 702, 704, and 706(1) all insist upon 'agency action,' either as the action to be

complained of (in Sections 702 and 704) or as the action to be compelled (in Section 706(1))."

<u>Id</u>.  The Court concluded that, under the APA, "the only agency action that can be compelled . . .

is action legally required" (emphasis in original).  <u>Id.</u> at 2379.  That is precisely the type of

agency action at issue in this case involving FDA's inaction on Sandoz' NDA given the FD&C

Act provisions requiring the Defendants to act upon every NDA within the 505(c) deadline.

The APA authorizes a reviewing court, faced with such government intransigence, to

"compel agency action unlawfully withheld."  Never has this statement necessitated more

appropriate application than in this case.  Without reason and in the face of a glaring legal

obligation, FDA has chosen to unlawfully withhold action.  The Court has therefore a duty to

compel FDA to act, and thus should enter summary judgment on Count II in Sandoz' favor.

## III.    AS ALLEGED IN COUNT III, DEFENDANTS HAVE VIOLATED THE APA MANDATE FOR ACTION WITHIN A REASONABLE TIME PERIOD AND WITHOUT UNDUE DELAY

In addition to breaching its organic statutory obligations, FDA has "unreasonably

delayed" its decision on the Omnitrope NDA in violation of the APA.  5 U.S.C. § 555(b)

mandates that agencies decide matters in a reasonable time, providing, "With due regard for the

convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."  Additionally, 5 U.S.C. § 706(1) grants a reviewing court discretion to compel agency action when its delay (or inaction) is unreasonable, providing, "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall--(1) compel agency action unlawfully withheld or unreasonably delayed…."

    In this case, judicial relief is urgently warranted to redress the continuing unreasonable delay in the taking of the statutorily-compelled final action on the Omnitrope NDA.  FDA is in continuing violation of multiple statutory directives meant to preclude such delay, including (1) the statutory period for approval set forth in Section 505(c) of the FD&C Act; (2) the statutorily-established PDUFA Performance Goals (for which Sandoz has received unfair value for its $533,400 user fee); and (3) the directive added by Congress in 1997 establishing as the first stated Mission for FDA that it "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner," FD&C Section 903(b), 21 U.S.C. § 393(b).  Under such circumstances, the courts are clearly authorized to compel the agency to act.[21]

---

[21]    See In re American Rivers & Idaho Rivers United, 372 F.3d 413, 420 (D.C. Cir. 2004); Cutler v. Hayes, 818 F.2d at 894-99; TRAC, 750 F.2d 70, 76-77, 79 (D.C. Cir. 1984); Public Citizen Health Research Group v. FDA, 740 F.2d 21, 32, 33 (D.C. Cir. 1984); Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1153-54 (D.C. Cir. 1983); see also Public Citizen Health Research Group v. Chao, 314 F.3d 143 (3d Cir. 2002).  These precedents applied the unambiguous language of the APA, 5 U.S.C. §§ 555(b) & 706(1).  In that same vein, the D.C. Circuit Court of Appeals has held that an unjustified agency delay is "an outright violation of 5 U.S.C. § 555(b)'s mandate that agencies decide matters in a reasonable time . . . ."  TRAC, 750 F.2d at 79.  Moreover, Congress, in 5 U.S.C. § 706(1), has specifically "instructed statutory review courts to compel agency action that has been unreasonably delayed."  Id.  See generally Sierra Club v. Thomas, 828 F.2d 783, 792-96 (D.C. Cir. 1987).

This Circuit has identified three guidelines to determine whether an agency has engaged in unreasonable delay. First, the court should "ascertain the length of the time that has elapsed since the agency came under a duty to act and should evaluate any prospect of an early completion." Cutler, 818 F.2d at 897; see also Public Citizen, 740 F.2d at 32 ("There must be a 'rule of reason' to govern the time limit to administrative proceedings") (citation omitted). Second, "[t]he reasonableness of the delay must be judged 'in the context of the statute' which authorizes the agency's action." Cutler, 818 F.2d at 897 (quoting Auchter, 702 F.2d at 1158 n.30; National Congress of Hispanic American Citizens v. Marshall, 626 F.2d 882, 888 (D.C. Cir. 1979)). As part of this inquiry, a court "must also examine the extent to which the delay may be undermining the statutory scheme . . . by frustrating the statutory goal . . . ." Id. at 897-98. Here, where the "agency is charged with the administration of a statutory scheme whose paramount concern is protection of the public health, the pace of agency decisionmaking must account for this statutory concern." Public Citizen, 740 F.2d at 34. Third, "and perhaps most critically, the court must examine the consequences of the agency's delay." Cutler, 818 F.2d at 898. "The deference traditionally accorded an agency to develop its own schedule is sharply reduced when injury likely will result from avoidable delay." Id. Accordingly, "[d]elays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." Id. (quoting Auchter, 702 F.2d at 1157).

## A.    The Length of the Delay

At the time of the filing of the instant motion, the Defendants' period of review and inaction will have eclipsed 901 days, which is more than twice the length of the review process statutorily established by Congress, even given the extended review period to August 31, 2004, agreed to by Sandoz. By any standard, the length of this delay is unreasonable. Moreover, *there*

*is no end in sight*.  Aside from the untenability and illegality of the delay that already has occurred, FDA has yet to contact Sandoz to even disclose a timetable for action.  Indeed, in advance of the filing of this motion, FDA has repeatedly notified Sandoz (both directly and through counsel) that it is not in a position to provide such a timetable.[22]

 **B.**  **Statutory Context**

 It is not necessarily unusual for administrative agencies to miss statutory timelines for action.  What is most unusual here, however, is that no outstanding scientific issues have been identified, no remotely legal basis for delay has even been attempted by the Defendants.  At a time of rising health care costs and federal budget deficits, it is inconceivable that a federal agency such as HHS, with various healthcare agency components (some of which are directly involved in reimbursing for medicines such as human growth hormone), would be a party to delaying entry of a competitive medicine, yet that is precisely what is happening here.  The burden clearly rests on Defendants to justify that there is some as-yet unrevealed statutory basis for Defendants' failure to act.  "When the public health may be at stake, the agency must move expeditiously to consider and resolve the issue before it."  Public Citizen, 740 F.2d at 34.  In this case, the Defendants have not moved expeditiously nor with energy and perseverance.  In fact, FDA has been precluded from moving at all.

---

[22] It would be manifestly unfair, and contrary to all concepts of administrative due process, for this to be allowed to continue.  See Midwest Gas Users Ass'n v. FCC, 833 F.2d 341 (D.C. Cir. 1987) (citing MCI Telecomms. Corp. v. FCC, 627 F.2d 322, 340 (D.C. Cir. 1980)) ("Although the issue of whether delay is unreasonable necessarily turns on the facts of each particular case, the Court has stated generally that a reasonable time for an agency decision should encompass 'months, occasionally a year or two, but not several years or a decade.'").

C.     **Consequences**

The consequences of the Defendants' delay are clear. Patients, healthcare providers, and payors will not have access to a safe and effective competitive medication, and Sandoz will unlawfully continue to lose millions of dollars as this open-ended delay stretches on. Thus, the Defendants' inaction fails all three guidelines for assessing unreasonable delay. Ample precedent gives this Court the authority to grant the relief requested. If the Court should see fit to put FDA on an expedited schedule for action, there is ample precedent for that as well (and, in this case, there is nothing in the record providing justification for any further delay).[23]

Accordingly, this Court should enter summary judgment on Count III in Sandoz' favor.

**IV.    AS ALLEGED IN COUNT IV, DEFENDANTS HAVE INEXPLICABLY AND ARBITRARILY AND CAPRICIOUSLY ENGAGED IN DISPARATE TREATMENT OF SANDOZ AND ITS OMNITROPE 505(b)(2) NDA**

An agency's unjustifiably disparate treatment of similarly-situated parties violates the arbitrary-and-capricious standard. See, e.g., Airmark Corp. v. FAA, 758 F.2d 685, 691-95 (D.C. Cir. 1985). In Count IV, Sandoz challenges FDA's disparate treatment of the Omnitrope NDA as a substantive and procedural matter when compared to similarly-situated 505(b)(2) NDAs for similarly-situated products, such as the recently-approved 505(b)(2) NDAs for recombinant hyaluronidase, calcitonin, and glucagon, as well as other approved 505(b)(2) NDAs for naturally-sourced products such as hyaluronidase and menotropins, and other biologic drugs. See supra note 13.

---

[23]     See, e.g., In re American Rivers, 372 F.3d at 420 (ordering FERC to respond to petition within 45 days); EDF v. EPA, 852 F.2d 1316 (D.C. Cir. 1988) (ordering EPA to issue proposed rules within 33 days and final rule three months later); Public Citizen v. Heckler, 602 F. Supp. 611, 614 (D.D.C. 1985) (directing agency to publish a proposed rule reflecting its decision on petition concerning pasteurization of raw milk within 60 days); see also TRAC, 750 F.2d at 81 (retaining jurisdiction, ordering agency to inform court of its timetable within 30 days, and requiring progress reports every 60 days thereafter).

Like those other approved biologic drugs, id., Omnitrope is a well-characterized specified biologic molecule, the active moiety of which has been shown to be indistinguishable from a previously-approved rhGH, namely, the RLD Genotropin.  See AR at 002795-043000.  Biologic drugs in a wide range of complexity – including several having much greater degrees of complexity than Omnitrope – nonetheless have been approved by the Agency.[24]  At one end of the spectrum are the recombinant biologic drug 505(b)(2) approvals for recombinant glucagon, recombinant calcitonin (Fortical), and similar products, which only differ from Omnitrope because they have fewer amino acids or amino acid residues in their sequence.  Glucagon has 29 amino acids,[25] and Fortical has 31 amino acids.[26]

At the other end of the spectrum are the hyaluronidase products – one of which (Hylenex) is an extraordinarily complex recombinant product that is well over double the size of Omnitrope having 447 amino acids as well as being glycosylated, which FDA has seen its way clear to

---

[24]     These facts are confirmed by uncontroverted documents that have been issued by FDA and introduced into the public realm.  Because these are "matters of public record," this Court can take judicial notice of them in accordance with Fed. R. Evid. 201(b)(2).  Marshall County Health Care Authority v. Shalala, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993) (discussing examination of Federal Register statements in evaluating a 12(b)(6) motion) (citation omitted)).  See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) ("Pursuant to Fed. R. Evid. 201(b)(2), '[a] judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'").

[25]     GlucaGen [glucagon (rDNA origin) for injection] "is produced by expression of recombinant DNA in a saccharomyces cerevisiae vector with subsequent purification.  The chemical structure of the glucagons in GlucaGen… is a single-chain polypeptide containing 29 amino acid residues."  See Physician Package Insert For GlucaGen [glucagon (rDNA origin) for injection] at 1, available at http://www.fda.gov/cder/foi/label/1998/20918lbl.pdf (PDF page 1 of 6) (Pl.'s Ex. 2).

[26]     "The active ingredient in FORTICAL® calcitonin-salmon (rDNA origin) Nasal Spray is a polypeptide of 32 amino acids manufactured by recombinant DNA technology…."  See Physician Package Insert For Fortical calcitonin-salmon (rDNA origin) Nasal Spray at 1, available at http://www.fda.gov/cder/foi/label/2005/021406lbl.pdf (PDF page 1 of 12) (Pl.'s Ex. 3).

approve during the pendency of this lawsuit.[27]  Under Section 505(b), FDA has even approved

an even larger biologic drug product (imiglucerase) of 497 amino acids.[28]  In addition to the

Hylenex recombinant version of hyaluronidase, FDA has approved three (3) other naturally-

sourced biologic drug versions of hyaluronidase – one shortly before and one shortly after FDA's

inaction in Omnitrope, and one during the pendency of this case – and yet all of these products

are uncharacterized, naturally sourced from different animal species (ovine and bovine), more

complex protein-based biologic drugs, and each of them has an even a larger number of amino

acids than the recombinant hyaluronidase product.[29]  Similarly, FDA has approved two 505(b)(2)

NDAs for naturally-sourced menotropin products that also are uncharacterized and comparably

as complex as the naturally-derived hyaluronidase products.[30]

---

[27]      "HYLENEX recombinant is produced by genetically engineered Chinese Hamster Ovary (CHO) cells containing a DNA plasmid encoding for a soluble fragment of human hyaluronidase (PH20). The purified hyaluronidase glycoprotein contains 447 amino acids…."  See Physician Package Insert For Hylenex Recombinant (hyaluronidase human injection) available at http://www.fda.gov/cder/foi/label/2005/021859lbl.pdf (PDF page 1 of 9) (Pl.'s Ex. 4).

[28]      See Physician Package Insert For CEREZYME® (imiglucerase for injection) (Cerezyme® "produced by recombinant DNA technology"; it "is a monomeric glycoprotein of 497 amino acids, containing 4 N-linked glycosylation sites") available at http://www.fda.gov/cder/foi/label/2005/20367s066lbl.pdf (PDF file page 1 of 6) (Pl.'s Ex. 5).

[29]      See Physician Package Insert For Vitrase (hyaluronidase for injection) Lyophilized, Ovine, available at http://www.fda.gov/cder/foi/label/2004/21640_vitrase_lbl.pdf ("Vitrase is a preparation of purified ovine testicular hyaluronidase, a protein enzyme. The exact chemical structure of this enzyme is unknown.") (PDF file page 1 of 6) (Pl.'s Ex. 6); Physician Package Insert For Hydase™ (hyaluronidase injection) available at http://www.fda.gov/cder/foi/label/2005/021716lbl.pdf ("Hydase™ is a preparation of purified bovine testicular hyaluronidase, a protein enzyme. The exact chemical structure of this enzyme is unknown.") (PDF file page 1 of 5) (Pl.'s Ex. 7); Physician Package Insert For Amphadase™ (hyaluronidase injection, USP) available at http://www.fda.gov/cder/foi/label/2004/21665lbl.pdf ("Amphadase is a preparation of purified bovine testicular hyaluronidase, a protein enzyme. The exact chemical structure of this enzyme is unknown.") (PDF file page 1 of 5) (Pl.'s Ex. 8).

[30]      See Physician Package Insert For Repronex® (menotropins for injection, USP) http://www.fda.gov/cder/foi/label/1999/21047lbl.pdf ("a purified preparation of gonadotropins extracted from the urine of postmenopausal women") (PDF file page 1 of 5) (Pl.'s Ex. 9); Physician Package Insert For Menopur® (menotropins for injection, USP) For Subcutaneous Injection, available at http://www.fda.gov/cder/foi/label/2004/21663lbl.pdf (generally the same for Menopur®) (PDF file page 1 of 5) (Pl.'s Ex. 11).

As a 505(b)(2) NDA applicant seeking approval of a biologic drug, Sandoz and its

Omnitrope 505(b)(2) NDA are indistinguishable as a legal, regulatory, and scientific matter from

the sponsors of, and the approved 505(b)(2) NDAs for, these other biologic drugs.  Yet, the

Agency has failed to apply to Omnitrope the same standards that have been applied to these

similarly-situated 505(b)(2) biologic drug applications.  Moreover, Sandoz is not aware of any

biologic drug 505(b)(2) application as to which FDA has failed to act within the statutory

timetables, and FDA has not identified one.

Defendants' failure to act on the Omnitrope 505(b)(2) NDA stands in stark contrast to,

and is inconsistent with, FDA's approval of these similarly-situated biologic drugs and 505(b)(2)

NDAs and thus constitutes arbitrary and capricious action.  Any suggestion by FDA that there is

no link between Omnitrope and these products (i.e., that they are not similarly-situated) is belied

by FDA's own hand-picked Administrative Record, which, like the recently-supplemented

public record, see infra note 30 and accompanying text, links these seemingly-distinct products

throughout.  See AR at 001617-002794.

The APA requires that agency actions must be set aside if they are "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(A)(2).

"Patently inconsistent application of agency standards to similar situations lacks rationality and

is arbitrary."  Contractors Transport Corp. v. United States, 537 F.2d 1160, 1162 (4th Cir. 1976)

(citing R-C Motor Lines, Inc. v. United States, 350 F. Supp. 1169, 1172 (M.D. Fla. 1972), aff'd

mem. 411 U.S. 941, (1973).[31]

---

[31]    Mary Carter Paint Co. v. FTC, 333 F.2d 654, 660 (5th Cir. 1964) (Brown, J., concurring), rev'd on other grounds, 382 U.S. 46, (1965).  "Thus, the grounds for an agency's disparate treatment of similarly situated applicants must be reasonably discernible from its report and order."  Contractors Transport, 537 F.2d at 1162 (citations omitted) (holding the decision at issue "does not meet these requirements" because, "[u]nder substantially similar circumstances, [two applicants] received markedly

Accordingly, FDA must apply the same standards to similarly-situated products.  See 5 U.S.C. § 706(2)(A); Bracco Diagnostics, Inc. v. Shalala, 963 F. Supp. 20 (D.D.C. 1997).  As Judge Friedman held in the seminal Bracco case, "The disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious."  Bracco, 963 F. Supp. at 28 (citing Independent Petroleum Ass'n of Amer. v. Babbitt, 92 F.3d 1248, 1260 (D.C. Cir. 1996)).  See also Fresno Mobile Radio, Inc. v. FCC, 165 F.3d 965, 968-70 (D.C. Cir. 1999) (Commission failed to adequately explain its disparate treatment of incumbent and new licensees); Allergan, Inc. v. Shalala, No. 94-1223, 6 Food and Drug Rep. 389, 391 (D.D.C. Nov. 10, 1994) ("If an agency treats similarly situated parties differently, its action is arbitrary and capricious"); U.S. Teleph. Ass'n v. FCC, 28 F.3d 1232, 1235 (D.C. Cir. 1994).  In accordance with these established APA principles, FDA should have permitted the 505(b)(2) approval analysis that FDA has applied to previously-approved biologic drug products to the similarly-situated product at issue here, Omnitrope.  Because FDA has failed to do so, their unreasonable delay, inactions, and constructive actions adverse to Sandoz should be held to be arbitrary, capricious, and contrary to law and summarily reversed.

Moreover, the Administrative Record is devoid of any contemporaneous documentation from FDA that even remotely attempts to distinguish Omnitrope from these similarly-situated products.  (Indeed, FDA's own hand-picked Administrative Record links all these products.)  In this respect, FDA has further aggravated their disparate treatment of Sandoz and Omnitrope by failing to reconcile their disparate treatment.  "We have long held that an agency must provide an adequate explanation before it treats similarly situated parties differently."  Chadmoore Communications, Inc. v. FCC, 113 F.3d 235, 242 (D.C. Cir. 1997) (citing Petroleum

different treatment" and the agency "stated no basis for its uneven disposition of the two applications, nor did it indicate why….").

Communications, Inc. v. FCC, 22 F.3d 1164, 1172 (D.C. Cir. 1994) (and cases cited therein)).

"This rule was developed to prevent an agency from, *inter alia*, 'vacillating without reason in its

application of a statute or the implementing regulations.'" Chadmoore, 113 F.3d at 242 (citing

New Orleans Channel 20, Inc. v. FCC, 830 F.2d 361, 366 (D.C. Cir. 1987)).

The only product as to which even FDA has attempted to distinguish Omnitrope is the

over two-times larger recombinant product hyaluronidase (Hylenex). More than 15 months after

the now impermissibly-missed Action Date for Omnitrope, and three months into the instant

lawsuit, a senior FDA official memorialized what can only be considered FDA's post hoc

rationalization of Defendants' disparate treatment of Omnitrope:

> The Omnitrope NDA, for a 191 amino acid recombinant human growth hormone,
> also includes substantial chemistry and clinical data intended to justify reliance, in
> part, on the agency's finding of safety and effectiveness for another 191 amino
> acid recombinant human growth hormone. Although we are still completing our
> review of the Omnitrope NDA, we believe the Hylenex NDA is distinguishable
> from the Omnitrope NDA because of the unique characteristics of the
> hyaluronidase products described above.[32]

Yet, this mid-stream explanation near the completion of this litigation does nothing to distinguish

Omnitrope; it simply distinguishes Hylenex. To the extent it does differentiate Omnitrope, it

proves Sandoz' case. First, it directly contradicts FDA's assertions before this Court that

Omnitrope is somehow unrelated to these other products. See Fed. Defs.' Opp. To Mot. To

Compel at 14. Second, because this FDA review memo on Hylenex says unequivocally that

Sandoz has submitted extensive data for a smaller and less complex product than that which

FDA has allowed to suffice for a far more complex product that is double the size, this Agency

document reflects, at best, a blatant double standard. At worst, FDA's memorandum reflects a

---

[32]     See http://www.fda.gov/cder/foi/nda/2005/021859_s000_Hylenex_AdminCorres.pdf
(pages 27-29 of 134) (Pl.' Ex. 10). See also Sandoz' Motion To Compel at 4 n.4.

contrived effort to supplement the Administrative Record with disingenuous conclusions.  In

either case, it is wrong, and it fails to justify any disparate treatment of Omnitrope.[33]

Several conclusions are compelled by the fact that FDA's unreasonable delay of, and

failure to act on, the Omnitrope NDA is unlike that which FDA has applied to any other product.

First, FDA has applied a different standard in acting upon the expert medical staff's review of

the application than they have following the expert staff's review of similarly-situated products.

Second, FDA has failed to consider any outcome other than continued delay and inaction.

Instead, FDA arbitrarily has been limited to constrained inaction and failed to consider any

alternatives – such as the statutorily-compelled approval or non-approval decision – for Sandoz'

application.  Third, by mandating delay and inaction rather than an informed decision consistent

with the law as achieved for similarly-situated products, FDA unlawfully engaged in disparate

treatment of Sandoz and its Omnitrope NDA.

This is the rare case in which one regulated entity has been singled out for disparate

treatment.  Bracco, 963 F. Supp. at 28.  See also Dominion Resources, Inc. v. FERC, 286 F.3d

586, 592 (D.C. Cir. 2002) ("the Compliance Order's insistence that the Standards of Conduct be

imposed on 'all energy affiliates,' rather than only 'electric affiliates,' represents a sharp and

unexplained break with FERC precedent and is otherwise arbitrary and capricious") (citing

ANR Pipeline Co. v. FERC, 71 F.3d 897, 901 (D.C. Cir. 1995) ("Where an agency departs from

established precedent without a reasoned explanation, its decision will be vacated as arbitrary

---

[33]     Because of FDA's failure to explain this "vexing" issue of "whether the disparate treatment of
different . . . licensees . . . is reasonable," U.S. Teleph. Ass'n, 28 F.3d at 1235, this Court should not
uphold FDA's determination that the approval criteria for this one product will be based on criteria other
than that applied to "other licensees and not explain their reasons for that position or subject that
explanation to judicial review."  Id.  Any contention FDA might proffer through counsel in this litigation
setting, even if true, should have resulted in consistent application of such a view by FDA, and thus
inaction and continued delay on a plethora of 505(b)(2) NDAs and biologic drug applications.  It has not.
An examination of the 100-odd 505(b)(2) NDAs and biologic drug approvals, which are not validly
distinguishable from Omnitrope, demonstrates FDA's disparate treatment of Sandoz.

and capricious")).  Here, FDA has engaged in substantive and procedural disparate treatment of

Sandoz and its Omnitrope 505(b)(2) NDA and failed to provide any explanation for doing so.

Accordingly, because FDA treated Omnitrope different from other FD&C Act drugs, summary

judgment should be entered in Sandoz' favor on Count IV.

## V.    AS ALLEGED IN COUNT V, DEFENDANTS HAVE CONSTRUCTIVELY AND UNREASONABLY GRANTED PFIZER'S CITIZEN PETITION ON THE BASIS OF FLAWED EVIDENCE IN THE RECORD

As discussed more fully at the outset, 21 C.F.R. § 10.3(e)(2) mandates that FDA "*shall*

furnish a response to each petitioner within 180 days of receipt of the petition.  The response will

either (i) Approve the petition, in which case the Commissioner shall concurrently take

appropriate action (e.g., publication of a *Federal Register* notice) implementing the approval; (ii)

Deny the petition; or (iii) Provide a tentative response."

The Agency has permitted Pfizer's Petition to languish unanswered before the FDA since

May 2004, and there is no indication that it has received any consideration whatsoever after

November 10, 2004, when FDA issued an interim response in the form of a perfunctory notice

indicating that FDA had not yet reached a decision on the matter.  Indeed, this is the only overt

action FDA has taken.  That reply 14 months ago provides no indication of when FDA will

resolve Pfizer's petition.  Moreover, since that date, FDA has not communicated any further with

the petitioners.  And yet, FDA has given Pfizer effectively the precise relief Pfizer sought from

FDA, i.e., not to approve the Omnitrope 505(b)(2) NDA.

There is no evidence in FDA's version of the Administrative Record suggesting that FDA

has taken any action in reviewing Pfizer's petition since late-2004.  Because of FDA's continued

inaction on that petition, this Court can conclude the matter is no longer under consideration by

the Agency.  Thus, FDA's prolonged and continuing inaction has precisely the same effect as if

it had granted the Pfizer petition outright.  Therefore, this Court should find the petition has been constructively granted.[34]

Based upon their answer, FDA can be expected to assert that Pfizer's Petition has not been fully adjudicated and thus may contend there is some lack of "final agency action" for Sandoz to bring this APA claim.  Any such assertion can be disposed of readily.  No action has been taken on the Pfizer Petition for 14.5 months, and there is no indication from the agency that the Pfizer Petition will ever receive further consideration.  Although FDA has implied in earlier pleadings that FDA is still evaluating the merits of Pfizer's Petition based on the 2,000-odd pages of general industry comments lodged in *other* dockets completely unrelated to Pfizer's petition, see Fed. Defs.' Opp. To Mot. To Compel at 4-5, FDA cannot point to a single entry in the Pfizer docket index, the Administrative Record, or elsewhere suggesting that any action is taking place with respect to Pfizer's petition.  This lengthy period of inaction constitutes both unreasonable delay under the APA and constructive granting based upon a reasonable interpretation of FDA's Administrative Procedure regulations.  Moreover, no other petition before the FDA is currently seeking the same result as the Pfizer Petition, i.e., specific non-approval of Omnitrope.  In sum, Sandoz' petition-related claims cannot ripen any further.

Once this Court reaches the penultimate question of the granting of Pfizer's Petition, the only remaining issue is whether FDA's decision in that regard is scientifically and legally sound.  It is not.  There is flawed evidence in Pfizer's Petition and in the Administrative Record of the Petition that precludes FDA from affirmatively or constructively granting Pfizer any of the relief

---

[34]    Even if this Court were to conclude that Pfizer's petition had not been granted when FDA failed to act on the statutorily-imposed Action Date of August 31, it cannot be reasonably disputed that, with the issuance of the November 2004 "interim response," the petition was for all intents and purposes granted.  This is born out by the Administrative Record of the NDA itself, which reflects two subsequent NDA Resubmissions by Sandoz, on both of which FDA has failed to act – a failure that, on this record, is reasonably attributable to the constructive granting of Pfizer's petition.  See AR at 002795-043000.

Pfizer has requested.  The most fundamental flaw in Pfizer's petition is the error it made in the presumed molecular weight of Omnitrope, which underlies many of Pfizer's erroneous assertions regarding the differences between the two products.  AR at 000005-000042, 001106-001111. The fundamental arguments advanced in Pfizer's Petition were premised on incorrect information from a draft version of a confidential Sandoz clinical trial protocol, the erroneous nature of which should have been clearly evident to anyone competent in the science of rhGH or in basic regulatory principles.  AR at 000005-000042, 001106-001111.  Furthermore, there is inadequate support in Pfizer's petition and in the Administrative Record of that petition to permit FDA to affirmatively or constructively grant Pfizer any of the relief Pfizer has requested.  AR at 000005-000042, 001106-001111.  Yet, that is what FDA has done here.

A reviewing court must reverse a decision if, inter alia, an agency relies on material in the record that was flawed, offered an explanation that is contradicted by the evidence before the agency or is otherwise implausible, arbitrarily failed to examine relevant data, or failed to consider important aspects of the issue.  State Farm, 463 U.S. at 43, 52; Marshall County, 988 F.2d at 1226 (HHS Secretary "unreasonably relied on other material in the record that was logically flawed") (citing State Farm).

Having demonstrated that FDA's action in constructively granting the petition by failing to approve the Omnitrope NDA as specifically requested by Pfizer, despite the absence of any statutory or other valid basis for refusing to approve the Omnitrope NDA, "unreasonably relied on other material in the record that was logically flawed," Marshall County, 988 F.2d at 1226, and lacks a reasonable basis in the record, Sandoz is entitled to summary judgment on Count V with respect to FDA's constructive action on the Pfizer Petition, and that action should be set aside.  5 U.S.C. §§ 706(2)(A), (D).

## CONCLUSION

Under the plain language of the FD&C Act, PDUFA, and the APA, Defendants have been directed by Congress to act on the Omnitrope application. The Defendants lack discretion under current law to do otherwise. Defendants must either approve or disapprove. Based upon what FDA considers the Administrative Record in this case, there simply is no compelling or cognizable reason to allow Defendants to sit on their hands, while a company that followed the law and the Agency's directions is left to bear the burden and cost of agency inaction. Doing nothing would irreparably harm Sandoz, patients, and the healthcare system. Requiring Defendants to act upon this application would cost FDA nothing, and ultimately would serve the best interests of FDA by preserving the fabric of the law and the Agency's institutional role in enforcing it. Directing the Agency to act as required in this case also will assist the entire regulated biopharmaceutical industry, by ensuring consistent reliable regulatory action. However, this Court's inaction would be too costly for too many stakeholders to tolerate.

Date:   January 17, 2006                          Respectfully submitted,


_____/s/_____
JOHN M. ENGEL (DCBN 443628)
Engel & Novitt, LLP
Market Square
Suite 620
801 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone: (202) 207-3303
Fax: (202) 207-3318
E-Mail: jengel@engelnovitt.com
Attorneys for Plaintiff Sandoz Inc.