**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SANDOZ INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:05CV01810 (RMU) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | |
| Health and Human Services, and | ) | |
| ANDREW C. VON ESCHENBACH, M.D., | ) | |
| Acting Commissioner, Food and Drug | ) | |
| Administration, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Of Counsel:

PAULA M. STANNARD
Acting General Counsel

SHELDON T. BRADSHAW
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

SHOSHANA HUTCHINSON
Assistant Chief Counsel
U.S. Dept. of Health & Human Services
Office of General Counsel
5600 Fishers Lane, GCF-1
Rockville, Maryland 20857

PETER D. KEISLER
Assistant Attorney General

EUGENE M. THIROLF
Director
Office of Consumer Litigation

DOUGLAS W. STEARN (DCBN 440735)
Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
Telephone: (202) 307-0061
E-mail: douglas.stearn@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.    Statutory and Regulatory Framework  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.    Relevant Facts And Proceedings in this Case . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.    This Case Does Not Involve Unreasonable Delay Warranting Equitable Relief   9

        A.    21 U.S.C. § 355(c) Does Not Require FDA to Act Within 180 Days  .  11

        B.    FDA's Consideration of the Omnitrope NDA Falls Within the "Rule of Reason" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.    Sandoz Has Offered No Reason for Reordering Agency Priorities . . . . 19

        D.    The Importance of Protecting the Public Health Outweighs Any Economic Effect That Could Arise from the Delay . . . . . . . . . . . . . . . 21

        E.    FDA Did Not Treat Sandoz or the Omnitrope NDA Disparately  . . . . . 23

    II.    Sandoz's Claims Concerning the Pfizer Petition Lack Merit  . . . . . . . . . . . . . 25

        A.    This Court Lacks Jurisdiction to Hear Sandoz's Challenge to FDA's Inaction on the Pfizer Petition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            1.    Sandoz does not have standing  . . . . . . . . . . . . . . . . . . . . . . . 26

            2.    There has been no final agency action to be set aside  . . . . . . . 27

            3.    Sandoz's claims are not ripe for review  . . . . . . . . . . . . . . . . . 29

        B.    FDA Has Not Unreasonably Delayed Acting on the Pfizer Petition  . . 30

    III.    Sandoz Fails to State a Cause of Action Under 5 U.S.C. § 706(2) Concerning the Agency's Review of the Omnitrope NDA  . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## TABLE OF AUTHORITIES

### CASES

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re American Rivers and Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) . . . . . . . . . 15

*Amgen Inc. v. Scully*, 234 F. Supp. 2d 9 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Barr Labs.*, 930 F.2d 72 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11, 14, 18-22

*Bennett v. Spear*, 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003) . . . . . . . . . . . . . . . . 10

*Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997) . . . . . . . . . . . . . . . 24, 25

*Branch v. Smith*, 538 U.S. 254 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . . 23

*City of Roseville v. Norton*, 219 F. Supp. 2d 130 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . 26

*Cmty. Nutrition Inst. v. Young*, 773 F.2d 1356 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 10

*Consol. Rail Corp. v. United States*, 896 F.2d 574 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . 30

*Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) . . . . . . . . . . . . . . . . . . . . 19

*FTC v. Standard Oil Co. of California*, 449 U.S. 232, 242 (1980) . . . . . . . . . . . . . . . . . . . 27, 28

*Gottlieb v. Pena*, 41 F.3d 730 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Int'l Chem. Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 10

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Kremer v. Chem. Constr. Corp.*, 456 U.S. 461 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ii

*LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Abraham*, 347 F.3d 315 (D.C. Cir. 2003) . . . . .  23

*Lewis v. Cont'l Bank Corp.*, 494 U.S. 472 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . .  20, 21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003) . . . . .  15

*Midwest Gas Users Ass'n v. FERC*, 33 F.2d 341 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . .  19

*Mobil Oil Exploration & Producing Southeast, Inc. v. United Distrib. Cos.*,
    498 U.S. 211 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*In re Monroe Communications Corp.*, 840 F.2d 942 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . .  15

*Nat'l Ass'n of Home Builders v. U.S. Army Corp of Engineers*,
    417 F.3d 1272 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27, 29

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) . . . . . . . . . . . . . . . . . .  29

*Natural Res. Def. Council, Inc. v. Fox,* 93 F. Supp. 2d 531 (S.D.N.Y. 2000), *vacated in part
    on other grounds sub nom. Natural Res. Def. Council, Inc. v. Muszynski,*
    268 F.3d 91 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . .  33

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Public Citizen Health Research Group v. FDA*, 740 F.2d 21 (D.C. Cir. 1984) . . . .  9, 27, 29, 30

*Reliable Automatic Sprinkler Co., Inc. v. CPSC*, 324 F.3d 726 (D.C. Cir. 2003) . . . . . . . . . . .  28

*Sabre, Inc. v. DOT*, 429 F.3d 1113 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26, 29

*Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687 (S.D. Ill. 2004) . . . . . . . . .  33, 34

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 19

*Singleton v. Wulff*, 428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Telecommunications Research & Action Center v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 11, 15, 19, 21, 23

iii

*Texas v. United States*, 523 U.S. 296 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Tri-Bio Labs, Inc. v. United States*, 836 F.2d 135 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . .  2

*United States Postal Serv. v. Gregory*, 534 U.S. 1 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*United States v. An Article of Drug, Bacto-Unidisk*, 394 U.S. 784 (1969) . . . . . . . . . . . . . . .  19

*Util. Air Regulatory Group v. EPA*, 320 F.3d 272 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . .  26

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 31

*Warth v. Seldin*, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) . . . . . . . . . . . .  26

## FEDERAL STATUTES

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 32-34

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 34

1 U.S.C. § 355 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 21

21 U.S.C. § 355(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

21 U.S.C. § 355(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 4

21 U.S.C. § 355(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

21 U.S.C. § 355(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

21 U.S.C. § 355(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3

iv

21 U.S.C. § 355(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11-13

21 U.S.C. § 355(c)(3)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

21 U.S.C. § 355(j)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

21 U.S.C. § 360c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

21 U.S.C. § 360d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

21 U.S.C. § 360e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

21 U.S.C. § 360cc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

21 U.S.C. § 379g . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

28 U.S.C. § 1361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

35 U.S.C. § 156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

35 U.S.C. § 271 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

35 U.S.C. § 282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

## FEDERAL REGULATIONS

21 C.F.R. § 10.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

21 C.F.R. § 10.30(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30, 31

21 C.F.R. § 10.45(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

21 C.F.R. § 314.3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3

21 C.F.R. § 314.54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

## LEGISLATIVE MATERIALS

Food and Drug Modernization Act of 1997, Pub. L. No. 105-115,111 Stat. 2296 (1997) . . . .  12

H.R. Rep. No. 102-895, 1992 WL 237629 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

H.R. Rep. No. 98-857 (Part I) (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647 . . . . . . . . . . . . .  2

Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173,
    117 Stat. 2066 (Dec. 8, 2003)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Performance Goals for the Prescription Drug User Fee Amendments of 2002,
    148 Cong. Rec. S5195-04 (June 6, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13

Prescription Drug User Fee Act of 1992, Pub. L. No. 102-571, Title I,
    106 Stat. 4491 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12

Public Health Security and Bioterrorism Preparedness and Response Act of 2002,
    Pub. L. No. 107-188, Title V, 116 Stat. 594 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . .  12

S. Rep. No. 87-1992 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2784 . . . . . . . . . . . . . . . . . .  9-10

## ADMINISTRATIVE MATERIALS

Scientific Considerations Related to Developing Follow-On Protein Products,
    69 Fed. Reg. 50386 (Aug. 16, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

## INTRODUCTION

Defendants, Michael O. Leavitt, Secretary of Health and Human Services, and Dr. Andrew C. von Eschenbach, Acting Commissioner of Food and Drugs, United States Food and Drug Administration ("FDA") (collectively "Defendants"), submit this memorandum of points and authorities in opposition to Plaintiff Sandoz Inc.'s ("Sandoz") Motion for Summary Judgment on All Counts ("MSJ") and in support of Defendants' Cross Motion for Summary Judgment. Sandoz alleges that the agency's failure to act on its pending New Drug Application ("NDA") for the approval of Omnitrope, a recombinant human growth hormone, constitutes unreasonable delay, and that FDA has therefore violated its legal obligations under the Federal Food, Drug, and Cosmetic Act ("FDCA" or "the Act") and the Administrative Procedure Act ("APA"). As the administrative record demonstrates and as discussed more fully herein, the time FDA has spent reviewing the Omnitrope NDA and closely related issues raised in other proceedings before the agency is well within the "rule of reason" and does not warrant equitable relief as a matter of law. Sandoz's motion thus lacks merit and should be rejected by this Court, and judgment should be entered in favor of the Defendants.

## BACKGROUND

### I.    Statutory And Regulatory Framework

Under the FDCA, a new drug product cannot be marketed in the United States until the drug's sponsor submits an NDA to FDA and obtains the agency's approval. 21 U.S.C. §§ 355(a), (b). The NDA applicant is required to submit extensive clinical evidence that the drug product is safe and effective; a list of the components of the drug; a statement of the drug's composition; a description of the manufacturing, processing, and packaging of the drug; samples of the drug as necessary; patent information on any patent that it claims will protect the drug

product or its uses; and proposed labeling for the drug.  21 U.S.C. § 355(b)(1).  To establish

safety and effectiveness, an NDA must include "full reports of investigations which have been

made to show whether or not such drug is safe for use and whether such drug is effective in use."

21 U.S.C. § 355(b)(1)(A).  Once an NDA is approved, FDA includes that drug product in its

publication "Approved Drug Products With Therapeutic Equivalence Evaluations," also known

as the "Orange Book," and refers to the approved drugs as "listed drugs."  21 C.F.R. § 314.3(b).

In 1984, Congress amended the FDCA to create new abbreviated drug approval

mechanisms, marketing incentives, and certain new patent protections (the "Hatch-Waxman

Amendments").  21 U.S.C. §§ 355, 360cc; 35 U.S.C. §§ 156, 271, 282.   These amendments

were intended to balance encouraging innovation in drug development with accelerating the

availability of lower cost alternatives to approved brand-name drugs.  *See* H.R. Rep. No. 98-857

(Part I), at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. at 2647-48.  *See also, e.g., Tri-Bio

Labs, Inc. v. United States,* 836 F.2d 135, 139 (3d Cir. 1987).

Section 505(b)(2) of the Act, 21 U.S.C. § 355(b)(2), created by the Hatch-Waxman

Amendments, permits the filing of an NDA where the sponsor does not own or have a right of

reference to all of the studies supporting approval:

> An application submitted under [section 505(b)(1)] for a drug for which the
> investigations described in [section 505(b)(1)(A)] and relied upon by the
> applicant for approval of the application were not conducted by or for the
> applicant and for which the applicant has not obtained a right of reference or use
> from the person by or for whom the investigations were conducted shall also
> include–
>
>> (A) a certification, in the opinion of the applicant and to the best of
>> his knowledge, with respect to each patent which claims the drug for
>> which such investigations were conducted or which claims a use for such
>> drug for which the applicant is seeking approval under this subsection and
>> for which information is required to be filed under paragraph (1) or

2

subsection (c) of this section–

(I)    that such patent information has not been filed,
(ii)    that such patent has expired,
(iii)    of the date on which such patent will expire, or
(iv)    that such patent is invalid or will not be infringed by the
manufacture, use, or sale of the new drug for which the application
is submitted; and

(B) if with respect to the drug for which investigations described in
paragraph (1)(A) were conducted information was filed under paragraph
(1) or subsection (c) of this section for a method of use patent which does
not claim a use for which the applicant is seeking approval under this
subsection, a statement that the method of use patent does not claim such a
use.

21 U.S.C. § 355(b)(2).  This section permits an NDA applicant to rely for approval on

investigations "*not conducted by or for* the applicant and for which the applicant *has not*

*obtained a right of reference*."  *Id.* (emphasis added).  FDA regulations define "right of reference

or use" as "the authority to rely upon, and otherwise use, an investigation for the purpose of

obtaining approval of an application, including the ability to make available the underlying raw

data from the investigation for FDA audit, if necessary."  21 C.F.R. § 314.3(b).

Section 505(b)(2) thus permits FDA to approve drug applications that rely on studies not

conducted by or for the applicant and for which the applicant does not obtain a right of reference

from the sponsor.  A 505(b)(2) application may rely for approval on studies described in

published literature or on the FDA finding that the listed drug it references is safe and effective,

which finding is supported by studies in the referenced NDA.  The applicant need not need re-

demonstrate to FDA what has already been demonstrated through adequate studies in animals or

humans.  Section 505(b)(2) does not authorize the applicant to obtain and submit proprietary

data belonging to another company.  Rather, among other things, Section 505(b)(2) permits an

3

applicant for a new drug product to rely on FDA's finding of safety and effectiveness for an approved drug.[1]

As with any NDA submitted under Section 505(b)(1) of the Act, a 505(b)(2) application must satisfy the requirements for evidence of safety and effectiveness described in 21 U.S.C. §§ 355(b) and (c). To the extent the 505(b)(2) application describes a drug with differences from the listed drug it references, it must support those differences with appropriate safety and effectiveness information. For example, a 505(b)(2) application may seek approval for a new dosage form, indication, or new formulation of a previously approved drug. In such cases, the 505(b)(2) application can rely on the finding of safety and effectiveness of the listed drug only to the extent the product seeking approval and the listed drug are the same, and must include other safety and effectiveness data to the extent they are different. 21 C.F.R. § 314.54.[2]

## II.    Relevant Facts And Proceedings in this Case

On July 31, 2003, FDA accepted Sandoz's submission seeking approval of the Omnitrope NDA. (*See* Exhibit ("Ex.") A, A.R. 000001 (referencing NDA submission at A.R. 023343-030230).[3]) Sandoz submitted the Omnitrope NDA pursuant to Section 505(b)(2) of the Act, referencing Genotropin as the listed drug that FDA previously found safe and effective.

---

[1]    This permitted reliance is subject to certain patent and exclusivity protections set out in Section 505(b)(2) and in Section 505(c)(3)(E), 21 U.S.C. § 355(c)(3)(E).

[2]    FDA's interpretation and application of Section 505(b)(2) is further described in a consolidated citizen petition response issued in October 2003. (*See* October 14, 2003 FDA Consolidated Response to Citizen Petitions submitted by Pfizer, Biotechnology Industry Organization, and TorPharm (Docket Nos. 2001P-0323/CP1 & CP5, 2002P-0447/CP1, and 2003P-0408/CP1) (Ex. I, A.R. 002757-002794) (citing FDA's 1999 Draft Guidance for Industry entitled "Applications Covered by Section 505(b)(2)" at 13).)

[3]    There were contacts between FDA and Sandoz relating to Sandoz's submission that preceded FDA's acceptance of the Omnitrope NDA (*See* A.R. 002795-023157).)

(*Id.*)  Pfizer Inc. ("Pfizer") holds the approved NDA for Genotropin.

On May 13, 2004, Pfizer filed a Citizen Petition requesting that FDA reject the Omnitrope NDA, on both scientific and legal grounds (Docket No. 2004P-CP1) ("Pfizer Petition") (Ex. B, A.R. 000005-000052) (referencing attachments at A.R. 000053-001100). Sandoz filed an opposition to the Pfizer Petition on June 25, 2004 ((Ex. C, A.R. 001101-001121) (referencing attachments at A.R. 001122-001475), and Pfizer submitted additional comments on August 4, 2004 (Ex. D, A.R. 001476-001482) (referencing attachments at A.R. 001483-001544). At the time Pfizer submitted its petition, there were already two other citizen petitions pending that raised issues relating to approval of drug products under Section 505(b)(2).  (*See* April 8, 2004 Genentech Citizen Petition (Docket No.  2004P-0171) (Ex. G, A.R. 002102-002129)); April 23, 2003 BIO Citizen Petition (Docket No.  2003P-0176) (Ex. H, A.R. 002464-002542).) By letter dated November 10, 2004, FDA advised Pfizer that the agency had not yet reached a decision on the petition because "it raises significant and complex issues requiring extensive review and analysis by Agency officials," and that Pfizer would be notified as soon as a decision had been reached.  (Ex. E, A.R. 001545).)

On August 31, 2004, FDA issued a letter to Sandoz, explaining that FDA was "unable at this time to reach a decision on the approvability of the [Omnitrope] application because of unresolved scientific and legal issues that relate to your NDA."  (Letter from Orloff to Brannon of 8/31/04, at 1 (Ex. A, A.R. 000001).)  FDA further elaborated that several citizen petitions had been filed with the agency regarding approvals under Section 505(b)(2); that FDA would be holding public workshops in September 2004 and early 2005 relating to recombinant protein products (also referred to as follow-on protein products) to address subjects including

5

manufacturing, characterization, immunogenicity, preclinical and clinical studies, and efficacy

surrogate; and that in conjunction with the public workshops, a public docket was opened to

which comments could be submitted.  (*Id.* at 1-2.)  FDA's letter explained to Sandoz why it was

deferring a decision on the Omnitrope NDA:

> Because the Omnitrope application is a 505(b)(2) NDA for a recombinant
> protein product, our regulatory decision on the application will clearly
> involve legal and scientific issues within the scope of the issues raised in
> the pending citizen petitions and under consideration in the public process.
> Because of the nature and complexity of these issues, and the fact that
> resolution of the issues might affect the quantity and quality of data that
> might be required for approval of 505(b)(2) applications for human
> growth hormone, FDA is deferring a decision on whether the data
> submitted in NDA 21-426 are adequate to support a conclusion that
> Omnitrope is safe and effective for the proposed indications.

(*Id.* at 2.)

FDA held public workshops to discuss "Scientific Considerations Related to Developing

Follow-On Protein Products" on September 14 and 15, 2004, and February 14 through 16, 2005.

(Ex. F, A.R. 001606-001618).  The term "follow-on protein product" refers to "a protein that is

intended to be a similar version or copy of an already approved or licensed protein

pharmaceutical product.  Such proteins might be produced through biotechnology or derived

from natural sources."  69 Fed. Reg. 50386, 50387 (Aug. 16, 2004) (found at Ex. F, A.R.

001608).  FDA held the workshops "to conduct an extensive public dialogue on the scientific

issues relating to the development and approval" of follow-on protein products because of the

"scientific complexity of protein pharmaceutical products."  (Ex. F, A.R. 001608.)  The

associated docket to which the public could submit comments, docket number 2004N-0355,

remained open until March 16, 2005 (*id.*, A.R. 001617-001618), and numerous comments were

submitted (A.R. 001619-002088).

On September 13, 2005, Sandoz filed the complaint in the instant case, alleging that Defendants' failure to issue a final decision on either the Omnitrope NDA or the Pfizer Petition violated the FDCA and APA.  (*See* Complaint, Docket Item ("D.I.") 1, ¶¶ 165-214.)   In each cause of action, Sandoz alleged that FDA had a statutory duty to act no later than August 31, 2004.  (*See id.*, ¶¶ 3, 90, 165, 184, 190, & 199.)  The failure to act on the NDA by that date, Sandoz alleged, constituted a constructive granting of the Pfizer Petition.  (*See id.*, ¶¶ 9, 165, 184, 190, & 199.)  Sandoz asserted that, because there are no valid statutory grounds for denial, the alleged constructive denial of the Omnitrope NDA warrants injunctive and declaratory relief. (*See id.*, ¶¶ 165-219.)

Defendants filed their Answer to Plaintiff's Complaint on November 14, 2005.  (*See* Answer, D.I. 8.)  Defendants asserted that the review of the Omnitrope NDA and related materials provided by Sandoz, Pfizer, and other parties is currently ongoing, and that the continuation of the review process does not warrant any form of relief.  (*See id.*)

The parties disagree about the content of the administrative record for this case.  Pursuant to the Joint Meet and Confer Agreement (D.I. 9) and Supplement (D.I. 11), Defendants provided Sandoz with the complete administrative record in this case, as it exists to date,[4] including the voluminous material Sandoz itself submitted in support of its Omnitrope NDA.[5]

---

[4]    Because there has been no final agency decisions on the matters at issue in this case, Defendants will continue to add documents to the existing administrative record as appropriate after final decisions are made.

[5]    The Sandoz-generated materials submitted to support the Omnitrope NDA consist of approximately ninety volumes, which had to be gathered, copied, marked as "confidential," and numbered sequentially before being produced to Sandoz.  In the process of gathering the administrative record documents, Defendants realized that they would not be able to provide to Sandoz copies of its own documents that were submitted in support of the Omnitrope NDA by December 19, due to the extremely large number of documents.  A

On December 16, 2005, Sandoz filed a motion to compel the production of what it contended should be included in the administrative record – every internal FDA document related to its application, as well as every document FDA has that is related to allegedly similar drug applications. (*See* D.I. 10). Defendants filed their opposition on December 29, 2005 (*see* D.I. 14), and Sandoz filed a reply brief on January 6, 2006. (*See* D.I. 16). Sandoz also filed a motion for an expedited status conference on January 3. (*See* D.I. 15). The parties are filing their cross-motions for summary judgment in accordance with the agreed-upon briefing schedule, and prior to this Court's resolution of the pending motions related to the administrative record.

## ARGUMENT

Sandoz has failed to demonstrate that it is entitled to equitable relief on the basis of the time FDA had taken, and is currently taking, to evaluate the Omnitrope NDA and the Pfizer Petition. This Court lacks jurisdiction even to consider Sandoz's claims regarding the Pfizer Petition, and there is no basis to review Sandoz's claims to "set aside" agency action in the review of the Omnitrope NDA. This action must be determined under the case law construing unreasonable delay of agency action under the APA. This type of review involves the consideration of multiple factors, which all support summary judgment in favor of the government in this case.

---

Supplement to the Joint Meet and Confer Agreement was thereafter filed on December 19, 2005, explaining Defendants' inability, at the time, to provide all of the Sandoz-generated NDA documents and noting Sandoz's objection to the delay in the production of its NDA documents. Defendants provided Sandoz with the remainder of the existing administrative record, along with a complete index of that record, on January 27, 2006, and the Defendants filed a notice of this production on January 31, 2006 (*see* D.I. 21).

In 1991, the D.C. Circuit decided another case involving allegations of unreasonable delay in FDA's drug review process. *See In re Barr Labs.*, 930 F.2d 72 (D.C. Cir. 1991). In that case, the D.C. Circuit found that the FDCA supplied a deadline for agency action, but that delay beyond that time period alone was not sufficient to warrant judicial relief because review of claims of unreasonable delay rely on an evaluation of multiple factors. *Id.* at 74-75. Most critically, in the context of the drug review process, an order compelling action on a particular application necessarily reorders agency priorities and disadvantages other applicants. *Id.* Because of the respect for the autonomy and comparative institutional advantage of the executive branch, judicial relief is not justified unless the delays are the result of bad faith or are otherwise especially egregious. *Id.* at 75-76. In this case, the grounds for equitable relief are insufficient as a matter of law. The factors the Court must weigh argue against equitable relief to a greater degree here than they did in *Barr Laboratories*.

## I.    This Case Does Not Involve Unreasonable Delay Warranting Equitable Relief

A plaintiff alleging that an agency has unlawfully withheld or unreasonably delayed agency action may bring an action under the APA, seeking to compel agency action. In such actions, 5 U.S.C. § 706(1) provides the relevant waiver of sovereign immunity and the statutory basis for the cause of action. *See Public Citizen Health Research Group v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984). However, the sole remedy available to the plaintiff in such a case is for the court to "compel agency action," such as by issuing an order or a writ of mandamus requiring the agency to act, without directing the substantive content of the decision, or to provide additional explanation regarding the time taken to act. *See, e.g, id.* (the court "can order an agency to either act or provide a reasoned explanation for its failure to act"). *Cf.* S. REP. No. 87-1992, at 1,

9

*reprinted in* 1962 U.S.C.C.A.N., 2784, 2784-85 (the committee reports recommending

enactment of the federal mandamus statute, 28 U.S.C. § 1361, made clear that the courts were

"not to direct or influence the exercise of discretion of the officer or agency in the making of the

decision").  Furthermore, "[t]he issuance of equitable relief under section 706 of the APA 'is an

extraordinary remedy and [the Court] require[s] similarly extraordinary circumstances to be

present before [it] will interfere with an ongoing agency process.'"  *Biodiversity Legal Found. v.

Norton*, 285 F. Supp. 2d 1, 12 (D.D.C. 2003) (quoting *Cmty. Nutrition Inst. v. Young*, 773 F.2d

1356, 1361 (D.C. Cir. 1985).  *See also In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149

(D.C. Cir. 1992) ("This court rarely reviews nonfinal agency action, preferring instead to review

a factual record developed by the agency through the application of its expertise.").

    The D.C. Circuit has articulated factors for a court to consider when evaluating a claim of

unreasonable delay:

> (1) the time agencies take to make decisions must be governed by a "rule
> of reason;" (2) where Congress has provided a timetable or other
> indication of the speed with which it expects the agency to proceed in the
> enabling statute, that statutory scheme may supply content for this rule of
> reason; (3) delays that might be reasonable in the sphere of economic
> regulation are less tolerable when human health and welfare are at stake;
> (4) the court should consider the effect of expediting delayed action on
> agency activities of a higher or competing priority; (5) the court should
> also take into account the nature and extent of the interests prejudiced by
> delay; and (6) the court need not "find any impropriety lurking behind
> agency lassitude in order to hold that agency action is 'unreasonably
> delayed.'"

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)

("*TRAC*") (internal citations omitted).  This test is applicable to claims of unreasonable delay

concerning FDA's review process.  *See Barr Labs.*, 930 F.2d at 74-75 (relying on *TRAC* factors).

An order compelling action on a particular application necessarily reorders agency priorities and

would disadvantage other applicants such that equitable relief is not justified unless the delay is the result of bad faith or is otherwise especially egregious.  *Id.* at 75-76.  Here, it has been eleven months since the public docket closed, and FDA's continued review of the Pfizer Petition, the Omnitrope NDA, and other materials FDA received is well within the "rule of reason," given the complex legal and scientific issues involved, and does not warrant equitable relief as a matter of law.  Consideration of the *TRAC* factors does not support the extraordinary form of relief that Sandoz seeks, and Sandoz's request for summary judgment should therefore be denied.

### A.    21 U.S.C. § 355(c) Does Not Require FDA to Act Within 180 Days

Sandoz contends that FDA is required by statute to reach a final decision on the Omnitrope NDA within 180 days of its filing, citing 21 U.S.C. § 355(c) (*see* Sandoz MSJ at 4-5). *Cf. TRAC*, 750 F.2d at 80 (the applicable statutory scheme may "supply content" for the rule of reason).  As explained below, Congress has clarified in separate legislation that the time frames specified in 21 U.S.C. § 355(c) are meant to be aspirational rather than mandatory.  Pursuant to the applicable statutory provisions, the 180-day time frame in 21 U.S.C. § 355(c) does not represent a "deadline" for FDA to issue a final decision with regard to drug applications; instead, it represents a "performance goal" that FDA strives to meet in the large majority of cases but with which FDA is not required to comply as to all drug applications.

Historically, FDA frequently missed the 180-day time frame suggested by 21 U.S.C. § 355(c).  *See* H.R. REP. NO. 102-895, 1992 WL 237629, at 8 (1992) ("For almost two decades, there has been an intense debate in this country about whether FDA takes too long to approve new drugs. . . . The FDA has made some progress in reducing drug approval times, but today the FDA still takes an average of 20 months.").  In recognition of FDA's historical difficulty in

11

meeting 21 U.S.C. § 355(c)'s 180-day time frame, Congress enacted the Prescription Drug User Fee Act of 1992 ("PDUFA"), Pub. L. No. 102-571, Title I, 106 Stat. 4491 (1992). PDUFA was intended to provide FDA with additional resources which it could allocate to speeding up the review process for drug applications. *See id.* § 102. In exchange for these additional resources, FDA agreed to meet certain performance goals in the timeliness of its review of drug applications. *See* FY2003 FDA Performance Report to the President and the Congress (available at http://www.fda.gov/oc/ pdufa/report2003/default.htm). The PDUFA program was re-authorized in the Food and Drug Modernization Act of 1997, Pub. L. No. 105-115, § 101(3), 111 Stat. 2296 (1997).

Congress again re-authorized PDUFA when it enacted the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, Title V of which is called the Prescription Drug User Fee Amendments of 2002. Pub. L. No. 107-188, Title V, 116 Stat. 594, 687 (2002). Those amendments provide, in pertinent part, as follows:

> The Congress finds that – . . . (4) the fees authorized by amendments made in this subtitle will be dedicated towards expediting the drug development process and the process for the review of human drug applications as set forth in the goals identified . . . in the letters from the Secretary of Health and Human Services to the chairman of the Committee on Energy and Commerce of the House of Representatives and the chairman of the Committee on Health, Education, Labor and Pensions of the Senate, as set forth in the Congressional Record.

*Id.* § 502, 116 Stat. 687-88, codified as a note following 21 U.S.C. § 379g.

The referenced letter from the HHS Secretary to Congressional leaders is a June 4, 2002, letter from then-Secretary Thompson, which in turn attached the PDUFA Reauthorization Performance Goals and Procedures. *See* 148 Cong. Rec. S5195-04 (June 6, 2002) (also available at http://www.fda.gov/cder/pdufa/). In enacting the amendment quoted above, Congress

incorporated the PDUFA Reauthorization Performance Goals and Procedures into the statutory

timetable for acting on drug applications, effectively modifying the 180-day "deadline" set forth

in 21 U.S.C. § 355(c).  As stated in the Performance Goals, while FDA aspires to review and act

on ninety percent of the filed drug applications within the Performance Goals, Congress and

FDA recognize that in as many as ten percent of cases, the process may take longer.[6]  By

recognizing that a percentage of drug applications may be so complex that it is unrealistic to

expect FDA to take action within 180 days, and by establishing performance "goals" which

explicitly acknowledge and anticipate that FDA cannot meet the target date in every case,

Congress confirmed that the 180-day time frame in 21 U.S.C. § 355(c) is not a rigid, inexorable

deadline.

        Contrary to Sandoz's suggestions, PDUFA did not provide sponsors with a cause of

action against FDA should FDA not act quickly enough, in the sponsor's opinion, in reviewing

an application upon payment of a user fee.  When Sandoz quotes PDUFA and cites its

enactment, Sandoz itself refers to the time periods as goals.  (*See* Sandoz MSJ at 5-6; Complaint,

D.I. 1 at ¶¶ 44-47.)  FDA's only obligation to Sandoz, after receiving its PDUFA payment, is to

review the Omnitrope NDA to determine whether or not it is approvable, which FDA is currently

doing.

        Sandoz also argues, without any support, that Congress did not implicitly repeal the 21

U.S.C. § 355(c) deadline because FDA has not shown that "PDUFA is in irreconcilable conflict

with or was intended as a substitute for Section 505(c) of the FD&C Act."  (Sandoz MSJ at 26.)

---

        [6]        Under the Performance Goals, FDA aspires to act on ninety percent of standard
original NDA submissions within ten months and to act on ninety percent of priority original
NDA submissions within six months.  *See* 148 Cong. Rec. S5195-04 (June 6, 2002).  The
Omnitrope NDA is a standard NDA under the Performance Goals.

The performance goals in PDUFA explicitly recognize that the statutory deadline in 21 U.S.C. § 355(c) may not be met and approve of that circumstance, and are therefore in irreconcilable conflict with (and substitute for) the supposedly firm deadline in 21 U.S.C. § 355(c) that Sandoz argues governs this case. *See Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 468 (1982). *See also Branch v. Smith*, 538 U.S. 254, 273 (2003) (same).

Moreover, assuming *arguendo* that the 180 day period is viewed as a deadline, this construction of the statute is not sufficient to justify equitable relief. The question of how long an NDA should take to evaluate is set forth in *Barr Laboratories*, 930 F.2d at 74. "The issue . . . is . . . whether [the Court] should exercise [its] equitable powers to enforce the deadline. Equitable relief . . . does not necessarily follow a finding of a violation: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *Id.* Even where the time involved extended past what was determined to be a statutory deadline in the drug review process, equitable relief is not generally warranted outside of egregious circumstances. *Id.* at 74-76.

The second *TRAC* factor involves the extent to which Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed and the extent to which the statutory scheme may supply a rule of reason for the time taken for agency action. In *Barr Laboratories*, the D.C. Circuit construed the 180-day time period in the FDCA to form a deadline, but nonetheless found that an order compelling agency action in the drug review process was not justified. *Id.* at 73. Since Congress has established that the 180-day time period is aspirational after the decision in *Barr Laboratories*, FDA is not required to decide on Sandoz's

NDA within 180 days of its receipt.

> **B.**     **FDA's Consideration of the Omnitrope NDA Falls Within the "Rule of Reason"**

In evaluating whether the length of time expended in conducting an administrative proceeding constitutes unreasonable delay, courts typically apply the "rule of reason." *TRAC*, 750 F.2d at 80 (the first *TRAC* factor). "Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). "The 'rule of reason' requires the courts to evaluate alleged agency delay in light of the particular facts of a given case; accordingly, there is no hard-and-fast rule as to what amount of time constitutes an unreasonable delay." *Natural Res. Def. Council, Inc. v. Fox*, 93 F. Supp. 2d 531, 544 n.8 (S.D.N.Y. 2000), *vacated in part on other grounds sub nom. Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91 (2d Cir. 2001). *See also In re American Rivers and Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (no *per se* rule on the length of time that constitutes unreasonable delay). Courts have found the passage of several years reasonable in some circumstances but not in others. *See, e.g., American Rivers*, 372 F.3d at 419 (six plus years was unreasonable); *In re Monroe Communications Corp.*, 840 F.2d 942, 945-46 (D.C. Cir. 1988) (five year delay not unreasonable); *Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987) (less than three years not unreasonable). The passage of only a few months is generally considered reasonable. *American Rivers*, 372 F.3d at 419.

The Omnitrope NDA represents the first effort by a pharmaceutical manufacturer to introduce a recombinant human growth hormone drug product into the public marketplace without product-specific clinical trials for each proposed indication. Recombinant human

15

growth hormone is a complex protein manufactured by an involved biosynthetic process and this factor, among others, raises relatively new scientific issues in the review process. In the citizen petitions and at the public workshop, Pfizer and a number of other companies presented FDA with arguments and data to claim that, at least in this relatively new area involving protein drug products, safety and effectiveness cannot be ensured without a complete array of product-specific clinical and pre-clinical trials. (*See*, *e.g.*, Exs. B, D, and H, A.R. 00005-000052, 000940-000941, 001476-001482, 002464-002542.)

Pfizer, which manufactures one of the approved recombinant human growth hormones, has mounted the most extensive challenge to Omnitrope's approval. In essence, Pfizer has alleged that Omnitrope cannot be ensured to be safe and effective without full product-specific clinical and pre-clinical study data and that the approval of Omnitrope on the basis of anything less could be detrimental to patients. More specifically, among other things, Pfizer has argued the following: (1) compositional differences between Omnitrope and approved growth hormone products makes any approval under Section 505(b)(2) scientifically inappropriate; (2) because manufacturing differences in recombinant DNA technology are likely to affect safety and efficacy, full pre-clinical and clinical trials of Omnitrope should be required; (3) testing has not been conducted on a sufficiently broad patient population to ensure safety and efficacy for multiple indications; (4) the manufacture of Omnitrope cannot ensure the purity of this recombinant protein, and may result in adverse immune responses from molecular variants and host cell contaminants or adverse events from low levels of aberrant forms of growth hormone and low levels of contaminating proteins; (5) manufacturing problems with Omnitrope result in the development of higher antibody levels than is the case for the approved Pfizer drug product;

and (6) the difficulty in measuring the biologic activity of growth hormone requires additional studies to ensure safety and efficacy.  (*See* Exs. B and D,  A.R. 00005-000052, 000940-000941, 001476-001482.)  In support of its arguments, Pfizer has cited dozens of scientific articles and studies.[7]  (*See id.*)  Other companies and organizations have raised similar objections, citing additional scientific arguments and data.  (*See* Exs. G and H, A.R. 002102-002129, 002464-002542.)

Sandoz has made an impassioned defense of Omnitrope to FDA.  (*See* Ex. C, A.R. 001101-001121.)  Sandoz has attacked alleged errors in the Pfizer Petition, and pointed out that Pfizer does not have access to, and cannot evaluate, the clinical data provided to FDA.  (*See id.*)  Sandoz has also taken issue with the scientific assertions about recombinant growth hormone in general, and Omnitrope in particular, and cited to additional scientific literature.  (*See id.*)

FDA cannot simply accept the assertions of Pfizer, Sandoz, or others on their face.  Rather, FDA is responding to the scientific objections to the approval of Omnitrope and to Sandoz's response by conducting additional reviews to determine the truth of the assertions.  As described above, part of FDA's process has involved conducting public workshops on scientific considerations related to development of follow-on protein products and the review of the comments related to this issue from numerous industry players.  (*See* Ex. F, A.R. 001606-001618.)  FDA is also analyzing the numerous arguments in the Pfizer Petition and Sandoz's response, and in other relevant statements and submissions.  As part of the review process,  the merits of these statements and the voluminous scientific literature cited to FDA must be assessed.  This requires the involvement of  reviewers from numerous disciplines who have

---

[7]     This data has not been included in the exhibits because of its volume, but the articles cited are generally available in the scientific literature.

many responsibilities.  The agency is actively reviewing the submissions relevant to the

Omnitrope NDA.  It is FDA's position that a thorough consideration of the applicable data and

information is important to ensure a decision on the Omnitrope NDA that comports with the

public health.

      The Omnitrope NDA thus involves drug review issues that are more difficult and

complex than those at issue in *Barr Laboratories*.  The generic drug applications in *Barr*

*Laboratories* involved an "expedited process" that "permits generic drug applications to piggy-

back on clinical findings that FDA has already embraced."  930 F.2d at 73.  The core question

for FDA there was whether the generic drug application in question established that the generic

drug was the "bioequivalent" of the listed drug and that it was properly manufactured and

labeled.  *Id.* (citing 21 U.S.C. § 355(j)(2)(A)).  As explained above, while a Section 505(b)(2)

application may partly rely on FDA's prior finding concerning another drug product, it also

involves testing and review considerations beyond the issues presented in a generic drug

application.  Furthermore, as set forth in the administrative record, there have been numerous

issues raised with FDA concerning the underlying scientific issues in the Omnitrope NDA.

      Given the volume of materials FDA is reviewing in connection with the Omnitrope

application, the relative novelty and complexity of the issues involved in this case, and the many

other applications to which FDA must also allocate resources, FDA's delay in issuing a decision

on the Omnitrope NDA is not unreasonable.  *See Barr Labs.,* 930 F.2d at 74-76.  *See also Cutler*

*v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987) ("An agency has broad discretion to set its agenda

and to first apply its limited resources to the regulatory tasks it deems most pressing").  As noted

above, when Congress enacted PDUFA's Performance Goals, it clearly recognized that FDA

cannot complete its review of all drug applications within the six-month time-frame, and that

even the time frames established in the Performance Goals may not provide a realistic time for

decision-making for some applications that, like the Omnitrope NDA, raise particularly complex

regulatory or scientific issues.  Moreover, the public docket regarding follow-on proteins did not

close until March 16, 2005 (*see* AR 001617-001618), and it is entirely reasonable for the

government to carefully consider questions with potentially significant public health

consequences.  *See Sierra Club v. Thomas*, 828 F.2d at 798-99.  *See also Midwest Gas Users

Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987).[8]  Considering all of these facts, the first

*TRAC* factor, the "rule of reason," thus supports Defendants' motion for summary judgment.

### C.     Sandoz Has Offered No Reason for Reordering Agency Priorities

According to *TRAC*, one of the factors the court should consider is "the effect of

expediting delayed action on agency activities of a higher or competing priority."  *TRAC*, 750

F.2d at 80.  In *Barr Laboratories*, after evaluating the *TRAC* factors to determine whether the

agency's delay was reasonable, the Court concluded,

> In short, we have no basis for reordering agency priorities.  The agency is
> in a unique – and authoritative – position to view its projects as a whole,
> estimate the prospects for each, and allocate its resources in the optimal
> way.  Such budget flexibility as Congress has allowed the agency is not
> for us to hijack. . . .  While Congress clearly intended a faster track for . . .

---

[8]     FDA's careful consideration of drug products to ensure their safety and
effectiveness before allowing those products to be marketed furthers the agency's goal of
protecting the public health.  *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 369 (2002)
("Preserving the effectiveness and integrity of the FDCA's new drug approval process is clearly
an important governmental interest, and the Government has every reason to want as many drugs
as possible to be subject to that approval process.").  *See also FDA v. Brown & Williamson
Tobacco Corp.*, 529 U.S. 120, 133-34 (2000) ("it is evident that one of the [FDCA's] core
objectives is to ensure that any product regulated by the FDA is 'safe' and 'effective' for its
intended use"); *United States v. An Article of Drug, Bacto-Unidisk*, 394 U.S. 784, 798 (1969)
(FDCA's "overriding purpose [is] to protect the public health.").

drug applications in general, it did not choose a super-priority for Barr, *and it did not address the trade-off between strict compliance with the 180-day deadline and the FDA's disposition of its other projects with enough clarity to guide judicial intervention.*

*Barr Labs.*, 930 F.2d at 76 (emphasis added).

So too here. FDA's Center for Drug Evaluation and Research ("CDER") is responsible for reviewing all new drugs for safety and effectiveness before those products can be marketed in this country, monitoring marketed drugs for unexpected health risks, overseeing advertising of prescription drugs, regulating information that accompanies over-the-counter drugs, and setting standards for drug quality and manufacturing processes, among other tasks. (*See* CDER 2004 Report to the Nation: Improving Public Health Through Human Drugs (available at http://www.fda.gov/cder/reports/rtn/2004/rtn2004.htm); White Paper, Prescription Drug User Fee Act (PDUFA): Adding Resources and Improving Performance in FDA Review of New Drug Applications (describing the increase in FDA's drug review workload in recent years) (available at http://www.fda.gov/cder/pdufa/whitePaper.pdf).) Sandoz has failed to establish any basis for this Court to reorder FDA's priorities and require FDA to act immediately on the Omnitrope NDA. *See Barr Labs.*, 930 F.2d at 74 ("respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities"). *See also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.") (citations and quotation marks omitted); *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 117 (D.D.C. 2005) ("The Department's decision on how to handle

20

competing applications is deserving of deference.  In analogous cases, where resource allocation

is the source of the delay, courts have declined to expedite action because of the impact on

competing priorities.").  As explained above, the reordering of agency priorities impacts other

applicants and projects and requires extraordinary circumstances to justify judicial intervention.

Sandoz argues that *Barr Laboratories* is inapplicable here because the case was decided

before PDUFA was enacted and that following PDUFA, FDA no longer lacks "the requisite

resources to timely act upon [drug] applications."  (Sandoz MSJ at 27.)  As explained above,

*Barr Laboratories* stands for the broader principle that courts are reluctant to "assume command

over an agency's choice of priorities," involves a direct application of the test for unreasonable

delay in the drug review process, and thus is directly on point here.  *Barr Labs.*, 930 F.2d at 74-

76.

> ### D.      The Importance of Protecting the Public Health Outweighs Any Economic Effect That Could Arise from the Delay

Both the third and the fifth *TRAC* factors relate to the impact the delay will have on the

parties.  *TRAC*, 750 F.2d at 80 ("delays that might be reasonable in the sphere of economic

regulation are less tolerable when human health and welfare are at stake," and "the court should

also take into account the nature and extent of the interests prejudiced by delay").  As explained

above, the public benefits from FDA's careful review and evaluation of the data and information

submitted in connection with the Omnitrope application to ensure that the requirements for

approval in 21 U.S.C. § 355 are fully evaluated.

The only harm Sandoz asserts as a result of FDA not yet having reached a decision on the

Omnitrope NDA is economic.  (*See* Sandoz MSJ at 18-20.)  Sandoz argues that FDA's "failure"

to render a decision on the Omnitrope NDA prevents Sandoz from "recouping its substantial

R&D [research and development] investment in [Omnitrope]," and "places Sandoz at a competitive disadvantage" to other biopharmaceutical manufacturers with FDA-approved products. (*Id.*) This alleged "harm," however, would be the same if FDA were to decide that the Omnitrope NDA was not approvable and is a risk inherent in the drug development business. Sandoz's description of the economic impact of FDA's continuing consideration of the Omnitrope NDA thus does nothing to advance Sandoz's claims of unreasonable agency delay. This harm pales in comparison to the benefit to the public of FDA's careful consideration of the Omnitrope NDA, and thus both the third and fifth *TRAC* factors support a finding that any alleged delay in this case is reasonable.

Again, this case presents a stronger case against injunctive action than the case presented in *Barr Laboratories.* There, in balancing the equities, the D.C. Circuit found that the lack of prescription drug coverage for much of the American population was a consideration that supported equitable action. *See Barr Labs.*, 930 F.2d at 75. Since that time, the Medicare Prescription Drug, Improvement, and Modernization Act has substantially increased prescription drug coverage under the Medicare Program. *See* Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003). As a result, there is substantially greater coverage for drugs than existed fifteen years ago and thus less of an economic effect to counterbalance FDA's vital core mission – assuring the safety and effectiveness of drugs approved for human consumption.

E.    FDA Did Not Treat Sandoz or the Omnitrope NDA Disparately

The final *TRAC* factor asks whether there is any "impropriety" causing the agency's delay. *TRAC*, 750 F.2d at 80. FDA has approved other NDAs under Section 505(b)(2) during the pendency of the Omnitrope NDA review, including NDAs for other biological drug products. Contrary to Sandoz's arguments, those approvals do not mean that FDA has acted in an arbitrary and capricious manner, nor has FDA "singled [Sandoz] out for disparate treatment." (Sandoz MSJ at 41.) Instead, as explained previously, the extended review period for the Omnitrope NDA is due to the complex legal and scientific issues raised by the NDA itself, as well as in the related citizen petitions, public workshops, and comments submitted to the public docket. Furthermore, Sandoz has offered no evidence to rebut the well-established "presumption of regularity [that] attaches to the actions of [g]overnment agencies." *United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003).

Sandoz contends that FDA has treated the Omnitrope NDA differently from NDAs for similarly-situated products, including recombinant hyaluronidase, calcitonin, and glucagon, and naturally-sourced hyaluronidase and menotropins, which products FDA has approved. (*See* Sandoz MSJ at 35.)[9] Sandoz alleges that some of the approved products are more complex

---

[9]    Sandoz contends that it is not aware of any similarly-situated 505(b)(2) application as to which FDA has failed to act within the statutory timetables, and FDA has not identified one. (Sandoz MSJ at 38.) In fact, for one of the products that Sandoz mentions by name, Hylenex (*see id.* at 37 n.27), FDA did miss its PDUFA action date. (*Compare* Hylenex approval letter, dated Dec. 2, 2005 (available at http://www.fda.gov/cder/foi/appletter/2005/021859ltr.pdf) *with* NDA /Efficacy Supplement Action Package Checklist (available at http://www.fda.gov/cder/foi/nda/2005/021859_s000_Hylenex_AdminCorres.pdf) (listing the user fee goal date as September 23, 2005); News Release: Halozyme Theapeutics Provides

23

and/or larger (i.e., contain more amino acids) than Omnitrope, and therefore FDA must have

acted in an arbitrary and capricious manner by approving those products while failing to take

action on the Omnitrope NDA.

Sandoz also asserts that "Sandoz and its Omnitrope 505(b)(2) NDA are indistinguishable

as a legal, regulatory, and scientific matter from the sponsors of, and the approved 505(b)(2)

NDAs for, these other biologic drugs." (Sandoz MSJ at 38.) However, given the complexity of

scientific and regulatory issues to be reviewed in a drug application, it is ludicrous to assert that

these applications are "indistinguishable." The NDAs that are purportedly "similarly-situated"

to the Omnitrope NDA were submitted for products that have active ingredients other than

human growth hormone, have different indications, dosing regimens, and other characteristics,

and that were supported by different safety and effectiveness data. By their nature, drug

applications are *sui generis* and Sandoz's description of all of these products as scientifically

"indistinguishable" is thus completely inaccurate.[10]

Sandoz's reliance on *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997),

to support its disparate treatment claim is misplaced. In *Bracco*, plaintiffs challenged FDA's

regulation of their injectable contrast imaging agents (used with diagnostic ultrasound

---

Update on Hylenex New Drug Application, 9/26/05 (available at
http://www.halozyme.com/4_0_investor.htm) (stating that FDA "told the Company that it would
be unable to meets is [PDUFA] action date for Hylenex").)

[10]     Sandoz also argues that FDA failed to "even remotely attempt[] to distinguish
Omnitrope from these similarly-situated products." (Sandoz MSJ at 39.) There is no
requirement, however, that FDA make a public record to "distinguish" drug products from one
another in the course of the agency's review, and Sandoz has cited no authority to the contrary.
Sandoz's claim that FDA was somehow under an obligation to distinguish Omnitrope from any
other drug products prior to taking final action on the NDA thus lacks merit and should be
rejected.

equipment) as new drugs under the FDCA, in view of FDA's regulation of a virtually identical product manufactured by a different company as a device. *Bracco*, 963 F. Supp. at 23-34.[11] The *Bracco* court held that FDA's failure to "provide a rational basis for treating [one company's] imaging agent as a device while simultaneously regulating essentially identical agents as drugs" – with the products regulated as drugs being subject to a "more rigorous [review] regimen" – was arbitrary and capricious agency action under the APA. *Id.* at 28. Here, however, there is no question that FDA is regulating both Omnitrope and all of the products Sandoz alleges are "similarly-situated" to Omnitrope as new drugs under Section 505(b)(2) of the FDCA. Thus all of the products are subject to the same standards for approval; *Bracco* is simply inapplicable here.[12]

## II.    Sandoz's Claims Concerning the Pfizer Petition Lack Merit

### A.    This Court Lacks Jurisdiction to Hear Sandoz's Challenge to FDA's Inaction on the Pfizer Petition

Sandoz lacks standing to challenge FDA's delay in responding to the Pfizer Petition. Additionally, the factual allegations set forth in the complaint and the documents in the existing administrative record clearly show that FDA has not yet issued a final agency decision on the Pfizer Petition regarding the approvability of the Omnitrope NDA. Thus, Sandoz's claims concerning the Pfizer Petition should be dismissed.

---

[11]    The review and approval of new drugs and devices are governed by different provisions of the FDCA, and therefore different standards for approval may apply. *Compare* 21 U.S.C. § 355 (new drugs) *with* 21 U.S.C. §§ 360c, 360d, 360e (devices).

[12]    The basis of the *Bracco* court's finding was that there was 'disparate treatment of *functionally indistinguishable* products." *Bracco*, 963 F. Supp. at 28 (emphasis added). As described above, far from being "functionally indistinguishable," the other products Sandoz alleges to be similar have different functions than Omnitrope.

1.    Sandoz does not have standing

The federal judicial power is limited by Article III to resolution of "cases" and "controversies."  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982); *Util. Air Regulatory Group v. EPA*, 320 F.3d 272, 277 (D.C. Cir. 2003).  To invoke federal court jurisdiction, a party must establish standing to bring suit, and to have standing, a party must demonstrate an injury-in-fact that is (1) actual or imminent, and concrete and particularized; (2) caused by, or fairly traceable to, the action of the defendant being challenged; and (3) redressable by the court.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Sabre, Inc. v. DOT*, 429 F.3d 1113, 1117 (D.C. Cir. 2005). Federal courts are without power to decide questions that will not affect the rights of litigants in the case before them.  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).

A well established principle of prudential standing is that a plaintiff cannot rest his claim on the rights and interests of third-parties.  *See, e.g., Warth v. Seldin,* 422 U.S. 490, 499 (1975); *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999).  Litigants are barred from asserting the statutory rights of third-parties because courts should not adjudicate third-party rights unnecessarily and because the third-party is presumed to be the best proponent of its own rights.  *See Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 142 (D.D.C. 2002).  Courts have recognized a very narrow exception to this general prohibition where the litigant pursuing the claim shows *both*: 1) that the litigant and the third-party have a close relationship; and 2) that the third-party is hindered from asserting its own rights.  *See Kowalski v. Tesmer*, 543 U.S. 125 (2004).  Sandoz has neither alleged nor demonstrated that either of these circumstances is present here, nor can it.

26

Sandoz thus lacks standing to ask this Court to redress FDA's alleged unreasonable delay in responding to *Pfizer's* Citizen Petition.  This is true even if Sandoz could allege an injury relating to the Pfizer Petition that would suffice to satisfy the "case or controversy" requirement: "That a party may indirectly benefit from asserting the rights of a third party will not suffice to confer standing."  *Amgen Inc. v. Scully*, 234 F. Supp. 2d 9, 16 (D.D.C. 2002).  The appropriate party to be bringing an unreasonable delay action would be Pfizer, and Pfizer has not chosen to do so.

            2.    There has been no final agency action to be set aside

Although Sandoz contends that FDA has "constructively granted" the Pfizer Petition (*see* Sandoz MSJ at 43), there has in fact been no final agency determination to date on that petition and Sandoz's action is thus premature.  Before a party can bring suit under the APA to set aside agency action, there must be final agency action.  5 U.S.C. § 704.  "As a general matter, two conditions must be satisfied for agency action to be final:  First, the action must mark the consummation of the agency's decision-making process–it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations and quotation marks omitted).  *See also Nat'l Ass'n of Home Builders v. U.S. Army Corp of Engineers*, 417 F.3d 1272, 1278 (D.C. Cir.  2005).  The requirement of final agency action preceding judicial review "prevents 'piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary.'" *Public Citizen*, 740 F.2d at 30 (quoting *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 242 (1980)).

27

An agency's governing statutes and regulations may specify what agency actions are final for purposes of review under the APA. *See* 5 U.S.C. § 704; *DSE, Inc. v. United States*, 169 F.3d 21, 25-27 (D.C. Cir. 1999). FDA regulations require that, "before any legal action is filed in a court complaining of an action or failure to act" by the agency, the plaintiff must formally request that the Commissioner take or refrain from taking such action, and FDA must issue a final administrative decision. 21 C.F.R. § 10.45(b). When such request is made through a citizen petition, the Commissioner has 180 days from receipt of the petition to approve the petition, deny the petition, or, if more time is required, issue a tentative response. 21 C.F.R. § 10.30(e)(2). The tentative response may indicate the likely date of a final response, *see id.*, but the regulations do not otherwise specify when a final response must issue. If a court action is initiated before the Commissioner issues his final agency decision, the Commissioner may request dismissal based on failure to exhaust administrative remedies, lack of an actual case or controversy, and no final agency action. 21 C.F.R. § 10.45(b).

In this case, there has been no final agency determination with respect to the Pfizer Petition. FDA's letter in November 2004 to Pfizer explaining that a decision had not yet been reached on its petition did not "mark[] the consummation of the agency's decisionmaking process;" did not impose "an obligation," deny "a right," or fix "some legal relationship;" and "legal consequences" for Sandoz (or for Pfizer) did not derive from those letters. *Reliable Automatic Sprinkler Co., Inc. v. CPSC*, 324 F.3d 726, 731 (D.C. Cir. 2003) (internal quotation and citation omitted). Because FDA has not issued a final agency decision on the Pfizer Petition, there has been no final agency action for the Court to set aside; the absence of administrative finality requires the Court to dismiss Sandoz's claims. (*See* Section III, *infra*.)

28

3.    Sandoz's claims are not ripe for review

Sandoz's cause of action regarding the Pfizer Petition is also barred by the doctrine of ripeness, a concept similar to administrative finality which is designed to ensure that the issues raised are appropriate for judicial review.[13]  *See Public Citizen*, 740 F.2d at 30; *Nat'l Ass'n of Home Builders*, 417 F.3d at 1281.  As the Supreme Court explained, the ripeness doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).  *See also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732-33 (1998).  Under the ripeness doctrine, a court must determine (1) whether the issues before the court are sufficiently developed to be fit for judicial determination; and (2) whether withholding a judicial determination will cause substantial hardship to the parties.  *Texas v. United States,* 523 U.S. 296, 300-01 (1998); *Sabre, Inc. v. DOT*, 429 F.3d 1113, 1119 (D.C. Cir.  2005).

The claim at issue fails to satisfy the ripeness standard.  First, the claim is not fit for judicial review because there has been no agency action that is "sufficiently final" to adjudicate. *Nat'l Ass'n of Home Builders*, 417 F.3d at 1281 (internal quotation and citation omitted).  As explained above, FDA has not reached a decision on the Pfizer Petition; it remains the subject of

---

[13]    "The two doctrines [of ripeness and finality] are intended to further slightly different interests.  Ripeness is primarily concerned with ensuring that issues are in a posture fit for *judicial* review.  Finality is primarily concerned with protecting the integrity of the *administrative* process.  Notwithstanding this difference in emphasis, the doctrines tend to converge in that both are meant to prevent premature judicial intervention in the administrative process."  *Public Citizen*, 740 F.2d at 30 (emphasis in original; citations omitted).

an on-going administrative process.

The Court must then determine whether withholding a judicial determination will cause hardship to the parties. *See Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990). Here, the "institutional interests in postponing review" far outweigh the "hardship to the parties that will result from the delay." *Id*. In this case, any "hardship" to Sandoz arises solely from the wait occasioned by the agency's evaluation of submitted information prior to the completion of its review of the Pfizer Petition. However, that situation may arise with FDA review of any citizen petition. Some period for consideration of submitted data and information, and a possible delay in related agency action, is a necessary part of the administrative review process and does not, by itself, constitute substantial hardship. *See Public Citizen*, 740 F.2d at 31.

In sum, neither prong of the ripeness test is satisfied by Sandoz's claims regarding the Pfizer Petition, and those claims should therefore be dismissed by this Court.

**B.    FDA Has Not Unreasonably Delayed Acting on the Pfizer Petition**

Assuming *arguendo* that Sandoz could establish this Court's jurisdiction over its unreasonable delay claim regarding the Pfizer Petition, the claim nonetheless must fail on the merits. No statute or regulation provides a specific deadline requiring FDA to issue a final response to a citizen petition within a specific time frame.[14] It is not unusual for citizen petitions raising novel or complex issues to remain under review at FDA for a substantial period while the

---

[14]    Defendants do not dispute Sandoz's contention that, by regulation, FDA must provide "a response" to a citizen petition within 180 days of receipt. 21 C.F.R. § 10.30(e)(2). (*See also* Sandoz MSJ at 11.) That response, however, need not be the agency's final decision on the petition, but can consist of FDA's explanation for "why the agency has been unable to reach a decision on the petition," (*id.*), as was the case in the letter issued by FDA to Pfizer within the 180-day timeframe (Ex. E, A.R. 001545).

agency considers the merits of the submissions and any related regulatory actions.

Moreover, because the Pfizer Petition raises many of the same legal, factual, scientific, and regulatory issues as the Omnitrope NDA, FDA cannot fully adjudicate the Pfizer Petition independently from its consideration of the Omnitrope NDA.[15]  FDA needs to evaluate the legal, factual, scientific, and regulatory issues raised by the Omnitrope NDA, both directly and indirectly, as well as the relevant comments submitted to both the follow-on proteins public docket and the citizen petition dockets, before it can render a final decision on the Pfizer Petition.  Under these circumstances, the time FDA has taken to consider the Pfizer Petition cannot be shown to violate the rule of reason.  *See Vermont Yankee Nuclear Power*, 435 U.S. at 543 ("administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties") (citations and quotation marks omitted); *Mobil Oil Exploration & Producing Southeast, Inc. v. United Distrib. Cos*., 498 U.S. 211, 230 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and

---

[15]      For example, the Pfizer Petition states:

Even if FDA legally could rely on Pfizer's proprietary data to approve Omnitrop, Genetropin and Omnitrop have so many important chemical and formulation differences– including molecular weight, genetic sequence of the recombinant plasmid, master and working cell banks, and preservatives– that FDA can not make a scientifically-rational decision about the safety and effectiveness of Omnitrop based on the proprietary Pfizer data, limited public Genetropin data, and publicly available Sandoz data.  Consequently, absent additional testing and data on Omnitrop, FDA will not be able to confirm the batch-to-batch reproducibility, stability, level of adverse events, dosing, and overall safety and effectiveness of this proposed product.

(Ex. B, A.R. 000011; *see also id.*, A.R. 000013-000014 (discussing several scientific differences that Pfizer alleges exist between its product, Genotropin, and Sandoz's product, Omnitrope).)

priorities.") (citations omitted).

Sandoz also asserts that because FDA "failed to formally respond in a timely manner to the Pfizer petition," FDA has "constructively granted" the Pfizer Petition, and that "[b]ecause of FDA's continued inaction on that petition, this Court can conclude the matter is no longer under consideration by the Agency." (Sandoz MSJ at 11, 42-43.) Sandoz fails to cite any authority for the notion that a court should deem a citizen petition to have been granted if an agency does not render a decision in a "timely manner," with such "timely manner" not defined in any regulation or statute. But Sandoz merely states that FDA's "lengthy period of inaction [on the Pfizer Petition] constitutes . . . constructive granting based upon a reasonable interpretation of FDA's Administrative Procedure regulations." (*Id.* at 43.) In fact, FDA is evaluating the complex legal and scientific issues raised in the Pfizer Petition itself, and the additional comments submitted to the petition docket. (*See* A.R. 000005-001605 (including Exs. B-E) .)[16] This Court should therefore reject Sandoz's request for summary judgment regarding the "constructive granting" of

_____

[16]     Sandoz's assertion that "[t]here is no evidence in FDA's version of the Administrative Record suggesting that FDA has taken any action in reviewing Pfizer's petition since late-2004," (Sandoz MSJ at 42), lacks merit. First of all, FDA's letter of November 10, 2004, states that FDA "will respond to your [Pfizer's] petition as soon as we have reached a decision on your request," (Ex. E, A.R. 001545), which plainly means that until Pfizer receives a response from FDA, the agency is continuing to consider the issues raised in the petition. Secondly, FDA's regulations define an administrative record as "the documents in the administrative file of a particular administrative action on which the Commissioner relies to support the action," with an administrative file defined as "the file or files containing all documents pertaining to a particular administrative action, including internal working memoranda, and recommendations." 21 C.F.R. § 10.3(a). By definition, then, the existing Administrative Record in this case cannot contain any internal memoranda or recommendations on which the agency relies to support its decision, because FDA has not yet reached a decision on the Pfizer Petition, so it is not surprising that the existing Administrative Record does not contain any documents, other than the November 10, 2004 letter, evidencing FDA's continuing evaluation of the Pfizer Petition.

the Pfizer Petition.[17]

## III.    Sandoz Fails to State a Cause of Action Under 5 U.S.C. § 706(2) Concerning the Agency's Review of the Omnitrope NDA

The APA authorizes a reviewing court (1) to compel agency action unlawfully withheld or unreasonably delayed; and (2) to hold unlawful and set aside agency actions, findings, and conclusions that fall within six legal categories.  *See* 5 U.S.C. § 706.  Where a plaintiff challenges an agency action and the action "is *not* a final decision, any review the plaintiff[] seek[s] *cannot be under § 706(2) of the APA* but must instead be under § 706(1), the 'action unlawfully withheld or unreasonably delayed' prong."  *Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687, 701 (S.D. Ill. 2004) (emphasis added).  Where the agency has not made a final decision, there is no action to "set aside" under 5 U.S.C. § 706(2).

In this case, three of the five counts in Sandoz's complaint seek to "set aside" action on the Omnitrope application pursuant to 5 U.S.C. § 706(2).[18]  (*See* Complaint, D.I. 1, Counts One, Two, and Four.)  The pleadings in this case, together with the documents in the existing administrative record, demonstrate that FDA has not yet issued a final agency decision as to whether to approve or to reject the Omnitrope NDA.  Indeed, Sandoz's own complaint repeatedly and specifically states that FDA has not acted on its Omnitrope application by issuing either an approval or denial.  (*See*, *e.g.*, *id.*, ¶ 4 ("the Defendants have refused to render the one

---

[17]     Sandoz's extraordinary request that this Court "set aside" FDA's "constructive action on the Pfizer Petition" (Sandoz MSJ at 44) is merely a back-handed way of asking this Court to order FDA to approve the Omnitrope NDA, an action which this Court lacks the authority to take.  *See, e.g., Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65-67 (2004); *Gottlieb v. Pena*, 41 F.3d 730, 734 (D.C. Cir. 1994).

[18]     Count Five seeks to "set aside" action on the Pfizer Petition and suffers from the same problem, among others.  (*See* Section II, *supra*.)

and only action supported by the Administrative Record of the NDA");¶ 181 ("The Defendants were statutorily required to . . . render a decision on the approvability of the Omnitrope NDA, and the Defendants fail[ed] to fulfill this statutory mandate[.]"); ¶ 189 ("the Defendants' failure to act on the Omnitrope 505(b)(2) NDA . . . must be set aside[.]").

Because there has been no final agency determination on the Omnitrope NDA, there is no action to "set aside" under Section 706(2), and no cause of action stated under that section, *Shawnee Trail Conservancy*, 343 F. Supp. 2d at 701. For this reason alone, Counts One, Two, and Four are subject to dismissal. Furthermore, there is no basis to adopt any test for judicial review in this action pursuant to Sandoz's various allegations under Section 706(2). The only applicable standard in this case is the test for unreasonable delay applicable under *TRAC*, 750 F.2d at 80, and, for the reasons set forth above, equitable relief is not justified under that standard in this case.

## CONCLUSION

FDA has not unreasonably delayed rendering a final decision on either the Omnitrope NDA or the Pfizer Petition. No other cognizable claim is presented here. Furthermore, this Court lacks jurisdiction over Sandoz's claims regarding the Pfizer Petition. Therefore, Defendants respectfully request that the Court enter summary judgment in Defendants' favor,

dismiss Sandoz's claims concerning the Pfizer Petition, and award Defendants their costs,

expenses, and such additional relief as the Court may deem appropriate.

Of Counsel:                                 Respectfully submitted,

PAULA M. STANNARD                           PETER D. KEISLER
Acting General Counsel                      Assistant Attorney General

SHELDON T. BRADSHAW                         EUGENE M. THIROLF
Associate General Counsel                   Director
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation            _____/s/_____
                                            DOUGLAS W. STEARN (DCBN 440735)
SHOSHANA HUTCHINSON                         Trial Attorney
Assistant Chief Counsel                     Office of Consumer Litigation
U.S. Dept. of Health & Human Services       U.S. Department of Justice
Office of the General Counsel               P.O. Box 386
5600 Fishers Lane                           Washington, D.C. 20044
Rockville, MD  20857                        Telephone: (202) 307-0061
(301) 827-8579                              Facsimile:  (202) 514-8742
                                            E-mail: douglas.stearn@usdoj.gov
February 13, 2006