UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SANDOZ INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | Case No. 1:05CV01810 (RMU) |
| Health and Human Services, and | ) | |
| ANDREW C. VON ESCHENBACH, M.D., | ) | |
| Acting Commissioner, Food and Drug | ) | |
| Administration, | ) | |
| | ) | |
| Defendants. | ) | |

# *Plaintiff's Exhibit #3*

# *Accompanying*

### Consolidated Opposition/Reply Pursuant To January 31st Order Sandoz' Consolidated Memorandum Of Points & Authorities In Opposition To Defendants' Motion For Summary Judgment And Reply In Support Of Sandoz' Motion For Summary Judgment On All Counts In Its Complaint

I ask unanimous consent that there be printed in the RECORD at this point a brief summary of the amendments, what they would do, and the difficulties of the pending bill which they seek to overcome, so that this body may be informed as to the narrative and the tenor of the entire dispute.

There being no objection, the summary was ordered to be printed in the RECORD, as follows:

### SUBSTITUTE FOR SECTION 3

*Information on patents for drugs*

Section 3(b), with all amendments, lends itself to many constructions. The term "modification of a drug" is believed to mean only a new drug that is a close chemical relative of an existing drug, so close in chemical structure that the new drug is presumed to have properties not significantly different from those of the existing drug. Such a new drug is now regarded as presumptively "obvious" under section 103 of the Patent Code unless a surprising advantage is demonstrated. So construed, section 3(b) would not substantially change the law.

However, another possible construction would be based on the theory that section 3(b) would not be passed in the absence of a congressional desire to make a change. Terms such as "modification of drug" lend themselves to a broader meaning reaching beyond those modifications of existing drugs that would be presumptively "obvious" under the present law. In such event, drugs that are patentable, and should continue to be patentable, would be denied patent protection—for example, a drug which, even though having no convincingly demonstrated advantage over prior drugs, represents a genuine technical advance and useful new product competition that should continue to be stimulated by patent rights.

Moreover, the language of section 3(b) is unworkable, will create hardship, and will give rise to undesired consequences in specific and important instances, viz:

1. The case of the typical antibiotic, where chemical structure is unknown and it is therefore not known whether it is or is not a "modification of a drug."

2. The case where a product has utility both in the drug field and in another field. Disclosure of the drug utility—most desirable in the public interest—will be discouraged to avoid problems under section 3(b).

3. The case where a new standard of section 3(b) regarding comparison with the prior "drug" might be broadly construed to require otherwise unnecessary, socially useless, and highly dangerous tests of a prior chemical compound (in a manner not previously tested) on humans.

The Dirksen substitute is patterned on the statute (title 35 sec. 164) which has worked so well as to patents on plants for the Department of Agriculture. It would provide the flexibility that is desirable in consultations between the Patent Office and the HEW on any drug patent question.

### SUBSTITUTE FOR LICENSING (IN NAME OF REGISTRATION)

S. 1552 proposes a new section 508 to the FDC Act which would set up a "registration" system which is, in effect, a licensing system. This is wrong for the following reasons:

A. The licensing system would give the Government life-and-death power over every phase of drug manufacture.

B. It departs from the present regulatory principles which are founded on the quality of the end product, not meticulous governmental control of the processes which produce the product.

C. It would overlap other provisions of the FDC Act which work well in practice and which themselves are to be tightened up by other provisions of S. 1552.

In lieu of the proposed licensing system, the following amendments should be substituted:

1. A substitute section 508 setting up a true registration system under which each manufacturer and each plant is recorded in the FDA for its purposes and for public scrutiny, with provision for inspection of each plant at least once in every 2-year period. Amendment No. 1.

2. Amendment of section 704(a) of the act to strengthen the FDA's inspection authority, without interfering unreasonably in matters unrelated to potential violations of the act. Amendment No. 2.

3. Amendment of section 501(a)(2) of the act to declare a drug adulterated if it is not made in accordance with current good manufacturing practice. Amendment No. 3.

The proposed true registration system, coupled with strengthened inspection authority and provision for manufacturing controls in accordance with good manufacturing practice (and with the new drug procedures of section 505), would make the licensing system proposed in S. 1552 superfluous as well as undesirable.

The amendments of sections 704 and 501 would carry out recommendation No. 3 in the President's letter of April 10.

### SUBSTITUTE FOR NEW DRUG PROCEDURES AND CRITERIA

*New drug clearance procedures*

A. S. 1552 would change the present procedure so that no new drug application could become effective unless and until the FDA specifically approves it. Under the present law, a new drug application becomes effective in 60 days (which FDA may extend to 180 days) unless the FDA acts to block it. The present procedure should be retained, with two changes: (a) Extension of the preliminary time for action from 60 to 90 days; (b) provision for hearing promptly after the 180-day period. This would eliminate the potential delay inherent in a requirement of affirmative approval, while preserving FDA's right to block marketing until it is satisfied with the evidence. This would be accomplished by amendment No. 4.

*Substitute for efficacy test on new drug original clearance*

B. Under the present law, the new drug must be shown to be safe for use. S. 1552 would also require that it be shown to be efficacious. However, S. 1552 does not make clear the burden of proof necessary to meet the test of efficacy. It should be made clear that the new drug applicant has met the test if he has presented substantial evidence (not necessarily preponderant evidence) that the drug will have the effects claimed for it. This would be accomplished by amendment No. 5.

The purpose of the amendment is to permit legitimate differences of opinion among responsible clinicians to be resolved by the medical profession in day to day practice, instead of being resolved for all doctors against the effectiveness of the drug by the fiat of the FDA staff. Experience proves that the majority of "experts" have often been wrong in initially condemning a new medicine.

*Substitute for safety and efficacy tests on new drug suspension*

C. Under the present law, a new drug previously cleared and on the market can be suspended, after hearing, if new evidence shows it to be unsafe. S. 1552 would permit the same suspension if new evidence shows it not to be efficacious. Recommendation No. 2 in the President's letter of April 10 is that a drug already on the market be subject to suspension if the FDA has substantial doubt as to its safety or efficacy, even though no new adverse evidence has become available since the drug first went on the market. However, "substantial doubt" is a slippery, elastic term, permitting suspension whenever the Secretary feels like it, without hope of meaningful judicial review. The test for suspension should be the same as on original clearance of new drugs. Suspension should be authorized on the basis of new evidence (evaluated with the old evidence), and only if, in the case of safety, the manufacturer cannot show the drug to be safe or, in the case of efficacy, cannot show substantial evidence that the drug has the effects claimed for it. This would be accomplished by amendment No. 6. This amendment would carry out the President's recommendation with respect to substantial doubt as to safety, but with safeguards, in the case of efficacy, to avoid suspension from the market of a safe drug for whose effectiveness there is substantial evidence.

*No change in definition of new drug*

D. S. 1552 would change the definition of "new drug" from one that is not generally recognized to be "safe" for use to one that is not recognized as "safe and efficacious" for use. This change is unnecessary to give FDA power to pass on the efficacy of truly new drugs, which are covered by the existing definition because, being new, they are not generally recognized to be safe. The change would also cause confusion when a new use is discovered for a safe old drug. For example, if aspirin in its normal dosage were to be newly recommended as efficacious for acne, it should not have to go through the elaborate new-drug procedure. If FDA believes the claim is false, it has ample power to seize the drug as "misbranded" under existing law. Amendment No. 7 would eliminate the change.

### RECORDS AND REPORTS AS TO EXPERIENCE ON NEW DRUGS AND ANTIBIOTICS

This amendment would carry out recommendation No. 1 in the President's letter of April 10. It would add new language to existing sections 505(i) and 507(d) of the FDC Act, and add completely new sections 505(j) and 507(g) to the act. The amendment is in the form submitted by the administration, with additional language providing that FDA regulations with respect to records and reports of experience with drugs be promulgated with due regard for the ethics of the medical profession and that such regulations provide, where the Secretary of HEW deems it appropriate, for examination by the manufacturers of similar information obtained by the Secretary on their drugs.

### OFFICIAL OR GENERIC NAMES OF DRUGS

*Requirement that labels include official name with conspicuousness required under section 502(c) (substitute for requirement that type be equal in size and prominence to trade name)*

S. 1552 would require that the generic name of a drug be printed in type at least as large and as prominent as that used for the trade name.

This is wrong because:

1. The FDC Act should not be used to deprive drug manufacturers of trademark rights and thus reduce their incentive to strive for excellence surpassing the minimum statutory standard.

2. It is impracticable and undesirable to establish flat rules in the law with respect to the precise relative size of the various words on labels and advertising.

3. The present act gives the FDA adequate authority to require whatever information is necessary on labels and in labeling in such form as may be readily understood.

In lieu of the proposal in S. 1552, amendment No. 9 would require that the official name be shown on labels in accordance with section 502(c) of the act—that is, with the conspicuousness necessary to make it readily understood.