**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SANDOZ INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | Case No. 1:05CV01810 (RMU) |
| Health and Human Services, and | ) | |
| ANDREW C. VON ESCHENBACH, M.D., | ) | |
| Acting Commissioner, Food and Drug | ) | |
| Administration, | ) | |
| | ) | |
| Defendants. | ) | |

# *Plaintiff's Exhibit #4*

# *Accompanying*

**CONSOLIDATED OPPOSITION/REPLY PURSUANT TO JANUARY 31ST ORDER
SANDOZ' CONSOLIDATED MEMORANDUM OF POINTS & AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF SANDOZ' MOTION FOR SUMMARY JUDGMENT
ON ALL COUNTS IN ITS COMPLAINT**

# Calendar No. 1703

| 87TH CONGRESS<br>*2d Session* } | SENATE | { REPT. 1744<br>Part 2 |
|---|---|---|

## DRUG INDUSTRY ACT OF 1962

---

AUGUST 21, 1962.—Ordered to be printed

---

Mr. EASTLAND, from the Committee on the Judiciary, submitted the following

## · REPORT

[To accompany additional amendments to the bill S. 1552]

The Committee on the Judiciary having reported the bill (S. 552) to amend and supplement the antitrust laws with respect to the manufacture and distribution of drugs, and for other purposes, reports additional amendments thereto.

### STATEMENT

After the committee had completed action on the bill as reported to the Senate on July 19, 1962, the President of the United States addressed a letter dated August 3, 1962, to the chairman of this committee enclosing drafts of amendments he asked the committee to consider. In addition, the committee decided to give further special consideration to the adequacy of the present provisions of the Food and Drug Act, as proposed to be amended by the previously reported bill, from the point of view of safety because of the concern shared by the committee with the American people about the disclosures as to the effects of the drug thalidomide, although the drug was kept off the U.S. market under the premarketing clearance provisions of existing law.

The committee met in executive session on August 6, 7, 8 9, 10, and 20, and decided on the language changes contained in the substitute adopted by the committee on August 20. In reporting out these changes, the committee is of the opinion that with these changes in the bill, the legislation will insure the reliability of drugs.

Following is a section-by-section explanation denoting language changes made by the committee substitute.

### INFORMATION ON PATENTS FOR DRUGS

The committee made no changes in this section.

85006

2                    DRUG INDUSTRY ACT OF 1962

### REGISTRATION

This section (sec. 3) of the bill, as reported by the committee on July 19, 1962, providing for annual registration of drug manufacturing establishments with the Department of Health, Education, and Welfare, was not changed, except that the committee inserted a transitional provision to the effect that the requirement that a person who already owns or operates such an establishment at the time of enactment of the bill will be deemed to have satisfied the registration requirement with respect to the calendar year 1962 if he first registers prior to the first day of the seventh calendar month following the month of enactment of the bill. This will give existing manufacturing establishments a reasonable time for becoming acquainted and complying with the requirements of the new law. The transitional provision also provides that such a delayed registration for 1962, if actually made in 1963 within the above-mentioned period after enactment, shall likewise be deemed compliance with the requirement of registration for the year 1963.

### FACTORY INSPECTION

Section 4 of the bill, as reported by the committee on July 19, 1962, provided for adding to the existing inspection provisions of the Federal Food, Drug, and Cosmetic Act (sec. 704(a)) broader inspection authority for prescription drug establishments, but with certain exceptions including an exception as to retail pharmacies. The President, in the amendments submitted to the chairman of this committee on August 3, 1962, proposed deletion of the limitation to prescription drugs, as well as the deletion of other exceptions from the additional inspection authority.

The inspection provisions of S. 1552, in the version originally introduced, in the version reported to this committee by the Subcommittee on Antitrust and Monopoly, and in the version reported to the Senate on July 19, 1962, were limited to prescription drug establishments. The proprietary drug industry, in reliance on this fact and on assurances publicly made from time to time, did not ask to be heard on this matter. Therefore, this committee decided not to go into the question of the need for added inspection authority for proprietary drug establishments. This decision is without prejudice to the merits of the proposal to extend the inspection authority to such establishments.

Similarly, the exclusion of retail pharmacies from the inspection provisions does not represent any narrowing of the bill from the original version, and the retail drug industry was not heard on the merits of the proposal to extend inspection beyond existing authority as to such pharmacies. The committee did clarify the provision exempting pharmacies from the new prescription drug inspection authority by amending it to read:

> pharmacies * * * engaged in dispensing prescription drugs, upon prescriptions of practitioners licensed to administer such drugs, * * * which do not, *either through a subsidiary or otherwise*, manufacture, prepare, propagate, compound, or process drugs for sale other than in the regular course of their business of dispensing or selling drugs at retail.

In addition to the two broad exceptions to the extended inspection authority above mentioned, the bill as reported July 19, 1962, contains other limitations to the new inspection authority that are applicable to certain data, including personnel and research data. The limitation on inspection of personnel data has been modified by the committee amendment so as to permit inspection of data on the qualifications of technical and professional personnel performing functions subject to the act. The limitation on inspection of research data has been clarified to permit inspection of the type of records required to be kept and reports required to be made under the regulations issued under the records and reports provisions of the bill (sec. 7).

A final subsection would be added to section 4 providing that nothing in the new prescription drug inspection authority shall be construed to negate or derogate from any authority previously vested in the Secretary. This subsection, recommended by the President, makes explicit in the bill the committee's intent, stated on page 13 of its report of July 19, 1962, that—

> Nothing in the specific provisions added by the committee as to prescription drugs is intended to detract from, or imply the absence of, existing authority as to other drugs or articles subject to the act.

## QUALITY MANUFACTURING CONTROLS

Section 5 of the bill, as reported by the committee on July 19, 1962, would have amended the Food, Drug, and Cosmetic Act to deem a drug to be misbranded if "the methods used in, or the facilities or controls used for," its manufacture, processing, packaging, or holding do not conform to current good manufacturing practice, to assure that the drug has the required safety, identity, and strength, and that it has the quality and purity it purports or is represented to have. In addition, the reported bill provided that the Secretary was authorized to issue "interpretative regulations * * * which shall * * * be prima facie evidence of what constitutes current good manufacturing practice."

The President, in the recommendations submitted for the consideration of the committee with his letter of August 3, 1962, proposed a revised version which included the following principal amendments to the reported bill:

(1) It proposed to replace the provisions on regulations with prima facie evidentiary effect with a provision that the adequacy of the quality controls be determined "in accordance with regulations promulgated by the Secretary on the basis of good manufacturing practice" after formal rulemaking procedures, i.e., after affording an opportunity for hearing, and for judicial review on the basis of the hearing record, with respect to such regulations.

(2) It proposed to specifically require that the "personnel" employed in the manufacture, processing, packaging, or holding of the drug, as well as the methods, facilities, and controls used, conform to such regulations of the Secretary. This proposal, in effect, would have conferred on the Secretary authority to set personnel standards for all personnel employed in the manufacture and other activities of drug establishments specified in this provision of the bill.

4                   DRUG INDUSTRY ACT OF 1962

The explanation accompanying the recommendations of the President expressed concern lest the language as to interpretative regulations with prima facie evidentiary effect invite endless de novo litigation on the question of what constitutes good manufacturing practice each time there is enforcement action under the new quality control provisions. The committee acceded to the President's request for elimination of the "prima facie" regulatory authority in the bill. It felt, however, on balance, that there was no need for inserting provisions for regulations through formal rulemaking on the subject of what is good manufacturing practice. Section 701(a) (21 U.S.C. 371(a)) now vests in the Secretary "authority to promulgate regulations for the efficient enforcement of this Act." This permits the Department to issue such regulations as it desires and their scope and effect will be the same as that of other regulations issued under such general authority. Numerous regulations have been issued under section 701(a) and have been the subject of consideration and application in the courts in actions arising under the various provisions of the act not now subject to formal rulemaking procedures.

In lieu of the other proposal of the President, i.e., to confer on the Secretary of Health, Education, and Welfare or his delegate, authority to set personnel standards for the drug industry, the committee decided to provide that not only must the requisite methods, facilities and quality controls be established in conformity with current good manufacturing practice, but that these methods, facilities, and controls must, in fact, be operated and administered in conformity with current good manufacturing practice.

NEW-DRUG CLEARANCE PROCEDURE

Section 6 of the previously reported bill, which would measurably have advanced the protection afforded under existing law under the new-drug section of the act insofar as the time limit within which the Department must act on a new-drug application is concerned, would be further strengthened and improved in this respect by the new committee amendment.

In the first place, under the amendment now proposed no new drug could go on the market without affirmative approval by the Department. Under present law, a new-drug application becomes "effective" automatically in 60 days, which may be extended to 180 days, unless the Secretary within that period, after notice and hearing, refuses to permit the application to become effective. Secondly, under the bill previously reported, the new-drug application would "become effective" in 90 days, which the Secretary could extend to 180 days, unless the Secretary within the 90- to 180-day time limit gave notice of a hearing, to commence 30 days after such notice (unless otherwise agreed); but no specific time limit would have applied to the hearing or decision thereon though such hearing and decision were to be on an expedited basis. Under the proposed committee amendment, not only will a new-drug application not become effective automatically under any circumstances, but the Secretary initially has 180 days (unless further extended by agreement) within which to decide whether to approve the application on the basis of the information then before him or to give notice of an opportunity for hearing; in the latter event, the applicant has 30 days to request a hearing, and in the event of such request the hearing would, unless otherwise agreed, have to

commence within 90 days after such 30 days; that is, within a total of 120 days after the applicant's receipt of notice of the opportunity for hearing. The hearing, as under the previously reported bill, would have to be conducted on an expedited basis.

The act would also be amended by the proposed committee amendment so that appeals from the Secretary's orders in new-drug cases would be to the U.S. courts of appeals rather than the district courts, thus bringing the appeal provisions of the new-drug section of the act into conformity in this respect with other parts of the Food and Drug Act which provide for action by the Secretary after formal hearing and for judicial review on the basis of the administrative hearing record.

## RECORDS AND REPORTS AS TO EXPERIENCE ON NEW DRUGS AND ANTIBIOTICS

Section 7 of the bill was not changed by the committee.

## EFFECTIVENESS AND SAFETY OF NEW DRUGS

Section 8 of the bill, as reported on July 19, 1962, would have amended section 505(b) relating to the information to be submitted with a new-drug application, section 505(d) setting forth the grounds for rejection of a new-drug application, and section 505(e) specifying the grounds for withdrawal of approval of a new-drug application.

The committee substitute involves five different topics, which are as follows:

    (a) Definition of "new drug";
    (b) Test of effectiveness;
    (c) Suspension for imminent hazard to public health;
    (d) Additional grounds for withdrawal of new-drug approval; and
    (e) Transitional provisions.

Each of these topics is discussed below.

### (a) Definition of "new drug"

The bill as reported on July 19, 1962, did not include effectiveness in the definition of a new drug. Senate Report 1744 accompanying S. 1552 as reported stated, at page 17, that it was unnecessary to amend the definition of a "new drug" to include the concept of "effectiveness." A question arose as to the circumstances and extent to which a new claim or change of claim for effectiveness made after the initial approval of a new-drug application could be made without supporting evidence to be submitted to the Department under the new-drug procedure. In order to eliminate any possible ambiguity on this point, the term "effectiveness" is incorporated in the committee's substitute amendment. The effect of this change is to require that all claims for effectiveness, whether made initially in a new-drug application or at any time thereafter, must be supported by "substantial evidence," which term is defined in the substitute amendment. The effect of this amendment on drugs already on the market is discussed below under "Transitional provisions."