**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SANDOZ INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | Case No. 1:05CV01810 (RMU) |
| Health and Human Services, and | ) | |
| ANDREW C. VON ESCHENBACH, M.D., | ) | |
| Acting Commissioner, Food and Drug | ) | |
| Administration, | ) | |
| | ) | |
| Defendants. | ) | |

*Plaintiff's Exhibit #2*

*Accompanying*

**MEMORANDUM OF SANDOZ INC. REGARDING
THE STATUS OF *TUMMINO* AND ITS APPLICABILITY TO THIS CASE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
----------------------------X    Docket#
TUMMINO,                      : 05-CV-366(erk)
              Plaintiff,      :
                              :
   - versus -                 : U.S. Courthouse
                              : Brooklyn, New York
ANDREW C. von ESCHENBACH,     :
              Defendant       : December 22, 2005
----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES MAGISTRATE JUDGE

A    P    P    E    A    R    A    N    C    E    S:


**For the Plaintiff**  :        **Andrea Costello, Esq.**
                                 **Shelbi Day, Esq.**
                                 **Nan Strauss, Esq.**
                                 **Simon Heller, Esq.**
                                 **Priscilla Smith, Esq.**


**For the Defendant**  :        **Franklin Amanat, AUSA**
                                 **Karen Schifter, Esq.**


**Official Transcriber**  :     **Rosalie Lombardi**
                                 **By:   L.F.**


**Transcription Service**  :    **Transcription Plus II**
                                 823 Whittier Avenue
                                 New Hyde Park, N.Y.  11040
                                 (516) 358-7352


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

**Proceedings**

1          THE CLERK:   Tummino v. von Eschenbach    .

2          Your appearances, counsel.

3          MR. HELLER:  Simon Heller for plaintiffs.

4          MS. STRAUSS:  Nan Strauss for plaintiffs.

5          MS. SMITH:  Priscilla Smith for plaintiffs.

6          MR. COHEN:  Sanford Cohen for plaintiffs.

7          THE CLERK:  On conference for plaintiffs?

8          MS. COSTELLO:  Andrea Costello for the

9   plaintiff.

10         MS. DAY:  Shelbi Day for the plaintiff.

11         MR. AMANAT:  Your Honor, I am Franklin Amanat,

12  assistant United States attorney here for the

13  Commissioner Andrew C. von Eschenbach.

14         MS. SCHIFTER:  Karen Schifter for FDA on behalf

15  of the defendant.

16         MR. AMANAT:  Good afternoon, your Honor.

17         Before the Court today is defendant's motion

18  for judgment on the pleadings.  I just want it to be

19  clear that what's before the Court is only that motion,

20  not any motion for summary judgment by the plaintiffs.

21         Therefore, the only question before the Court

22  today is whether the allegations in the complaint

23  standing alone are legally sufficient to establish this

24  court's subject matter jurisdiction and to withstand a

25  motion for judgment on the pleadings.  As set forth in

3

**Proceedings**

1    our briefs, we respectfully submit that they are not.

2           But if the Court disagrees with our position

3    and believes that the complaint is legally sufficient,

4    the most the Court can do today is to deny our motion in

5    whole or in part and set the case down for submission of

6    the administrative record or the relevant parts thereof,

7    and for further briefing on cross motions for summary

8    judgment.

9           THE COURT:  I can allow discovery, too.

10          MR. AMANAT:  Well, discovery is an issue that's

11   currently before the magistrate judge --

12          THE COURT:  No, no.

13          MR. AMANAT:  -- in connection with our motion

14   for protective order but that is, of course, an issue

15   that would have to be resolved.

16          THE COURT:  He stayed discovery.

17          MR. AMANAT:  I beg your pardon?

18          THE COURT:  He stayed discovery.

19          MR. AMANAT:  He -- yes, he stayed discovery

20   until this conference and reserved ruling on our motion

21   for a protective order which we filed a couple of months

22   ago.

23          In saying this, I just want to emphasize that

24   nothing before the Court today would allow the Court to

25   actually grant the plaintiffs any of the relief they were

4

**Proceedings**

1  seeking by the Court.

2          THE COURT:  I understand this.  You don't have

3  to tell me.

4          MR. AMANAT:  Okay.

5          THE COURT:  It's your motion.

6          MR. AMANAT:  Right.

7          THE COURT:  You want, in effect, summary

8  judgment.

9          MR. AMANAT: Now, we have submitted a lot of

10  paper to the Court and let me just take a few moments, if

11  I may, to just try to encapsulate what I see as the main

12  themes that I would like the Court to hear in connection

13  with our motion.

14          First, in considering the legal sufficiency of

15  the allegations of the complaint, the Court should keep

16  in mind that the only administrative proceeding which the

17  Court conceivably has subject matter jurisdiction to

18  evaluate in this case is listed in petition.  And the

19  plaintiffs lack standing to contest any aspect of FDA's

20  handling of Barr's supplemental new drug application.

21          THE COURT:  That may or may not be so.  I don't

22  know -- if you want to argue it, you could argue it but

23  it's not clear that they necessarily lack standing.

24          MR. AMANAT:  Well, I --

25          THE COURT:  Or third party standing.  The

Transcription Plus II          Rosalie Lombardi

5

**Proceedings**

1   question there is whether if they're going to -- to the

2   extent they stand in Barr's shoes, to challenge what they

3   allege to be a final decision of the FDA, then whether it

4   should be in the court of appeals or not.

5           MR. AMANAT:  Well, then that's an excellent

6   question, your Honor.  Let me touch on that for a moment.

7           THE COURT:  I mean, I don't necessarily accept

8   that they don't have third party standing but that in

9   itself may involve a question that has to be dealt with

10  discovery.  Part of it may depend on why it is that Barr

11  has sort of acquiesced in what the FDA has done, and if,

12  in fact, Barr acquiesced in what the FDA has done or has

13  not sought to challenge what the FDA has done is because

14  they don't want to -- this may not be a drug from which

15  that will derive much economic advantage if it's because

16  -- and, therefore, do not wish to launch a wholesale

17  legal war over it or because they may be concerned about

18  getting on the wrong side people at the FDA whom they may

19  have to deal with in other instances where they're

20  actually seeking approval of drugs.  That might be an

21  instance in where you could conceive of an argument, the

22  kind of -- where the third party is "hindered" from

23  asserting his own rights.  And I think that in my view,

24  they have -- they can show the kind of discrete injury to

25  themselves that would be sufficient to justify third

6

**Proceedings**

1  party standing.

2            MR. AMANAT:  Well, we would respectfully

3  disagree, your Honor.  As we set forth in our

4  supplemental brief which we've filed last week, the case

5  law is very clear that a plaintiff seeking to challenge

6  federal agency action cannot predicate Article 3 standing

7  on the rights of a third party.  And we believe that that

8  case law applies here.

9            Simply stated, your Honor, the only entity that

10 has standing to challenge FDA's handling of Barr's SNDA

11 (phonetic), whether on a claim of unreasonable delay or

12 on a claim that FDA's issuance of the May 2004 letter was

13 arbitrary and capricious would be barred.

14            THE COURT:  I know you harp on the May 2004

15 letter but it was no -- and it may have been the

16 significant document at the time the complaint was filed,

17 there is an even more significant document here which is

18 the August letter --

19            MR. AMANAT:  Right, but even if --

20            THE COURT:  -- which to my mind constitutes --

21 I mean, you know the agency could put it in whatever form

22 it wants but it's a clear rejection of over the counter

23 authorization for the sale of plan B to persons under the

24 age of 17.

25            MR. AMANAT:  Well, I would disagree with that,

7

### Proceedings

1  your Honor, and I will address that in a moment.

2          THE COURT:  You do?

3          MR. AMANAT:  But --

4          THE COURT:  Well, I mean, I -- you can disagree

5  with it but it seems  clear to me that it is and that

6  they don't intend to do anything about that and their

7  rule making is, in fact, designed to deal with how they

8  address -- they claim that they don't have the competence

9  to decide now how to deal with authorizing over the

10 counter for women above the age of 17 while not

11 authorizing it for women below the age of 17 and that's

12 the purpose of the -- the stated purpose of their rule

13 making which suggests that they have no intention, aside

14 from the fact that they say there's no evidence that --

15 that there's insufficiency that it could be safely sold

16 to what we'll roughly call minors.  I don't know -- what

17 do you need, some sort of a formal stamp to say denied?

18          MR. AMANAT:  Well, I don't know if it needs to

19 be a formal stamp, your Honor, but I think it is

20 certainly --

21          THE COURT:  Well, you know, this is an argument

22 -- you know, you started off lecturing me about what this

23 case is about.  But what it's really about is throwing

24 them out of court without any further adieu and whether

25 there's a sufficient basis to do that.

Transcription Plus II          Rosalie Lombardi

8

**Proceedings**

1          MR. AMANAT:  Well, I think certainly --

2          THE COURT:  I mean, you can't tell me that it's

3   so clear that this is not final with respect to people

4   under the age of 17 that that claim -- that an

5   administrative challenge to that order cannot be made.

6          MR. AMANAT:  Actually, your Honor, you know, I

7   believe --

8          THE COURT:  I mean, may be if you got me an

9   affidavit and you actually made a motion for summary

10   judgment instead of asking me to give you summary

11   judgment without affidavits you might, you know -- you

12   might advance the argument.

13          MR. AMANAT:  Well, what --

14          THE COURT:  You have an affidavit from anybody

15   that says they have any intention of authorizing over the

16   counter sales to people under the age of the 17?

17          MR. AMANAT:  Well certainly what's before the

18   Court at this time, your Honor, is of course the pleading

19   filed by the plans and the other --

20          THE COURT:  I understand the pleadings are not

21   wonderfully drafted.  The complaint should be amended

22   again to include what's -- you know, the factual

23   allegations that are in their memoranda but fundamentally

24   for these purposes, for the purposes of not dismissing

25   the not only the complaint but also the --

9

## Proceedings

1       MR. AMANAT:  The judicial notice of all

2  materials that the --

3       THE COURT:  Well, also what they allege in

4  their memo of law, the factual allegations that they

5  allege there because I could assume that they could

6  easily put it in their complaint.  I may not be able to

7  consider it for the purpose of granting a motion to

8  dismiss but for the purpose of sustaining the complaint,

9  I can consider what else they've alleged.  They haven't

10  alleged a lot of things that I think ought to be alleged

11  in the complaint.

12       MR. AMANAT:  But even with regard to the August

13  26 action taken by the commissioner, the letter which

14  your Honor has in front of you now, even that letter,

15  even based on that letter, I believe that it is premature

16  to conclude -- there is no basis to conclude -- that

17  there is no possibility that FDA will at some point in

18  the future approve --

19       THE COURT:  Look, anything is possible but this

20  is what they actually say in the letter.  The Center for

21  Drug Evaluation and Research, CDER, and they have come up

22  with documents that suggest that it really wasn't the

23  Center for Drug Evaluation and Research, has completed

24  its review of this application as amended and has

25  concluded that the available scientific data are

Transcription Plus II          Rosalie Lombardi

**Proceedings**

1  sufficient to support the safe use of Plan B as an over

2  the counter product but only for women who are 17 years

3  of age and older.

4          MR. AMANAT:  And it said that the verdict is

5  out as to the user's below that age.

6          THE COURT:  No, there's --

7          MR. AMANAT:  What the commissioner stated,

8  your Honor, in that letter was that regard to the younger

9  age groups, the --

10          THE COURT:  No, I --

11          MR. AMANAT:  -- agency still did not have

12  enough information to make a final determination and

13  there are legal issues.

14          THE COURT:  This is one of the problems here.

15  Barr withdrew that request, so they didn't offer any

16  additional evidence.  You have not told these plaintiffs

17  that their request is in any way deficient.  You have

18  taken no action on the citizen complaint.  And as far as,

19  you know, you're trying to say that they don't have

20  enough information, you know, basically Barr has thrown

21  in the towel in an effort to accommodate the FDA and the

22  concerns about the sales of these to minors.  So, Barr

23  says, all right, you're worried about sales to minors,

24  we're just asking for over the counter authorization for

25  adults.  So, they're not going to do it, since Barr has

Transcription Plus II        Rosalie Lombardi

**Proceedings**

11

1    effectively amended its own application.

2           They're not going to take any further action

3    with -- on this issue with respect to Barr because Barr

4    has submitted an amended application.  Their application

5    is still pending and you haven't told them anything about

6    their application.

7           MR. AMANAT:  Well, your Honor --

8           THE COURT:  And basically what you're -- this

9    has all the earmarks of an administrative agency

10   filibuster.

11          MR. AMANAT:  Well, your Honor, if I could break

12   down a couple of the issues that your Honor raises there,

13   first of all, with regard to the citizen's petition, the

14   plaintiffs have not established that there has been a --

15          THE COURT:  Before you get to this --

16          MR. AMANAT:  Yes.

17          THE COURT:  -- this is my roughly my view of

18   the third party standing issue.

19          MR. AMANAT:  Yes.

20          THE COURT:  I think whether they have third

21   party standing, I can't determine on the basis of the

22   record right now because it in part depends on why Barr

23   has essentially acquiesced in the FDA's concerns and why

24   it hasn't chosen to litigate the matter right now.

25          And number two, I think if they're going to

Transcription Plus II          Rosalie Lombardi

### Proceedings

1  proceed solely on a -- if you limit the action solely to

2  their ability to stand in the shoes of Barr, it seems to

3  me they have to go to the form where Barr would go to

4  indicate its claim which is the court of appeals, at

5  least to the extent that they're, in effect, seeking to

6  put themselves in the shoes of Barr and exercise third

7  party standing on behalf of Barr.

8           So, that's my view of that.  I think that I'm

9  inclined to disagree with most of the arguments that you

10 raise as to why they couldn't but on the issue of

11 standing alone, I think I can't resolve the third party

12 standing issue on the current state of the -- without

13 knowing why Barr isn't here.

14          MR. AMANAT:  May I address that, your Honor?

15          THE COURT:  Yes.  And then we can go on to the

16 other.

17          MR. AMANAT:  Okay.  Let me address a couple of

18 aspects of what you said.  First of all, even assuming

19 that there would be standing, even Barr would not be able

20 to raise a challenge as your Honor yourself pointed out

21 in this court.  It would have to raise it in a petition

22 for review to the third circuit or the DC circuit and

23 even then --

24          THE COURT:  Why the third circuit?

25          MR. AMANAT:  Because its venue -- it's

13

Proceedings

1  domiciled in Pennsylvania and the statute allows it to

2  petition for either --

3          THE COURT:  Well, I don't know that they

4  couldn't go to the second circuit but that's neither here

5  nor there.  I think obviously what congress was looking

6  for was an appellate court review.

7          MR. AMANAT:  Right.

8          THE COURT:  And I think it said either in the

9  District of Columbia which is where the agency is or in

10 the --

11         MR. AMANAT:  Or in the court of appeals where

12 the --

13         THE COURT:  -- where the plaintiff is --

14         MR. AMANAT:  -- sponsor is venued.

15         THE COURT:  Well, I don't know that they use

16 sponsor but I think they use applicant.  But I don't have

17 to get involved in this.  I think they could go to the

18 second circuit but, go ahead.

19         MR. AMANAT:  In any event, the petition for

20 review could only be brought by Barr after FDA renders a

21 final agency decision on its application and after Barr

22 exhausts its administrative remedies.

23         THE COURT:  Right.

24         MR. AMANAT:  Barr hasn't raised such a

25 challenge to FDA's actions.

## Proceedings

14

1    THE COURT:  Well, the issue is why they haven't

2  and whether these people can have third party standing to

3  do it.

4    MR. AMANAT:  Well, I think why Barr has not

5  done so is ultimately irrelevant.

6    THE COURT:  It's not.  A third party standing

7  inquiry depends in part on the reason why the, shall we

8  call it the first party -- I'm not sure who the second

9  party is but -- shall we call it the first party, hasn't

10  asserted its rights.  You know, the classic case is the

11  Batson  cases where under the rationale of the supreme

12  court decisions when a juror is struck because of race,

13  the constitutional violations is of the prospective

14  jurors right to the equal protection of the laws.  It

15  does not involve a violation of the right of the

16  defendant who is asserting that there was an improper

17  objection.

18    Nevertheless, one of the reasons for according

19  third party standing was that there really isn't any

20  realistic way that a challenged juror can assert that

21  claim.  They may not even know to begin with why it is

22  that they've been kicked off the jury.  But there are a

23  number of practical reasons why that juror whose right

24  has been violated is hindered in asserting it.

25    And so that the defendant in that case, whose

15

<strong>Proceedings</strong>

1   rights have not been violated, his equal protection

2   rights have not been violated, is accorded third party

3   standing.  So, then the question -- it's relevant.

4        Now, there also has to be some sort of injury

5   to the first party but if you take a look at    Ohio v.

6   Powers , that injury isn't very much.  It could even be --

7   I mean, if you read Kennedy's opinion very carefully, it

8   could almost be potential, it doesn't even have to be

9   actual.

10        MR. AMANAT:  But your Honor's reference to the

11   Batson  case in connection with third party standing we

12   would submit is distinguishable because in this case,

13   this is not a case where Barr is somehow prevented from

14   asserting its own rights.  It certainly can.

15        THE COURT:  We don't know.  It's not prevented

16   in the sense that it's barred.

17        MR. AMANAT:  Well --

18        THE COURT:  Forgive the pun.  But neither is

19   the juror.

20        MR. AMANAT:  Well, but --

21        THE COURT:  It's not barred.  There's no rule

22   that says the juror can't raise his hand and say, Judge,

23   why am I being thrown off?  It's just realistically, it

24   doesn't happen that way and the question then becomes why

25   is it that Barr acquiesced first of all in withdrawing in

### Proceedings

1  response to the commission's concerns its application for

2  over the counter authorization for minors and why is it

3  that they're not here.  That's relevant.  It's sort of

4  like asking why the juror in the    Batson  case is unable to

5  assert its right.  It's part of one of the prongs that

6  are relevant to the issue of third party standing and I

7  can't find that they have that unless I know the reason

8  for Barr's absence from this table.

9          MR. AMANAT:  Well, but Barr has not intervened

10 in this case.

11          THE COURT:  I understand that.

12          MR. AMANAT:  They haven't filed an amicus.

13          THE COURT:  They haven't.

14          MR. AMANAT:  They haven't given any indication

15 that they support --

16          THE COURT:  I know.

17          MR. AMANAT:  -- what the plaintiffs are trying

18 to accomplish here.

19          THE COURT:  I understand that.  So, why not?

20          MR. AMANAT:  Well, whatever Barr's reason for

21 protections, plaintiffs cannot presume to step in Barr's

22 shoes and speak --

23          THE COURT:  Well, but that can be determined.

24 That's an issue of fact to be determined.  That could be

25 determined whether or not why Barr -- you know, we don't

## Proceedings

1  have to sit and speculate.  That's an issue that could be

2  resolved in discovery.

3         MR. AMANAT:  Well --

4         THE COURT:  You know, it may be that Barr says,

5  you know, whatever they want to say.  But I could

6  conceive of reasons why they wouldn't -- I don't know but

7  I could speculate that there's not a hell of a lot of

8  money to be made in this.  It's not like Lipitor and they

9  may make a judgment that it's not worth expending the

10 time, effort or money to litigate and/or alternatively,

11 they could determine that they don't want to aggravate

12 the FDA since there's some indication here that this is

13 not being handled in the ordinary course and they have

14 other fish to fry with the FDA that may be more important

15 than this one.

16        MR. AMANAT:  Well, let's assume that those are

17 their rationale.

18        THE COURT:  Well, then I think that --

19        MR. AMANAT:  Let's assume that this --

20        THE COURT:  -- they have satisfied that prong

21 for third party standing.  That's what I think.

22        MR. AMANAT:  Then we would submit --

23        THE COURT:  And I think their own injury is

24 sufficient here to satisfy the prong of a discrete injury

25 that gives them a sufficient interest in the case to

**Proceedings**

1   litigate it in an effective way.  In fact, you recognize

2   -- the agency itself recognizes their interest in these

3   proceedings by giving the right independently to file a

4   claim.  And there are two interests here; one is their

5   potential, the fact that some of the plaintiffs may in

6   the future have some need for this plan B but there is

7   yet another -- I know you've tried to make it appear that

8   it's the whole population of the United States that's

9   somehow effected by it when we're talking about even

10  under your view is simply that portion of the population

11  of child bearing years which is considerably less than

12  the total population of the United States.

13       But the more pertinent ones is that they're

14  also here essentially representing people who may need it

15  and who may at the time that they actually need it,

16  possibly to avoid an abortion at some future date, will

17  not be in the position to go bring a legal action to

18  obtain it.

19       So, in a sense there's a different kind --

20  there's a different third party now in the third party

21  standing equation and I think that would be sufficient to

22  satisfy the discrete injury aspect of the standing

23  requirement.  But again, I don't know -- if you want to

24  press it, we could continue this argument.  But go ahead.

25       MR. AMANAT:  Well, I don't necessarily want to

19

**Proceedings**

1  press it except to jury reiterate --

2          THE COURT:  No, the only reason I ask is

3  because until -- well, go ahead.

4          MR. AMANAT:  Well again, the cases such as

5  Simon v. Eastern Kentucky Welfare Services    and the other

6  cases that we cite, the cases that we cited in our

7  supplemental brief, make it clear that absent very

8  limited circumstances which we respectfully submit do not

9  apply here, a plaintiff challenging government agency

10  action cannot predicate standing based on the rights of

11  third parties who are perfectly capable of asserting of

12  the argument.

13          THE COURT:  There it is; perfectly capable.

14  And perfectly capable is a question here.  They may be

15  capable theoretically, just as the juror that I posited

16  in the Batson  case, but the question is basically a more

17  practical one and you're operating on a premise, it seems

18  to me, that has yet to be established.  And that premises

19  is why it is that the first party here Barr, is

20  essentially acquiesced in whatever the FDA has chosen to

21  do here, whether it's to question the authorization for

22  over the counter use by minors or to just endlessly delay

23  a final resolution of their application.

24          MR. AMANAT:  But even assuming that the third

25  party could vest, because such third party standing would

20

### Proceedings

1  only take place in the court of appeals, we would submit

2  that it would be inappropriate for this court --

3           THE COURT:  No, I understand that.

4           MR. AMANAT:  -- to order discovery --

5           THE COURT:  That's true.

6           MR. AMANAT:  -- or to authorize discovery

7  because the answer that would come out of that discovery

8  would at best show that these plaintiffs might

9  conceivably have standing to raise a petition for review

10 in the DC circuit or the third circuit or the second

11 circuit as your Honor posited and it would seem to us

12 that the decision as to whether discovery would be

13 necessary to determine whether they would be able to

14 exercise such third party standing in the context of an

15 appellate petition for review should be made by the court

16 of appeals, not by this court.

17          There is no discovery which could take place

18 which would result in the discovery of facts which would

19 vest this court with Article 3 jurisdiction to review

20 these plaintiff's challenges to any action which the FDA

21 has taken or may have failed to take with regard to Barr

22 and the FDA.

23          THE COURT:  Now we're dealing with discovery,

24 which we could get to at the end.

25          MR. AMANAT:  Okay.

Proceedings

1        THE COURT:  So --

2        MR. AMANAT:  If I may then proceed, your Honor,

3   with regard to the citizen petition, although these

4   plaintiffs or at least one of them, arguably have

5   standing to contest FDA's response of the citizen's

6   petition through an HP (phonetic) action in this court,

7   the Court lacks subject matter jurisdiction to review

8   such a challenge for a different reason, namely the

9   absence of a final agency action which is ripe for

10  judicial review.

11        THE COURT:  No, no.

12        MR. AMANAT:  No?

13        THE COURT:  First I want to deal with --

14  there's a separate issue there as to where that ought to

15  be brought. I thought you were going to go -- I thought

16  you were going to deal with -- well, go ahead.  I don't

17  want to --

18        MR. AMANAT:  You thought I was going to deal

19  with what?

20        THE COURT:  I thought you were going to deal

21  with the unreasonable delay.

22        MR. AMANAT:  I will deal with the unreasonable

23  delay in a moment but if I could just --

24        THE COURT:  Look, I think there's clearly -- I

25  mean, you know, except for form, I don't understand how

22

## Proceedings

1  you could sit here and tell me on behalf of the agency

2  that there's any possibility except to the extent that

3  anything's possible in this world that they are -- they

4  have any plans or that there's any process --

5          MR. AMANAT:  Right.

6          THE COURT:  -- through which they are going to

7  authorize over the counter dispensing of this Plan B,

8  that children under the age of 17.

9          MR. AMANAT:  I mean, I --

10          THE COURT:  I don't know how much more final it

11  can be --

12          MR. AMANAT:  Well --

13          THE COURT:  -- except for the fact that, you

14  know, it's not in the form order.

15          MR. AMANAT:  Well, let me address that,

16  your Honor.  As set forth in the commissioner's letter of

17  August 26 and the ANPR, the advanced notice of proposed

18  rule making which was issued on the same date, the reason

19  the agency did not go ahead and approve the SNDA as of

20  that date, notwithstanding its finding that the science

21  supported over the counter status for drug for users over

22  the age of 17 was because as indicated in the

23  commissioner's letter and in the ANPR, there were several

24  discrete legal questions involving the agency's

25  authority.

23

## Proceedings

1    THE COURT:  Look, they could make up all sorts

2    of discrete legal questions.  There is a serious issue

3    here as to whether they are acting in good faith.  I

4    mean, there's a very serious issue that certainly can be

5    dealt with in discovery in terms of the cause of action

6    relating to the unreasonable delay in ruling on their

7    application.

8        I mean, there's just -- you could make up

9    anything.  I quite don't understand -- I mean, you have

10   to understand, first of all, the nature of rule making,

11   administrative rule making, which it takes forever.

12       MR. AMANAT:  I can take a while.

13       THE COURT:  It takes forever.  First of all,

14   they didn't just promulgate a proposal and ask for

15   comment; no.  First they asked, we have this problem that

16   we, for some reason are so difficult -- it's so difficult

17   that we need advice from the whole world on how to deal

18   with what seems to be a nothing with nothing issue.  But

19   we have this terrible problem.  We don't know how to

20   authorize the dispensation for over the counter Plan B to

21   adults and not authorize it for minors.  Not that we

22   haven't done it before but in this case, you see, the

23   dosage is exactly the same. So, this creates, oh, all

24   sorts of problems for us which strikes me as being

25   totally ridiculous but let's put that aside.

24

<strong>Proceedings</strong>

1         Because now that it's finished --

2         MR. AMANAT:  Right.

3         THE COURT:  -- they could take forever to

4 promulgate a draft rule.

5         MR. AMANAT:  Well --

6         THE COURT:  Wait.  That's not the end.

7         MR. AMANAT:  Right.

8         THE COURT:  Because after they promulgate the

9 rule, then they have to ask for the opinions of everybody

10 once more and then that could take God knows how long.

11 And then there's no time limit under which they have to

12 formulate the final rule after giving notice and an

13 opportunity to be heard.

14         So you're talking about a process that could

15 take years.  You, yourself, cited a rule that they

16 proposed in 2004 dealing with this 180 day period which

17 they have yet to finalize.  So you know, what you're

18 talking about here is a fundamentally endless process at

19 which in no way will deal with the issue of sales of this

20 drug to minors.

21         MR. AMANAT:  Well, I want to address of this --

22         THE COURT:  Over the counter sales.

23         MR. AMANAT:  I want to address the issue of

24 unreasonable delay in a moment but I wanted to get back

25 to your earlier question regarding what conceivable

Transcription Plus II          Rosalie Lombardi

25

**Proceedings**

1  scenario might happen that would result or could result

2  in the drug being made -- being approved for over the

3  counter sale to minors.

4         THE COURT:  Yes.

5         MR. AMANAT:  And the answer is that at the end

6  of this process that your Honor described, however long

7  it takes, the agency might come to the conclusion, it's

8  quite conceivable, that it may very well come to the

9  conclusion that it does not have the authority to approve

10  a split marketing approach.

11         THE COURT:  That's ridiculous.  They say they

12  have the authority.

13         MR. AMANAT:  Is it --

14         THE COURT:  They say they've done it before.

15         MR. AMANAT:  Well, it's still marketing as to

16  age, I mean.

17         THE COURT:  Well, how --

18         MR. AMANAT:  And if they come to that

19  conclusion --

20         THE COURT:  I mean, it's ridiculous.  So, let's

21  assume that they come to that conclusion.

22         MR. AMANAT:  If they come to that conclusion --

23         THE COURT:  Yes, let's assume that.

24         MR. AMANAT:  One scenario is that they could

25  say okay, well, let's then just make it over the counter

26

**Proceedings**

1  for everybody.

2           THE COURT:  Well, I don't know.  If they're

3  only convinced that it's safe as to adults, how are they

4  going to authorize it for people who are not adults.

5           MR. AMANAT:  Well, the fact of the matter is as

6  your Honor knows, and as the plaintiffs are key to point

7  out, the --

8           THE COURT:  This is what they've concluded that

9  the available scientific data are sufficient to support

10  the safe use of Plan B as an over the counter product but

11  only for women who are 17 years of age and older.  So,

12  they have concluded that it's not safe for people under.

13  I mean, I don't know -- I really am at loss to -- you've

14  basically undermined your credibility here by making

15  every foolish argument that comes into your head or that

16  necessarily suits your client's interests.

17           MR. AMANAT:  Well, your Honor --

18           THE COURT:  Do you know why you're here instead

19  of an FDA lawyer?

20           MR. AMANAT:  I beg your pardon?

21           THE COURT:  Do you know why you're here instead

22  of an FDA lawyer?

23           MR. AMANAT:  I have an FDA lawyer here.

24           THE COURT:  No, no, but why the United States

25  attorney represents the executive agency and not the

27

## Proceedings

1    executive agency itself?

2            MR. AMANAT:  Yes, I do, your Honor.

3            THE COURT:  It's because congress wanted an

4    independent lawyer who could give sound advice to a

5    client and who was not necessarily a mouthpiece for the

6    agency.

7            MR. AMANAT:  Well, your Honor --

8            THE COURT:  Otherwise, they don't need you

9    here.

10           MR. AMANAT:  Well --

11           THE COURT:  She could simply moth what the head

12   of the agency tells her to say.

13           MR. AMANAT:  Well, your Honor, with due

14   respect, we have --

15           THE COURT:  Really, I don't understand how you

16   could possibly sit here and tell me that there's any kind

17   of realistic possibility that they're going to authorize

18   it for people under the age of 17.

19           MR. AMANAT:  By virtue of the fact that there

20   has been a very serious debate within the agency and high

21   level officials within the agency have --

22           THE COURT:  The political appointees within the

23   agency as opposed to the professionals within the agency.

24   But I don't have any problem with the political

25   appointees having a say in this.  The real question is

Transcription Plus II        Rosalie Lombardi

28

## Proceedings

1  putting these cases in a posture in which they're subject

2  to some form of judicial review to which agency action

3  should be subject and what's happening here is they're

4  doing a dance that's designed to prevent judicial review

5  of their own actions.  And this dance, particularly as it

6  effects children or called minors under the age of 17,

7  you know, I just don't understand it.  They're basically

8  saying that there's no evidence to show that it's safe.

9          MR. AMANAT:  Well, but --

10         THE COURT:  And to the extent -- and Barr, of

11 course, is not offering any and these people have not

12 been told what's wrong with their application yet.

13         MR. AMANAT:  Well, your Honor, they're not

14 saying that there's no evidence.  They're saying there's

15 insufficient evidence.

16         THE COURT:  Well, you know, it's the same thing

17 for our purposes.

18         MR. AMANAT:  And I think that if your Honor

19 were to look at the administrative record it would become

20 apparent that this is not a case where the agency has

21 been trying to avoid a posture of having its decisions

22 subject to judicial review.

23         THE COURT:  Actually, I don't know, I may be

24 looking at the wrong record but it's certainly what it

25 looks to me like.

29

## Proceedings

1    MR. AMANAT:  Well, your Honor hasn't seen the
2  full administrative record.
3          THE COURT:  I mean, well, I don't know -- I
4  haven't seen the full administrative record but I am sure
5  you would have called this before me and I'm sure you
6  would have called any relevant parts of it to my
7  attention.
8          MR. AMANAT:  Well --
9          THE COURT:  What we have in the administrative
10  records is the professionals in the agency who have the
11  expertise to determine safety saying there's no problem.
12          MR. AMANAT:  Well, some of the professionals --
13          THE COURT:  Well, some of them.
14          MR. AMANAT:  Some of them; yes.
15          THE COURT:  Well --
16          MR. AMANAT:  Some of them are saying to the
17  contrary.  But in any event, your Honor, we would submit
18  that certainly a review of the administrative record
19  would make it clear that the agency --
20          THE COURT:  Well, why don't you let the
21  administrative record be reviewed?
22          MR. AMANAT:  Well, if that's the course of
23  action which the Court --
24          THE COURT:  Well, no, I mean, you know --
25          MR. AMANAT:  -- prefers to proceed on, we can

Transcription Plus II          Rosalie Lombardi

30

**Proceedings**

1  do that but --

2          THE COURT:  No, I mean, you basically don't

3  want that.  You're saying it's not final.  It can't be

4  reviewed.

5          MR. AMANAT:  Well, it --

6          THE COURT:  Whether it could be reviewed by me,

7  as opposed to the court of appeals if it was final is a

8  separate question.  But --

9          MR. AMANAT:  It goes down to the question,

10 your Honor, of subject matter jurisdiction, Article 3

11 jurisdiction.

12         THE COURT:  We're going in a circle.

13         MR. AMANAT:  Well --

14         THE COURT:  We'll dealing with you conceded

15 that they have standing for their own complaint.

16         MR. AMANAT:  Well, at least one of the

17 plaintiffs has standing --

18         THE COURT:  One is enough.

19         MR. AMANAT:  -- as to the citizen petition.

20         THE COURT:  One is enough.  It doesn't require

21 more than one.

22         MR. AMANAT:  Well, if I then may address the

23 question of unreasonable delay that your Honor has

24 posited.  In addressing unreasonable delay, let me say

25 again first of all that what we're dealing with here is

Transcription Plus II          Rosalie Lombardi

31

**Proceedings**

1  the pleadings and --

2          THE COURT:  Right.

3          MR. AMANAT:  -- the pleadings --

4          THE COURT:  The pleadings.  You have to keep

5  remembering that because you're asking me to throw them

6  out of court --

7          MR. AMANAT:  Well --

8          THE COURT:  -- in a case that wreaks of

9  unreasonable delay.

10          MR. AMANAT:  But the complaint itself, the

11  allegations in the complaint, do not support a finding or

12  conclusion of the agency's unreasonable delay.

13          THE COURT:  I think that the complaint has to

14  be redrafted but fundamentally, there's enough there to

15  avoid a dismissal on the face of the pleading and

16  certainly if you take into account the factual

17  allegations in their memorandum.

18          MR. AMANAT:  Well, let me address, if I may, a

19  couple of aspects of the claim of unreasonable delay with

20  regard to the citizen petition.

21          THE COURT:  Right.

22          MR. AMANAT:  First of all, they have made a

23  claim in their papers with regard to unreasonable delay.

24  They characterize in kind of arguing as to why there's

25  been unreasonable delay, they keep urging the Court to

32

## Proceedings

1  look at the period of time from when the citizen petition

2  was first filed on February 14, 2001 until the present.

3  We would submit that that is an erroneous

4  characterization for the following reason.

5          The citizen petition, your Honor, I have it

6  right here, the citizen petition consisted of three -- of

7  four pages.  That's it.  Okay?  When the citizen petition

8  was filed, it was filed almost 26 months before the

9  manufacturer of the drug asked the FDA to approve this

10  drug for OTC.

11          Now, first of all, as a threshold matter I

12  should say that never has FDA ever approved a switch of a

13  drug to OTC status based solely on its citizen petition

14  when the manufacturer itself has not asked for it.

15          THE COURT:  Is there anything in their

16  regulations that precludes that?

17          MR. AMANAT:  Well, the regulation allows a

18  citizen to ask for --

19          THE COURT:  Right.

20          MR. AMANAT:  -- an OTC switch to a citizen

21  petition.

22          THE COURT:  Right.  And does it say that unless

23  the manufacturer joins in it, that it won't be granted?

24          MR. AMANAT:  No, well the statute --

25          THE COURT:  If your argument is that this is --

33

## Proceedings

1  this four pages simply didn't warrant any relief, why

2  don't you just deny that?

3          MR. AMANAT:  Well, the reason it didn't deny it

4  is because instead what it did was --

5          THE COURT:  They waited 26 months for the

6  manufacturer to file.

7          MR. AMANAT:  No, that's not correct,

8  your Honor.  After this was filed --

9          THE COURT:  Yes.

10          MR. AMANAT:  -- FDA published the federal

11  register notice.

12          THE COURT:  Right.

13          MR. AMANAT:  Says substantially, petitioner has

14  asked the drug to be made --

15          THE COURT:  Right.

16          MR. AMANAT:  -- available over the counter.

17          THE COURT:  Okay.

18          MR. AMANAT:  They think it's a good idea for it

19  to do so.  What does everybody else think?

20          THE COURT:  Right.

21          MR. AMANAT:  People then began filing by the

22  tens of thousands public comments.

23          THE COURT:  I understand that.

24          MR. AMANAT:  The agency got those comments,

25  reviewed the comments.

34

## Proceedings

1      THE COURT:  The reality is is that there aren't

2   tens of thousands of reasons.  There are probably two or

3   three reasons that tens of thousands of people have.

4      MR. AMANAT:  No, it's --

5      THE COURT:  But the reality is is that there

6   aren't ten thousand different reasons.  You know, there

7   are fundamentally -- there are reasons why the people

8   oppose this.  There are reasons why they are in favor of

9   it.  And they come down to possibly two or three.  They

10   don't come down to ten thousand.

11      What you have going on here, as a practical

12   matter, is a letter writing campaign because there are

13   people who have strong feelings about it.

14      MR. AMANAT:  Well --

15      THE COURT:  But this is not some sort of, you

16   know, there are ten thousand people who have expertise in

17   pharmacology who are giving you ten thousand different

18   views.

19      MR. AMANAT:  Well, that's the point,

20   your Honor, is that neither citizen's petition nor the

21   public comments that were submitted in response to the

22   citizen petition contain a science.  They don't --

23      THE COURT:  So --

24      MR. AMANAT:  They didn't have the scientific --

25      THE COURT:  Why didn't you write him a letter

Transcription Plus II        Rosalie Lombardi

35

## Proceedings

1  and say we can't act on it because it doesn't contain the

2  science instead of --

3          MR. AMANAT:  Well, that's basically what we

4  did.

5          THE COURT:  I thought you just wrote him a

6  letter saying we'll get back to you.

7          MR. AMANAT:  Well, we sent him a letter, the

8  letter of which is attached as Exhibit B to --

9          THE COURT:  What does it say?

10          MR. AMANAT:  It says, "FDA has not yet resolved

11  the issues raised in the citizen petition because it

12  raises significant issues required extensive review and

13  analysis --"

14          THE COURT:  Right.

15          MR. AMANAT:  "-- by agency officials."

16          THE COURT:  Right.  Okay.

17          MR. AMANAT:  But the fact that --

18          THE COURT:  It doesn't say it's inadequate.

19          MR. AMANAT:  Well --

20          THE COURT:  It doesn't say that it's three

21  pages and it's just a plain -- it's three pages of

22  worthless paper and so we reject it.

23          MR. AMANAT:  But the fact --

24          THE COURT:  We will respond to your petition,

25  as soon as we have reached a decision on your request.

36

### Proceedings

1          MR. AMANAT:  And the --

2          THE COURT:  "September 6, 2001, we will respond

3   to your petition as soon as we have reached a decision on

4   your request.  And here we are, December what, 22, 23,

5   2005, and they have yet to hear from you since this

6   letter on September 6, 2001.

7          MR. AMANAT:  Well, but your Honor, my point is

8   that at the time the citizen petition was filed, okay,

9   let's say -- the citizen petition, if the agency were to

10  grant the citizen petition prior to the SNDA being filed,

11  what it would be doing was it would not be saying -- oh,

12  okay, Plan B is now available over the counter.

13          The action it would take upon the approval of

14  the citizen petition would be commence a rule making

15  proceeding.  A rule making proceeding which your Honor

16  yourself posited, could take a long time because it is

17  only through the mechanism of a rule making proceeding

18  that it could have equipped itself in the absence of an

19  SNDA, that it could have equipped itself with the

20  information necessary to make this determination.

21          THE COURT:  I don't understand this because

22  first of all, I don't know -- you have an advantage.  I

23  don't know that a rule making proceeding would be

24  necessarily required to act on a citizen petition.  I

25  don't know why you need this --

37

## Proceedings

1          MR. AMANAT:  On this kind of a decision.

2          THE COURT:  I don't know why but so, I accept

3    your word for it.  When did they undertake the rule

4    making effort that would be necessary to resolve this

5    petition.

6          MR. AMANAT:  Well, what they did was they

7    published federal --

8          THE COURT:  They have yet to do that.  Isn't

9    that true?

10          MR. AMANAT:  Well, your Honor, what they did

11    was as soon as Barr filed its SNDA, FDA acted diligently

12    with dispatch, moved quickly, it convened advisory

13    committee hearings, it evaluated the science.  It worked

14    with Barr to get the science and the scientific studies

15    which it needed.  And ultimately --

16          THE COURT:  And this is its decision.

17          MR. AMANAT:  Well --

18          THE COURT:  The drug may not be legally

19    marketed over the counter.  And you put in the words, "at

20    this time," and that sort of somehow insulates this whole

21    thing from review.

22          MR. AMANAT:  Well, the fact of the matter is,

23    your Honor, the review --

24          THE COURT:  And you don't respond to them.  You

25    still have not responded in any way to their petition.

38

## Proceedings

1      MR. AMANAT:  Well, your Honor, there is no

2  mandatory duty in the regulations or in the statute for

3  the agency to have responded to the citizen petition in

4  any way other than it did.

5      THE COURT:  Oh, so it's okay to never respond

6  under your --

7      MR. AMANAT:  That's not what I said,

8  your Honor.

9      THE COURT:  Well, I don't know what you said.

10  You said there's no obligation to respond.  First of all,

11  we'll deal with that statement.  But I just want to know,

12  there's a provision in the APA that requires that the

13  agency not unreasonably delay --

14      MR. AMANAT:  Right.

15      THE COURT:  -- in acting upon matters that are

16  before it.  So, it doesn't mean that you can just take

17  forever.

18      MR. AMANAT:  I don't disagree with that.

19      THE COURT:  Well --

20      MR. AMANAT:  I'm not saying that the agency can

21  take forever.

22      THE COURT:  You just did.

23      MR. AMANAT:  I don't think I did, your Honor.

24      THE COURT:  Well, what you said was that they

25  don't have to -- they could just delay as long as they

39

**Proceedings**

1  want.

2        MR. AMANAT:  No, that's not what I said,

3  your Honor.

4        THE COURT:  So, tell me again what you said so

5  I could hear it -- so I could quote it.

6        MR. AMANAT:  Because the question, as the

7  Souther Utah decision from the supreme court said,

8  "Unreasonable delay is -- the question of unreasonable

9  delay is measured --

10        THE COURT:  (inaudible.

11        MR. AMANAT:  -- with regard to discrete agency

12  action that an agency is required either by statute or by

13  regulation to take.

14        THE COURT:  Well, first of all look, you got

15  this case right when you described it the first time in

16  your reply brief at page 18 in which you said that "That

17  case stands for the proposition to the extent that the

18  plaintiffs can seek to compel the agency to act and that

19  at the same time to direct the content of that decision,

20  the supreme court in   SUA (phonetic) confirmed that such

21  relief would be impermissible."  You got it right.

22        This is different from   SUA.  First of all,

23  there's a separate statute here in the APA which is cited

24  in cases that you cite in your brief, which you cite

25  erroneously.

40

### Proceedings

1        MR. AMANAT:  Section 555(b).

2        THE COURT:  Yes, that you say are erroneously

3   have been overruled.  They haven't been overruled.  Which

4   explicitly mandate that the commission decide yes or no,

5   not what the decision should be, but one way or another

6   in a reasonable period of time.

7        MR. AMANAT:  Well --

8        THE COURT:  And that's the law.  That's what

9   the APA says.

10        MR. AMANAT:  But, your Honor --

11        THE COURT:  They're not asking you as was the

12   case in the -- we'll call it the    SUA case -- they're not

13   asking you at the moment in this particular cause of

14   action to decide it in any particular way.

15        MR. AMANAT:  Well, actually they are.

16        THE COURT:  No, no.  I'm talking about the

17   unreasonable delay cause of action.  They're simply

18   asking you to decide.

19        MR. AMANAT:  But the question as to what does

20   it mean to decide.  What the    SUA case said was in

21   determining what it means to decide whether for purposes

22   of 555(b) of the APA or for persons of 7601.

23        THE COURT:  They didn't say -- well, you put in

24   there, "whether for the purpose of 555," they don't -- I

25   mean, maybe I missed it but I didn't see that.

41

## Proceedings

1          MR. AMANAT:  Well --

2          THE COURT:  In fact, what you're relying on is

3    essentially what I would call dictum in a footnote in a

4    distinguishable case.

5          MR. AMANAT:  Well, what they say, your Honor,

6    is --

7          THE COURT:  This case that you're relying on

8    did not involve a claim that the agency unreasonably

9    delayed in making a discrete decision.  And the discrete

10   decision could be whatever the agency wants to decide.

11   But that's not what that case involved.  And I don't

12   agree that it precludes this cause of action.

13         MR. AMANAT:  Well, what it does provide,

14   your Honor, is that when a party challenging agency

15   action seeks relief in the nature of mandamus, which is

16   effectively what the plaintiffs are doing here, to compel

17   the agency to do something that it's not doing --

18         THE COURT:  Right.

19         MR. AMANAT:  -- what the supreme court held in

20   the SUA case was that such relief is not available unless

21   the plaintiffs can point to a statute or regulation which

22   requires the agency to take a discrete agency action.

23         THE COURT:  555(b).  It says you have to decide

24   one way or another.

25         MR. AMANAT:  Well --

42

**Proceedings**

1    THE COURT:  What they're trying to do in the

2  SUA case was to get the agency to -- they say the agency

3  did not consider X and they should have considered X.

4  And it was an effort to use the statute to obtain review

5  that was ont otherwise available.  This is not that case.

6    MR. AMANAT:  But, your Honor --

7    THE COURT:  SUA did not involve an unreasonable

8  delay case and there is a statute.

9    MR. AMANAT:  But, your Honor, as was cited on

10  page 23 of our supplemental brief, the case law provides

11  in Section 555(b) does not independently impose a

12  substantive duty on federal agency.

13    THE COURT:  I don't know what substantive duty

14  means.  It implies a procedural obligation to make a

15  decision.  Beyond that, I don't know what you're talking

16  about.

17    MR. AMANAT:  But the substantive content of --

18    THE COURT:  They write - they're not asking --

19  the issue here is not the substantive content of the

20  decision.  It's simply saying make a decision.

21    MR. AMANAT:  But that's what I am trying to

22  say, your Honor.  What cases like   Lohan v. National

23  Wildlife Federation   (phonetic) and the   Center for

24  Biological Diversity v. Benhaman   (phonetic) say is that

25  in looking at 555(b) in terms of deciding what kind of

43

**Proceedings**

1  decision the agency is supposed to make within a

2  reasonable time, you have to find another statute which

3  defines the kind of decision, the kind of action.

4          Here, in this case, your Honor, the regulation

5  which describes the kind of action which the agency is

6  required to take in response to a citizen petition is 21

7  CFR 10.30(e) and 21 CFR 10.30(h).  And we identified on

8  pages 20 and 21 of our brief, what those specific actions

9  are.

10          So, to the extent that   SUA or 555(b) or 7061

11  imposed on the agency an obligation to take a discrete

12  agency action within a reasonable period of time after a

13  citizen petition is filed, the definition of what action

14  is for purposes of such an obligation is defined

15  exclusively by the regulation.  And the agency has

16  complied with that regulation.  It took action in

17  accordance with the regulation in response to the citizen

18  petition.

19          THE COURT:  It basically wrote them a letter

20  saying we'll get in touch with you.

21          MR. AMANAT:  But --

22          THE COURT:  And I mean, that's all they had to

23  do.  They're not obligated at some point to decide it.

24          MR. AMANAT:  But, your Honor, let me point out

25  the whole process of the citizen petition process --

44

**Proceedings**

1      THE COURT:  Right.

2      MR. AMANAT:  -- is not a statutory process.

3      THE COURT:  So --

4      MR. AMANAT:  It is a regulatory process --

5      THE COURT:  So, it's a regulatory process.

6      MR. AMANAT:  -- which is --

7      THE COURT:  It still sets up a mechanism for

8  people to seek relief from an agency which you're

9  perfectly free to grant or deny and they presumably are

10  free to then challenge in a court.

11      MR. AMANAT:  True.  But the regulatory process

12  which the FDA developed to invite citizen petitions is

13  governed by its own regulations as to what it's required

14  to do in response to such citizen petitions and it did

15  that.

16      THE COURT:  So, it's not required by the

17  regulations to decide.  So, it could take forever.

18      MR. AMANAT:  Well, it is required but it says -

19  - the obligation to decide it comes from 21 CFR 10.30

20  (e)(1) which says, "The commissioner shall in accordance

21  with paragraph (e)(2), rule upon each petition."

22      THE COURT:  Okay.

23      MR. AMANAT:  That's where the obligation comes

24  from.

25      THE COURT:  So?

45

Proceedings

1    MR. AMANAT:  But --

2    THE COURT:  Where's the ruling?

3    MR. AMANAT:  You have to read that in

4  accordance with (e)(2) and with the subpoints, 1, 2 and

5  3, under (e)(1).

6    THE COURT:  And so he never has to issue a

7  decision.

8    MR. AMANAT:  No, that's not what I said,

9  your Honor.

10    THE COURT:  He could delay interminably.

11    MR. AMANAT:  No, that's not what I said,

12  your Honor.

13    THE COURT:  He could delay unreasonably.

14    MR. AMANAT:  He cannot delay unreasonably.

15    THE COURT:  Okay.  So, we've established that.

16  So, I don't know what you're arguing about.

17    MR. AMANAT:  But the point is --

18    THE COURT:  He cannot delay unreasonably but

19  they have no remedy if he does.  Is that your argument?

20    MR. AMANAT:  That's not what I said either,

21  your Honor.

22    THE COURT:  Well, I don't know.  I can't --

23    MR. AMANAT:  What I said was that in terms of

24  determining what is reasonable, reasonable has to be

25  determined in taking into consideration what the agency

Transcription Plus II        Rosalie Lombardi

46

**Proceedings**

1   is required to do in response to a citizen petition.

2   What it's required to do.

3            THE COURT:  But you ultimately read to me is to

4   decide it at some point, not to delay it endlessly either

5   because they don't want to put up with the political

6   flack that comes from a decision one way or another.

7            MR. AMANAT:  No, your Honor, the bottom line

8   is --

9            THE COURT:  Or for any other impermissible

10  reason.

11           MR. AMANAT:  The bottom line in our view is

12  that what 555(b) and 7061 provide in this context is if

13  an agency can be shown to actually have, as the

14  plaintiffs phrased it in their papers, can sign to

15  oblivion an application or an administrative action, put

16  in our shelf to gather dust for years without ever taking

17  any action that might very well engender a valid action

18  on the appeals of unreasonable delay.

19           THE COURT:  And what about moving it around

20  like pieces in a shell game?

21           MR. AMANAT:  No but here, your Honor, a review

22  of the administrative record would show that the agency

23  has from the very beginning taken very seriously the

24  citizen petition and the SNDA.  It has accumulated an

25  administrative record on the citizen petition which to

Transcription Plus II          Rosalie Lombardi

47

## Proceedings

1  date spans well over 100,000 pages.  The administrative

2  record on the SNDA spans --

3          THE COURT:  Why doesn't it decide it then?

4          MR. AMANAT:  Because -- well, let me say first

5  of all it's a complex issue.  The agency has never before

6  ever approved any hormonal contraceptive for over the

7  counter marketing to any segment of the population.  This

8  is the first time the agency is even considering doing

9  that.

10         Secondly, the agency has never before approved

11  as Barr is asking to now --

12         THE COURT:  It basically agrees, the agency,

13  that it could be sold over the counter safely to adult

14  women.

15         MR. AMANAT:  That is correct.  But --

16         THE COURT:  Basically, it agrees with that.

17         MR. AMANAT:  That is correct.

18         THE COURT:  So, the business about this being

19  the first time, it's made a judgment already it's made a

20  judgment that this could be safely sold.

21         MR. AMANAT:  It made a judgment that it took

22  several years to reach.

23         THE COURT:  I understand that.

24         MR. AMANAT:  Which is how long it took to

25  consider all of the policy aspects of it.

Transcription Plus II          Rosalie Lombardi

48

### Proceedings

1          THE COURT:  Right.

2          MR. AMANAT:  Your Honor, keep in mind that the

3    FDA is constantly under pressure because it is approving

4    drugs too quickly.  You know --

5          THE COURT:  Please.  They're under pressure

6    because they're approving it too slowly and they're under

7    pressure because they're approving it too quickly.

8          MR. AMANAT:  That's exactly correct.

9          THE COURT:  But, you know, fundamentally here,

10   there's a difference between -- look, I am not an expert

11   in this but this is a -- there's a fundamental difference

12   between approving a new drug for use by humans and simply

13   deciding whether or not a drug that's been safely used by

14   X numbers of hundreds of thousands of people and which

15   their own experts tell them can be safely used, can be

16   sold over the counter.

17         MR. AMANAT:  Well --

18         THE COURT:  There's a big difference.

19         MR. AMANAT:  And it's a very different type of

20   analysis.

21         THE COURT:  Right.  And it does not necessarily

22   have to be -- you know, you don't have to do experiments

23   on rats and you don't have to do a lot of other things

24   that you have to necessarily do before you decide whether

25   you want to authorize the approval of a drug for use by

49

## Proceedings

1  humans.

2       It strikes me that it's a much less difficult

3  and complex issue.  But in any event, that is an issue of

4  fact as to why they haven't decided it and whether the

5  delay was reasonable and whether or not they're

6  improperly stalling a decision here.

7       MR. AMANAT:  Well on that question, your Honor,

8  let me just make, in concluding if I may, a couple of

9  observations.  We don't believe the allegations in the

10  complaint support a claim for unreasonable delay.  Even

11  if your Honor believes that the plaintiffs new cause of

12  action under 7601 does survive a motion for judgment on

13  the pleadings, we would ask that your Honor allow the

14  next step to be the submission to the Court of the

15  administrative record or the subset of the administrative

16  record that the parties agree is relevant to that issue.

17       THE COURT:  Who stops you?  I told you to do

18  that months ago.

19       MR. AMANAT:  And to have that issue briefed on

20  cross motions for summary judgment.

21       THE COURT:  I am --

22       MR. AMANAT:  We do not believe that there's --

23       THE COURT:  First of all, you could do whatever

24  you want but I am not dealing discovery.  I don't require

25  people to get my permission to make motions for summary

50

## Proceedings

1  judgment but that's what you should have done to begin

2  with.  But except, you know, I think you're engaged in

3  continuing this administrative agency filibuster with a

4  filibuster of your own.

5          MR. AMANAT:  Well, I disagree, your Honor.

6          THE COURT:  No, you did.  You insisted.  You

7  asked me to delay the filing of this motion because of a

8  representation that this issue was ultimately going to be

9  decided.  It wasn't decided, notwithstanding, you know,

10  admittedly weaslely (sic) worded letter to Senator

11  Clinton, but that's ont he basis of which you delay this

12  proceeding for three months.

13          Now you make a frivolous, in my view, motion at

14  least with respect to the unreasonable delay, and then

15  you want to say well, now that I failed on this, I am

16  going to make a motion for summary judgment based on the

17  administrative record.

18          Do whatever you want but I am not going to stop

19  you from making a motion but I am not going to delay

20  discovery.

21          MR. AMANAT:  Well, your Honor, with regard to

22  the question of discovery --

23          THE COURT:  And they could also make a cross

24  motion for summary judgment.

25          MR. AMANAT:  With regard to the question of

Transcription Plus II          Rosalie Lombardi

51

## Proceedings

1  discovery, I would again advise your Honor that we

2  extensively briefed before Judge Pohorelsky a motion for

3  a protective order in which we laid out in some detail

4  all of the reasons why there should be no discovery and

5  why this case should be decided only on the basis of the

6  administrative record.

7            THE COURT:  I don't believe that the

8  unreasonable delay portion can be decided on the basis of

9  the administrative record.

10           MR. AMANAT:  Well, your Honor, but that's what

11  the cases say.  The plaintiffs will --

12           THE COURT:  No, but you're making an argument

13  to me and you've made it before, this is because the

14  agency has to balance priorities.  How do I know that

15  that's the reason?

16           MR. AMANAT:  Well, but, your Honor, the case is

17  -- the plaintiffs were unable to cite in opposition to

18  the motion for protective order --

19           THE COURT:  I --

20           MR. AMANAT:  -- a single case in which any

21  court has said that on a cause of action under 7061

22  alleging unreasonable delay, that discovery beyond the

23  administrative record was permitted.  We cited numerous

24  cases which says it's categorically not permitted.  And

25  we haven't submitted those cases to your Honor because

### Proceedings

1  that matter is before Judge Pohorelsky.

2         THE COURT:  Why is it not permitted on an

3  unreasonable delay claim?

4         MR. AMANAT:  That's what the cases say.

5         THE COURT:  I am asking --

6         MR. AMANAT:  I could cite the cases for

7  your Honor.

8         THE COURT:  You know, why is the reason I am

9  asking for those cases.  I assume I am not bound by any

10  of them.

11         MR. AMANAT:  I beg your pardon?

12         THE COURT:  I assume I am not bound by any of

13  those cases.

14         MR. AMANAT:  Well, they're appellate cases,

15  your Honor.

16         THE COURT:  Well, I don't know.

17         MR. AMANAT:  I don't know that the issue has

18  been decided in the second circuit but --

19         THE COURT:  Well, what is the reasoning?

20         MR. AMANAT:  Well, the reasoning is that in

21  other forms of claims under the APA, APA claims are

22  decided on the basis of the administrative record.

23         THE COURT:  Well, I mean, that's true as a

24  general matter.  Obviously, if you had reached a final

25  decision, it would have to be decided on the basis of the

53

### Proceedings

1   administrative record.  But it seems to me that where

2   there's a claim of unreasonable delay --

3           MR. AMANAT:  Well --

4           THE COURT:  -- factors that go to the issue of

5   reasonableness, particularly where you have -- where

6   there are indications that this has not been handled in

7   the ordinary course, in the ordinary way that these

8   applications are handled, should be explored in

9   discovery.  I mean, you've got to give me a reason.

10          MR. AMANAT:  Well, I don't have these cases

11  with me but I will read you --

12          THE COURT:  Well --

13          MR. AMANAT:  -- if I may, the footnote, that we

14  submitted to Judge --

15          THE COURT:  Give me the strongest case.

16          MR. AMANAT:  The strongest case is called     San

17  Francisco Bay Keeper v. Whitman     (phonetic).  It's a ninth

18  circuit case from 2002.

19          THE COURT:  What's the cite?

20          MR. AMANAT:  It's 297 F.3rd 877 which said,

21  "The judicial review is on the administrative record even

22  in a case based on agency inaction."  Another case --

23          THE COURT:  I'm going to read the case.  I need

24  to know the reasoning behind it.

25          MR. AMANAT:  Yes.

Transcription Plus II          Rosalie Lombardi

**Proceedings**

1    THE COURT:  I can't deal with decisions that

2  are based on -- where all you're giving me is the whole -

3  -

4    MR. AMANAT:  Another ninth circuit case is

5  Friends of the Clearwater v. Dombeck    (phonetic), 222

6  F.3rd 552, ninth circuit 2000 case which specifically

7  reviewed the agency's failure to act on an open ended

8  administrative record.

9    I also cited cases from the District of

10  Columbia, from the Eastern District of Pennsylvania.

11    THE COURT:  Well, the question was whether in

12  those cases -- I mean, again, I can't deal with giving me

13  citations for a holding, whether in those cases there was

14  evidence that would suggest that -- evidence outside the

15  administrative record that would shed light on the

16  reasonableness of the delay.

17    I mean, there's some reason here to believe

18  that there are factors that play here in the failure to

19  decide their application that would not be necessarily

20  completely reflected in the administrative record.

21    MR. AMANAT:  Well, but, your Honor, again my

22  point is that on the discovery issue, before

23  your Honor --

24    THE COURT:  Why are you afraid of discovery, by

25  the way?

55

## Proceedings

1    MR. AMANAT:  Why am I afraid of discovery?

2  Well, I will give you a perfect example of why I am

3  afraid of discovery.  Because the plaintiffs initiated

4  discovery.

5         THE COURT:  Right.

6         MR. AMANAT:  They initiated discovery by

7  undertaking a fishing expedition in which they asked us

8  essentially to compile the administrative record for all

9  66 applications in which various drug manufacturers over

10  the last ten years approved or sought the approval of OTC

11  status for prescription only drugs.

12         It's not so much that I am afraid of discovery

13  as I am -- I am not at all afraid of discovery,

14  your Honor.  It's the fact that they're not entitled to

15  discovery.

16         THE COURT:  I know, but if the FDA didn't

17  object there certainly could be discovery and I wouldn't

18  --

19         MR. AMANAT:  But the FDA does object --

20         THE COURT:  But what I am asking --

21         MR. AMANAT:  -- very strenuously.

22         THE COURT:  I know.  But all I was asking was

23  why?

24         MR. AMANAT:  Well, precisely because -- I mean,

25  first of all, there's the principle matter that APA cases

56

**Proceedings**

1    are decided on the administrative record, that --

2              THE COURT:  Where is the language?

3              MR. AMANAT:  It's on page --

4              THE COURT:  I mean, I agree that normally they

5    are but --

6              MR. AMANAT:  -- 886.

7              THE COURT:  -- it's normally decided on

8    administrative record --

9              MR. AMANAT:  Right.

10             THE COURT:  -- where you're basically reviewing

11   the decision to either grant or deny relief.

12             MR. AMANAT:  All I wanted to say, your Honor,

13   is that before your Honor assumes that there will be

14   discovery in this case or orders that there should be

15   discovery --

16             THE COURT:  I don't know that they need all of

17   that at the moment because they have a GAO report that

18   says this wasn't done in the ordinary course, in addition

19   to, I believe, possibly statements of FDA employees.

20             MR. AMANAT:  But we would ask, your Honor, that

21   before your Honor makes any ruling on discovery, that

22   your Honor allow Judge Pohorelsky to make such a ruling

23   because the matter is fully briefed before him.  And if

24   the plaintiffs then have a problem or if either side has

25   a problem with what Judge Pohorelsky decides in response

**Proceedings**

1  to our motion, then they would have their rights under

2  the rules to appeal to your Honor and your Honor could

3  then make the decision at that time.

4     THE COURT:  I don't really want to go through,

5  you know, this endless delay that you have contemplated

6  here.

7     MR. AMANAT:  But we would submit, your Honor,

8  that the --

9     THE COURT:  Could you stop for a minute?

10     MR. AMANAT:  Yes.

11     THE COURT:  Where in this ninth circuit case --

12     MR. AMANAT:  Page 886, your Honor.

13     THE COURT:  It seems to say the opposite but I

14  am -- it says  Bay Keeper  is correct.  I'm reading from

15  886.  " Bay Keeper  is correct that generally judicial

16  review of agency action is based on as said,

17  administrative record."

18     MR. AMANAT:  Right.

19     THE COURT:  "However, when a court considers a

20  claim that an agency has failed to act in violation of a

21  legal obligation, review is not limited to the record as

22  it existed in any single point in time because there is

23  no final agency action to demarcate the limits of the

24  record."

25     I mean, this suggests that you're not bound by

58

## Proceedings

1  the administrative record.

2          MR. AMANAT:  No, what it suggests is you're

3  bound by the administrative record but the administrative

4  record is an open ended universe of documents that

5  continues to --

6          THE COURT:  Well --

7          MR. AMANAT:  -- be developed as the

8  administrative -- as the underlying administrative

9  proceedings have developed.

10         THE COURT:  I don't know.  I don't find these -

11 - is that the strongest case you have?

12         MR. AMANAT:  Well, there's also, as I

13 mentioned,  Friends of the Clearwater v. Dombeck   .

14         THE COURT:  I'll read it.

15         MR. AMANAT:  222 F.3rd 552 560.

16         THE COURT:  I will read it.

17         MR. AMANAT:  In any event, your Honor, we would

18 ask that for the reasons that we set forth at some length

19 in our briefs, that the Court grant our motion to dismiss

20 this case and that in the alternative, that if the Court

21 is not prepared to do so at this juncture, that the next

22 step would be for the parties to submit cross motions for

23 summary judgment on the administrative record.  And that

24 there be no discovery.

25         THE COURT:  I'm not one of these judges who has

Transcription Plus II          Rosalie Lombardi

59

## Proceedings

1  to grant anybody -- needs to grant anybody permission to

2  make a motion for summary judgment.

3          MR. AMANAT:  I understand.

4          THE COURT:  But what I am not going to do is

5  delay the case from going forward.

6          MR. AMANAT:  But, your Honor, allowing them to

7  take discovery would delay the case from going forward.

8          THE COURT:  Well --

9          MR. AMANAT:  It would because we would have to

10  complete discovery before the parties could --

11          THE COURT:  To the extent that anybody wished

12  to take discovery, you would have to complete it.  But at

13  least the issue of the motion for summary judgment gets

14  decided on a complete record.

15          MR. AMANAT:  Well, we believe that the Court

16  has the complete record that it needs --

17          THE COURT:  I'm sure you do.

18          MR. AMANAT:  -- for purposes of deciding

19  this --

20          THE COURT:  I'm sure you do.

21          MR. AMANAT:  -- based on the --

22          THE COURT:  I'm sure you do but I am not sure -

23  - I mean, look, do you want to accept the GAO report?

24          MR. AMANAT:  I don't believe that the GAO

25  report reaches any conclusions that have any bearing on

Transcription Plus II          Rosalie Lombardi

60

**Proceedings**

1  the --

2           THE COURT:  Well, it --

3           MR. AMANAT:  -- claims that the plaintiffs

4  raise here.

5           THE COURT:  It does have a bearing on the issue

6  of the good faith of the agency and the reasonableness of

7  the delay.

8           MR. AMANAT:  I disagree with your Honor.

9           THE COURT:  I know you're going to disagree

10  with it.

11           MR. AMANAT:  Would your Honor like to hear why?

12           THE COURT:  Whatever I say that's inconsistent

13  with your position, you're going to disagree with.

14           MR. AMANAT:  Would your Honor like to hear why?

15           THE COURT:  Yes.

16           MR. AMANAT:  Well, for one thing, with regard

17  to unreasonable delay, the GAO report only examines the

18  course of administrative proceedings --

19           THE COURT:  Right.

20           MR. AMANAT:  -- through May of 2004.

21           THE COURT:  Right.

22           MR. AMANAT:  It doesn't even purport to address

23  anything that happened after May of 2004.

24           THE COURT:  I understand that but the

25  conclusions that it reaches through 2004 shed some light

61

**Proceedings**

1  on this.

2         MR. AMANAT:  Well --

3         THE COURT:  I am not going to assume as a

4  matter of law that the agency has acted in good faith

5  here.  I told you that in the preliminary order that you

6  entered.  I said, you know, I am not going to decide that

7  issue as a matter of law based on everything that's

8  before me.

9         MR. AMANAT:  But the GAO report didn't say that

10  the agency acted in bad faith.  They said that the

11  agency's process was unusual.

12         THE COURT:  Well, I understand that.

13         MR. AMANAT:  Unusual doesn't state a claim

14  under the APA.

15         THE COURT:  Well, listen to me.

16         MR. AMANAT:  Unusual is not arbitrary and

17  capricious.  Unusual is not in violation of the

18  Constitution.  Unusual simply means that the course of

19  proceedings in this case was --

20         THE COURT:  Not in accord with how the agency

21  normally conducts business.

22         MR. AMANAT:  But this --

23         THE COURT:  That's what it means.

24         MR. AMANAT:  But this drug is sui generis as

25  the plaintiffs have themselves said in the papers.

**Proceedings**

1        THE COURT:  Oh, come on.

2        MR. AMANAT:  You know, and the controversy

3   generated by this drug is sui generis.

4        THE COURT:  Well, I don't know --

5        MR. AMANAT:  So, it's not surprising that the

6   process is unusual.

7        THE COURT:  I don't know what to degree the

8   controversy generated by the drug is relevant to the

9   agency's determination.  Controversies are not

10  necessarily related to the safety of the drug.

11       MR. AMANAT:  Well, it's relevant that only in

12  the sense, your Honor, that one of the core findings of

13  the GAO report and concluding that the process was

14  unusual and one of the core findings that the plaintiff's

15  continue to harp on is the fact that the decision in this

16  case was made by high level agency officials.  It seems

17  logical and reasonable and it's an every day occurrence.

18       THE COURT:  It's not an every day occurrence,

19  otherwise it would not be unusual.

20       MR. AMANAT:  No, no.  What I am saying is it's

21  an every day occurrence that when an agency is

22  confronting an issue which is not routine which engenders

23  a great deal of public interest, which engenders a great

24  deal of interest from many quarters within society, that

25  the decision making process is going to be kicked up to

63

**Proceedings**

1  the next level of the chain of command.  That's something

2  which is to be expected rather than allowing those

3  controversial decisions so-to-speak to be made by the

4  lower level officials who may act on the more routine

5  aspects.

6          THE COURT:  The scientific evidence -- who may

7  act under scientific evidence.

8          MR. AMANAT:  No.  You know, in this case, the

9  decision makers did act on the scientific evidence but

10 they also brought to bear perhaps a different perspective

11 on the conclusions that could be drawn or should be drawn

12 from that scientific evidence.

13         THE COURT:  All right.  You have made your

14 points.

15         MR. HELLER:  Your Honor, I will try to be

16 brief.  I wanted to begin by briefly addressing standing.

17 I think to some degree the plaintiffs in this case may

18 stand in the shoes of Barr.  Frankly, I don't know and I

19 think it's a factual issue as the Court indicated, what

20 Barr's -- where Barr's interest lies here.  Does their

21 interest lie in accommodating the FDA so that their other

22 drugs get approved fairly?  Does their interest lie in

23 avoiding some political controversy if they were to file

24 a lawsuit seeking over the counter status?

25     I don't know where the interest lies.  It's clear

Transcription Plus II          Rosalie Lombardi

Proceedings

1    that for some reason, they made a decision to pursue a

2    more limited over the counter status.

3             So, our interest, the interest of these

4    plaintiffs which is an unrestricted over the counter

5    status may to some degree overlap with Barr's and may to

6    some degree stand in their shoes so-to-speak.  And to

7    that degree, we may be pursuing something that Barr -- a

8    result that Barr would be happy with.  We don't know.

9             THE COURT:  It's possible.  There's a real

10   issue as to why they're essentially acquiescing in what

11   the FDA wants.

12            MR. HELLER:  Exactly.  At this point,

13   unfortunately due to the -- I think the stay on

14   discovery, we couldn't even take the deposition of a Barr

15   official and ask them why did they accommodate the FDA,

16   so we can find out.

17            THE COURT:  Yes, well I am going to lift that

18   stay.

19            MR. HELLER:  The second sort of standing we

20   have here is as the Court indicated, one of our -- one of

21   the plaintiff's, one of my client's, is one of the

22   citizen's petitioner's.

23            THE COURT:  Right.

24            MR. HELLER:  And they have remained now for --

25            THE COURT:  There's no question.  There's no

**Proceedings**

1  question you have standing on your own claim.  You have

2  standing.

3         MR. HELLER:  And I think the their type of

4  standing which the Court also eluded to is the second

5  kind of third party standing which has been rather

6  routinely accepted by the federal courts which is the

7  standing of people who stand in sufficiently close

8  relationship to user's contraceptives specifically, such

9  as Eisenstat v. Bayer  .  We had some --

10        THE COURT:  Also beer.

11        MR. HELLER:  What's that?

12        THE COURT:  Also alcohol.

13        MR. HELLER:  Or alcohol, exactly.  Commercial

14 sellers who want to sell something to the consumer --

15        THE COURT:  I understand.

16        MR. HELLER:  -- they have in general been

17 granted third party saying to represent the interest of

18 those consumers.

19        THE COURT:  I understand that but it's all

20 reconcilable.  It's all consistent with the doctrine of

21 third party standing.

22        MR. HELLER:  The beer seller or the

23 contraceptive seller has an interest of his own in

24 selling the product and therefore satisfies the injury as

25 to himself and the people who are the potential

66

**Proceedings**

1  purchasers.  It's not practical for them really to bring

2  actions in their own name.

3          So, you basically satisfy -- those are clear

4  examples of the third party standing.  In fact, in the

5  Batson case which is Powers v. Ohio , Justice Kennedy

6  cited those cases and said, you know, these are examples

7  of instances and the actual --    Powers is interesting

8  because the actual injury to the defendant in a     Batson

9  case, the supreme court has articulated what     Batson is

10  about, is very, very -- it's almost in the air.

11          MR. HELLER:  Etherial.

12          THE COURT:  Etherial.  It's potential, at most.

13  I mean, if you read Kennedy's opinion, he was pulling

14  things out of the air to essentially justify it.

15          MR. HELLER:  I think in our case, certainly for

16  example, we have individual plaintiffs --

17          THE COURT:  I agree with you about that.

18          MR. HELLER:  -- who obtain prescriptions.  All

19  right.

20          THE COURT:  I don't know what --

21          MR. HELLER:  I won't belabor it.

22          THE COURT:  I mean, I agree that we have these

23  two separate claims or three actually.  First, is the

24  extent at which you assert third party standing to argue

25  on behalf of Barr, I think that that depends on discovery

67

## Proceedings

1   as to why Barr is not here but assuming you can show why

2   Barr is not here and that it would otherwise satisfy the

3   test, the question is why this case doesn't belong in the

4   court of appeals.

5            MR. HELLER:  And let me just briefly address

6   that.  I think there's very, very, limited case law on

7   the applicability of I think it's 355(h), title 21, which

8   makes this provision for an applicant --

9            THE COURT:  Right.

10           MR. HELLER:  -- who has been an applicant for

11  drug approval --

12           THE COURT:  Right.

13           MR. HELLER:  -- whose application has been

14  denied, to bring --

15           THE COURT:  Which you are, by the way, in both

16  capacities; whichever, third, first.

17           MR. HELLER:  In one of the parties -- to bring

18  a case directly to the --

19           THE COURT:  Right.

20           MR. HELLER:  -- appeal directly to the court of

21  appeals.

22           THE COURT:  Right.

23           MR. HELLER:  But a couple of courts have

24  addressed this and I will acknowledge that it's largely

25  in dicta but what they've said is, for example, the first

Transcription Plus II        Rosalie Lombardi

68

**Proceedings**

1   circuit -- I believe it's the first circuit in     Bradley v.

2   Weinberger   (phonetic), which is 483 F.2nd 410 in footnote

3   1, the Court says, "The right to petition the court of

4   appeals for review under 21 USC 355(h) is available only

5   to a drug marketing applicant after an order refusing or

6   withdrawing approval of a drug application."

7              THE COURT:  Well --

8              MR. HELLER:  I read that statement to mean --

9              THE COURT:  I understand you could read it to

10   support the view that it's not available to you and,

11   therefore, you should be able to come here but did that

12   case involved, you know, a circumstance of the kind that

13   we have here, where a third party essentially was saying

14   put me in the shoes of Barr?

15              MR. HELLER:  Well, this was a case involving

16   suit by physicians and a patient to enjoin the FDA from

17   complying with  proposal for relabeling certain drugs.

18   It's quite clear that you have on the one hand, a

19   manufacturer who sort of puts forth the labeling, gets

20   approval for the labeling and on the other hand, you have

21   these physicians and patients who have a different --

22   perhaps a different interest.

23              THE COURT:  Well, that's --

24              MR. HELLER:  And the Court said --

25              THE COURT:  But they're arguing against, in

Transcription Plus II          Rosalie Lombardi

## Proceedings

1  effect, what the manufacturer wanted.  It just -- you

2  know, I have to say that intuitively, it doesn't make

3  sense to me that to the extent that you stand in the

4  shoes of Barr, that you shouldn't go to the forum where

5  Barr would have to go.

6          Now, there's nothing to preclude you from doing

7  that while we're doing business in this case.  The one

8  possible thing is there is a statute of limitations but

9  at least with respect to the August letter, I think that

10 I can treat your -- the filing that you filed within 60

11 days of the August letter as, in effect, seeking review

12 of that August decision.  But I think that in this

13 context, it seems to me the place for that is the -- it

14 seems to me what would make sense as a practical matter

15 and aside from the fact that you think I'm sympathetic

16 now to your position, it's quicker to go directly to the

17 court of appeals than it is to go through here and then

18 whatever I do, there is going to be an appeal to the

19 court of appeals.

20          And I assume perhaps one of the reasons for

21 providing for direct review is to eliminate -- at least

22 that's normally why congress does that, they've just done

23 it in immigration cases, is because they want a process

24 that moves faster.

25          MR. HELLER:  I just want to give the Court just

70

**Proceedings**

1   one additional citation.

2           THE COURT:  I will look at them.

3           MR. HELLER:  This is a case from the Western

4   District of Wisconsin,   <u>Barnes v. Shalayla</u>  , 865 F. Sup.

5   550.  And there the Court again was -- this was a case

6   against HHS and the FDA, and the Court -- it was

7   suggested by the secretary of HHS that the case belonged

8   in the case of appeals under 355(h).  The Court said as a

9   general rule if the statute does not specify the

10  appropriate forum for judicial review of an

11  administrative action, the presumption is the review is

12  available in a federal district court under 28 USC 1331,

13  federal question statute.

14          And the Court said, "Therefore, as in

15  non-applicants," because the plaintiffs there were not

16  drug manufacturers applying for drug approval, "as

17  non-applicants, plaintiffs are making a different

18  challenge from the kind congress contemplated when it

19  enacted 355(h)."

20          So, while I agree with the Court that going

21  directly to the court of appeals might sort of skip a

22  step in terms of expedition of the case, moving the case

23  forward, I think that at least under these limited -- and

24  again it sets a precedence that sort of -- that are

25  largely dicta because I haven't been able to find a case

71

**Proceedings**

1   that sort of says, "This federal district court is trying

2   to win a case at the court of appeals because it can't --

3   doesn't have jurisdiction."

4           THE COURT:  Well, the question is is there a

5   case -- I mean, it doesn't strike me, I mean to the

6   extent I -- maybe I didn't hear it correctly, that what

7   you were dealing with was someone who basically wanted an

8   applicant wanted and what the applicant didn't get  and,

9   therefore, was going to the court of appeals to seek

10  review in a sense, in the shoes of the applicant of an

11  adverse administrative agency determination.

12          MR. HELLER:  I know of no such case.  But I

13  will say that again, we go back to the issue of what does

14  Barr want?  Is what Barr want what we want or is there a

15  major difference which is --

16          THE COURT:  Well, there is.

17          MR. HELLER:  -- want unrestricted access.

18          THE COURT:  There is.  But to that extent, you

19  have your own standing.  I mean, this is where there is

20  obviously a difference but that gets to the issue of how

21  we handle your own, as opposed to the issue of Barr's

22  application.

23          MR. HELLER:  I agree.  I think it would not be

24  unreasonable if we were solely standing in Barr's shoes

25  to say well, then you are the applicant.  You are

Transcription Plus II          Rosalie Lombardi

### Proceedings

1  supposed to go under 355(h).  I think that because we are

2  alleging things -- we are both seeking relief that Barr

3  may not want, in fact.

4          THE COURT:  I don't know that it doesn't want

5  but let's put it this way, it's acquiesced in the

6  concerns of the FDA.

7          MR. HELLER:  Well, also --

8          THE COURT:  They originally wanted it.

9          MR. HELLER:  We are also, perhaps, making

10 arguments that Barr would not make.  I have no idea

11 whether Barr would make an argument that constitutional

12 rights are violated by the FDA's action, where as we are.

13         THE COURT:  Well, I --

14         MR. HELLER:  So, I think it's a hard and novel

15 issue about where jurisdiction --

16         THE COURT:  Well, if they were really serious,

17 they would make the argument.

18         MR. HELLER:  Well, that may be true.  So, I

19 just wanted to say that about the standing jurisdictional

20 questions and then I wanted to say a couple of words

21 about discovery.  We did propound discovery to the FDA

22 that at the time we propounded it, we had no idea whether

23 what we were asking for was, you know, three cases of

24 over the counter approvals or 500.

25         We were unable to, I think, effectively

73

**Proceedings**

1   negotiate in any way to limit the scope of discovery

2   because the FDA's position was you get no discovery.  I

3   am more than happy to try to limit the scope of

4   discovery, so that we can really determine sort of was

5   this process genuinely different, as much of the

6   administrative records suggest.  Was it really very

7   different from what had been done before?

8          Every drug is sui generis.  I don't think we've

9   claimed this is sui generis in terms of its scientific or

10  medical safety --

11         THE COURT:  No, I think your argument though is

12  in terms of other forms of birth control and that it was

13  unusual in that respect.

14         MR. HELLER:  In that respect.  But it's not

15  unusual in terms of the type of evidence you would need

16  to show that it's safe or effective for over the counter

17  use.  In fact, with the citizen's position, the three or

18  four page document, the FDA also received in support of

19  that, affidavits from experts testifying that it was safe

20  and effective for over the counter use.  So, it wasn't

21  quite just four pages.

22         But in any event -- so one area of discovery

23  was sort of was this process abnormal?  Another area was

24  what were the reasons for the decisions the FDA made?  We

25  know that the scientists -- there was an overwhelming

74

### Proceedings

1  consensus among the scientists who reviewed the

2  scientific data that this was safe and effective for over

3  the counter use.

4        In fact, even after Barr acquiesced and said we

5  only want it for 16 and over, the scientists persisted.

6  They said that should not be approved.  The FDA should

7  approve it with no age restrictions because the

8  scientific evidence doesn't support any difference based

9  on age.

10        On the other hand, what we know about the use

11  of --

12        THE COURT:  Well, I don't want to interrupt

13  your train of thought --

14        MR. HELLER:  Yes, sir.

15        THE COURT:  -- but I think we have to keep --

16  the question is what the discovery is designed to which

17  cause of action?

18        MR. HELLER:  Yes.

19        THE COURT:  Is it to the unreasonable delay or

20  is it to the claim that there is a fact of final decision

21  and I should review that final decision on "your own

22  standing."

23        MR. HELLER:  I think that --

24        THE COURT:  Or is it with respect to the issue

25  of the unreasonableness of the delay?

75

**Proceedings**

1           MR. HELLER:  I --

2           THE COURT:  And then I don't want to -- go

3    ahead.

4           MR. HELLER:  I think it's on each of those, to

5    some degree.  What we know about the reasons for sort of

6    steps that were taken in the process, whether you view

7    the end result as a final one as we do or as a --

8           THE COURT:  Well, but that's important and, you

9    know --

10          MR. HELLER:  Well, we view --

11          THE COURT:  I mean, you might win if it were --

12   you know, if they were certain they could win by turning

13   it down, they would decide it.

14          MR. HELLER:  Yes, I think that whether an

15   agency's action is final, I think as the Court has

16   indicated, is not determined by whether the agency issues

17   some formal document stamped final decision.

18          THE COURT:  Right.

19          MR. HELLER:  It's determined by whether they've

20   actually -- they're actually still actively considering

21   something.

22          THE COURT:  Right.

23          MR. HELLER:  And it's clear not only from the

24   public August letter but from the prior documents that

25   scientists within the agency and I think we've put this

Transcription Plus II        Rosalie Lombardi

76

## Proceedings

1  in the letter sent to the Court yesterday, there were

2  scientists who were essentially saying something like if

3  this doesn't prove that this is safe for younger women,

4  we have no idea what we could come up with that would

5  ever satisfy the commissioner.

6          THE COURT:  Oh, I understand that.

7          MR. HELLER:  And so, the question is sort of is

8  there some -- because it's not apparent from the

9  administrative record, I think, is there some knowledge

10  that these upper level people have about this drug being

11  dangerous or requiring pharmacists or physicians other

12  than what they've said, for example, you know,

13  speculation about sex cults would form among teenagers if

14  this drug were available over the counter.  Is that the

15  sort of scientific reasoning that --

16          THE COURT:  But that information you have from

17  the -- they can't rely on anything -- they can't rely on

18  to sustain it if you were sitting to review a final

19  agency action.  They could only rely on what they've got

20  in the record.  They can't rely on something that's

21  hidden.

22          MR. HELLER:  Exactly.  But in order to decide -

23  - so, let's say first in order to look at whether the

24  delay was reasonable, there are a number of things to

25  look at.  What are reasonable and appropriate for these

77

**Proceedings**

1   higher level people to say this evidence isn't

2   satisfactory?

3           THE COURT:  Well, because that -- you know, the

4   unreasonable delay part assumes that they haven't decided

5   it.

6           MR. HELLER:  Right.

7           THE COURT:  So, you know, we're operating with

8   two --

9           MR. HELLER:  Two.

10          THE COURT:  -- which you're perfectly permitted

11  to do as we have been through that --

12          MR. HELLER:  Yes.

13          THE COURT:  -- you're perfect permitted to

14  argue that they've actually resolved it or if they

15  haven't resolved it, there was unreasonable delay.  So,

16  the unreasonable delay proceeds on the premise that

17  accepts his argument that there is no decision and then

18  the question is well, why hasn't there been any decision

19  and there, it seems to me, there might be some reason to

20  examine further the issue of why there has been delay and

21  why they have not finally resolved the issue.

22          MR. HELLER:  I do think that the same limited

23  discovery that might disclose why there has been delay is

24  likely to also have been upon the merits --

25          THE COURT:  So, okay.

Transcription Plus II        Rosalie Lombardi

## Proceedings

1         MR. HELLER:  -- of whether the decision was on

2   --

3         THE COURT:  It won't be fruit of the poison

4   tree.

5         MR. HELLER:  No.

6         THE COURT:  I mean, if it serves two functions,

7   it serves two functions.

8         MR. HELLER:  I do want to just briefly note one

9   example of why I think discovery would be fruitful in

10  general in shedding light on some of these issues which

11  is one small piece of the administrative record that we

12  received was some e-mail correspondence between someone

13  named Galson (phonetic), who was one of the key officials

14  involved in this, shortly before May of 2004, in which he

15  seeks some documentation for a point he wanted to make in

16  his final decision to issue a non-approval letter.

17        What struck me is not so much the content of

18  this e-mail, which is I think the GAO report refers to

19  this exchange, as well, but that this is the only e-mail

20  correspondence that's in the administrative record.

21  Where are -- I mean, I find it really hard to believe

22  that this is it.  That there's no other e-mail

23  correspondence in the FDA about this entire process other

24  than the two pages that they've included in the

25  administrative record.  And that's an additional reason

79

**Proceedings**

1 to allow that.    It's a --

2        THE COURT:  I mean, they don't necessarily -- I

3 don't know that you need all of that now.  But I mean,

4 this is not something that -- these are public documents

5 that are available and you can just look at the public

6 records if that's the road you want to go down.

7        MR. HELLER:  I think that there's -- I think I

8 have said enough about discovery.

9        MR. AMANAT:  May I briefly say something in

10 response, your Honor?

11        THE COURT:  Go ahead.

12        MR. AMANAT:  Mr. Heller's discussion of

13 discovery suggests that they are intending to use

14 discovery to really probe the decision making process and

15 the thought process of the decision makers here

16 including, for example, by taking depositions of high

17 ranking government officials.

18        We would strenuously object to that.  I think

19 all of the information that Mr. Heller indicated would be

20 relevant or probative to the causes of action which the

21 plaintiffs have asserted here is in the administrative

22 record.

23        And to the extent that he indicated, for

24 example, that the needs to know what was the basis for

25 the agency's decision making process, you know, for the

80

## Proceedings

1   decisions it made.  For example, the decision that was

2   made in August to proceed with the advanced notice of

3   proposed rule making, that's in the administrative

4   record, the rationale behind that.

5          In terms of why did Barr amend its supplemental

6   new drug application and replace it with this new dual

7   marketing proposal that's in the administrative record,

8   Barr submitted a very extensive discussion as to why it

9   was doing that, I don't believe discovery would add

10  anything to any of those questions.

11         I think the question of unreasonable delay, the

12  question of any substantive review of the merits of any

13  decision which the Court finds the agency has finally

14  made, can be reviewed and need to be reviewed based on

15  the administrative record.  We would --

16         THE COURT:  That's on the decision that have

17  made of which you claim there isn't any.

18         MR. AMANAT:  I beg your pardon?

19         THE COURT:  There's no decision that they've

20  made.

21         MR. AMANAT:  Well, we don't believe that the

22  agency has made any findings.

23         THE COURT:  No, I understand that.

24         MR. AMANAT:  But if your Honor --

25         THE COURT:  So, then we're left with the delay

81

### Proceedings

1  part.

2          MR. AMANAT:  Well, as to the unreasonable

3  delay, the reasons why the agency has made its various

4  decisions along the way, decisions not to decide are all

5  documented in the administrative record.

6          The question whether those -- ultimately, the

7  question of whether there's been unreasonable delay turns

8  on whether the various steps of the administrative

9  process the agency's decision not to decide was a

10  supportable decision.

11          THE COURT:  But suppose it was in bad faith.

12  Suppose the real reason was not a justifiable one.

13  That's not relevant to the issue of whether the delay was

14  reasonable or not?

15          MR. AMANAT:  Well, but they have made no

16  showing of bad faith, your Honor.

17          THE COURT:  That's what you say.

18          MR. AMANAT:  Well, your Honor, we would submit

19  that we haven't briefed that to your Honor.  We briefed

20  that to Judge Pohorelsky.

21          THE COURT:  What you'll tell me is the same

22  thing.

23          MR. AMANAT:  Well, if you --

24          THE COURT:  But, you know, fundamentally

25  there's been to my mind, an extraordinary delay here.

82

**Proceedings**

1          MR. AMANAT:  Well --

2          THE COURT:  And certainly in dealing with their

3   petition, you've basically not decided it.

4          MR. AMANAT:  Your Honor, I understand your

5   Honor's --

6          THE COURT:  And even on the issue of whether,

7   you know, you stand here and say oh, that's not final

8   about over the counter to people under the age of 17,

9   it's clearly still being considered.

10         Why shouldn't the head of the agency be asked

11  to say that under oath?

12         MR. AMANAT:  Well, he's explained the reasons

13  for that.

14         THE COURT:  Under oath?  Why shouldn't he be

15  questioned about that?

16         MR. AMANAT:  Well, because the case law --

17         THE COURT:  I'm not what has he explained.

18  You're telling me that they're still considering --

19  they're still actively considering the possibility of

20  authorizing if the people under the age of 17 --

21         MR. AMANAT:  Would your Honor like us to

22  supplement the administrative record, the affidavit from

23  --

24         THE COURT:  I don't --

25         MR. AMANAT:  -- the head of the agency?

Transcription Plus II          Rosalie Lombardi

83

## Proceedings

1    THE COURT:  I'm not sure that they're

2  necessarily bound by the affidavit but it would be nice

3  since you're saying all of these things.

4    MR. AMANAT:  If your Honor would like us to

5  supplement the administrative record with such a

6  statement, we could do that.

7    THE COURT:  I don't know what supplementing the

8  administrative record means.  There's a record here of

9  which the administrative record is a part.

10    MR. AMANAT:  My point, your Honor, is I know

11  that your Honor is anxious to move this case along and

12  we're anxious to move this case along.  But my point is

13  that before your Honor orders or authorizes any discovery

14  n this case, at the very least we would ask your Honor to

15  review the briefs which the parties -- the extensive

16  briefs, which the parties submitted on the motion for a

17  protective order.

18    THE COURT:  Well, I don't know how operative

19  they are at this point.  I don't know precisely -- is it

20  clear what you're asking for at this point?

21    MR. AMANAT:  They're asking --

22    THE COURT:  You?

23    MR. HELLER:  Well, we're just asking -- do you

24  mean in terms of discovery?

25    THE COURT:  Right.

Transcription Plus II          Rosalie Lombardi

84

**Proceedings**

1        MR. HELLER:  We're just asking for discovery to

2   proceed in the normal way that it would, that we -- or

3   they propound discovery, we make objections and they're

4   ruled upon as they go and to have absolute bar on

5   discovery lifted.

6        THE COURT:  Well, that I am going to do.

7        MR. AMANAT:  But, your Honor, the basis for our

8   motion for protective order, we made a motion before

9   Judge Pohorelsky asking him to preclude any discovery in

10  this case and we offered the reasons and rationale for

11  doing so.

12       THE COURT:  I'm not precluding discovery on the

13  issue of whether there's been unreasonable delay.

14       MR. AMANAT:  Can we at least submit the briefs

15  on the issue, your Honor?

16       THE COURT:  I'm not -- you could submit it to

17  me but I am not -- my feeling now is I will reconsider it

18  after I read your briefs.

19       MR. AMANAT:  Well, what would --

20       THE COURT:  But my basic feeling -- look, you

21  could solve this problem in part.  You could acknowledge

22  that there's a final decision here and then we don't have

23  to deal with the unreasonable delay.  Instead, you don't

24  want to acknowledge that there's a final decision even

25  though it's quite clear to me that there has been one and

85

## Proceedings

1  essentially, you want to argue that -- notwithstanding

2  the fact that there is no final decision, there's been no

3  unreasonable delay.

4       And you could solve a lot of these problems by

5  simply being honest and say they've decided it and then

6  we don't have to get into the issue of unreasonable delay

7  and I can focus on where this case belongs.

8       But fundamentally, your positions -- they could

9  have inconsistent positions as the plaintiff but I am not

10 sure that you can have inconsistent positions as a

11 defendant.  But it's your choice.  If you can have it,

12 you can have it.

13      But fundamentally, you could just be honest and

14 say yes, it's been decided.  We have -- the drug may not

15 be legally marketed over the counter at this time and

16 when it might be, you can't say, can you?

17           MR. AMANAT:  No.

18           THE COURT:  No.  It could be five years from

19 now.  It could be ten years from now.  It could be never.

20

21           MR. AMANAT:  Well, if your Honor -- your Honor

22 seems inclined to --

23           THE COURT:  I mean, if you want to consult with

24 your client and tell me a time, that might be helpful.

25 But you know, this is an endless process and quite

**Proceedings**

1  frankly, in my own view of the justifications for this

2  rule making is that it's absurd.  But that's a separate

3  issue.

4        You have either decided it, in which event you

5  could have your decision on the administrative record.

6  The only question is where or you could take the position

7  you haven't decided it, to which event I am not going to

8  stop them from taking discovery on the issue of whether

9  there's been unreasonable delay.  And if you have

10  specific objections, you could deal with it --

11        MR. AMANAT:  Well, what --

12        THE COURT:  -- you could take it up with the

13  magistrate.

14        MR. AMANAT:  What would the scope of that

15  discovery look like?

16        THE COURT:  Well, I don't know what they're

17  asking for yet.  I'm just -- all I am doing is lifting an

18  absolute ban on discovery.  And when they make a

19  particular discovery request that you're unhappy with,

20  you could make a motion.

21        So, I'm going to deny the motion to dismiss the

22  cause of action based on reasonable delay.  I'm going to

23  deny for the moment, the cause of action until I decide

24  where it should properly be brought, the cause of action

25  that the plaintiff's bring on their own based on the

## Proceedings

1  citizen's application.  And to the extent that they're

2  standing in the shoes of Barr, it seems to me they have

3  to stand in the court of appeals on that one, that this

4  isn't the place to stand in Barr's shoes isn't Barr's

5  forum.

6        I would suggest, although I don't think it's --

7  that you amend this complaint one more time to deal with

8  some of the things that I have suggested that I think

9  ought to be in the complaint that are particularly

10 dealing with this letter of --

11       MR. HELLER:  Well, I think there is both

12 information from that letter and from the administrative

13 agency record which are included in the allegations of

14 the complaint.

15       MR. AMANAT:  Is your Honor prepared to make a

16 ruling on their claims of constitutional violation and

17 our motion to dismiss those claims?

18       THE COURT:  Well, I don't know that I have to.

19 I mean, it seems to me that -- I mean, I have sort of a

20 pragmatic rule of thumb that basically says that, you

21 know, where a number of causes of actions arises, common

22 nucleus effects and I sustained one.  I don't necessarily

23 have to rule on all of the others in the interim.

24       They certainly, to the extent that they have a

25 viable claim, that if there has been a final decision and

## Proceedings

1    it's reviewable judicially, the statute itself gives them

2    the right to allege any violations of a constitution that

3    may have taken place as a result of the final agency

4    decision.  So, I don't see why I have to -- I don't know

5    why I have to rule on that independently right now.

6              MR. AMANAT:  The reason I raise it, your Honor,

7    is that in the course of our discussions before

8    Magistrate Judge Pohorelsky on the subject of the scope

9    of discovery --

10             THE COURT:  Right.

11             MR. AMANAT:  -- the plaintiffs repeatedly

12    insisted that their entitlement to seek discovery and

13    their justification for the scope of the specific

14    discovery that we're seeking, lies in the fact that they

15    had raised these constitutional claims.

16             THE COURT:  Well, they have a right to raise

17    the constitutional claims.  To the extent that there's a

18    final order and, you know, I really think it's final

19    clearly as to the people under the age of 17, they have a

20    right to say that one of the things that's wrong with

21    this order is that it's unconstitutional and that it

22    violates their constitutional rights.  The statute, I

23    believe, it's right in the statute that provides for

24    judicial review.

25             MR. AMANAT:  Right.

89

### Proceedings

1    THE COURT:  So, they have a right to say that

2    to the extent that the order is a final order that it

3    violates their constitutional rights.  so, I don't --

4    MR. AMANAT:  But that wasn't our argument, your

5    Honor.  Our argument was that the allegations which they

6    raised failed to state an actionable claim under either

7    the right to privacy or (inaudible).

8    THE COURT:  Well, why do I have to decide that

9    now?

10    MR. AMANAT:  Because if your Honor -- I

11    understand your Honor's usual practice as set forth in

12    your previous decision --

13    THE COURT:  This applies more so here since

14    they have this -- they can raise this claim in a -- as

15    part of the review of such -- as part of the review, to

16    the extent that there may be a final decision here.

17    MR. AMANAT:  So, my understanding, your Honor,

18    that your Honor understands their constitutional claims

19    as relating only to a potential claim under 7062.

20    THE COURT:  That's my current feeling.

21    MR. AMANAT:  So that if, for example, since

22    your Honor is authorizing discovery --

23    THE COURT:  For the moment, that's all I have

24    to decide.  Let me put it that way.

25    MR. AMANAT:  Okay.  And so if your Honor is

Transcription Plus II        Rosalie Lombardi

90

**Proceedings**

1  authorizing discovery as to their claim under 7061 for

2  the unreasonable delay claim --

3            THE COURT:  Right.

4            MR. AMANAT:  -- the fact that they have

5  asserted constitutional claims in their complaint would

6  not be germane then to the scope of any discovery --

7            THE COURT:  Well, I am not sure.

8            MR. AMANAT:  -- that would be permitted under

9  761.

10           THE COURT:  I don't know what we're talking

11  about.  It seems to me that if there is a serious

12  constitutional issue here that could go to the

13  reasonableness of the delay, I mean, you know, if you

14  accept the allegations of the complaint as true, that

15  what this delay is doing assuming that it's doing it,

16  whatever the decision of the FDA because they would at

17  least be able to obtain a review, and I assume for the

18  purposes of this that it's true that this order is

19  arbitrary and capricious, is essentially there are

20  people, women, who may not be able to get access to this

21  drug within 72 hours either because you have to call a

22  doctor, you have to maybe get an appointment, unless he's

23  prepared to write a prescription over the telephone,

24  which I am sure you wouldn't be too happy about, you have

25  to make sure that he's available.

**Proceedings**

1          And so the delay could result in someone

2     becoming pregnant and having to have an abortion at some

3     point.  And I think that however you want to characterize

4     it is a significant -- should be a very significant

5     concern of the FDA in terms of how they go about

6     processing this application, that you know, they're

7     undertaking a course of action that could actually result

8     in abortions that might not otherwise be necessary.

9          MR. AMANAT:  The agency certainly has taken

10    that consideration into account --

11         THE COURT:  Sure.

12         MR. AMANAT:  -- among the many other

13    considerations its taken into account.

14         THE COURT:  I don't know what discovery --

15    separate discovery you're looking at.

16         MR. HELLER:  I mean, if I may just indulge a

17    brief, hypothetical example, it's pretty clear to me from

18    the limited administrative record that I have time to

19    review that one of the former commissioners of the FDA,

20    Mr. McClellan (phonetic), had a significant role in

21    thinking about and deciding what would happen with this

22    drug.

23         Frankly, I myself don't find anything he said

24    to be either scientific or reasonable based on evidence

25    but my opinion doesn't count.  If it turns out --

92

## Proceedings

1      THE COURT:  But he said what he said.

2      MR. HELLER:  He said --

3      THE COURT:  You know what he said.

4      MR. HELLER:  Yes, we know what he said.  But if

5   it turns out that this is a pretext and I think there's

6   significant indication of things happening in an unusual

7   way with this drug, if it turns out that the commissioner

8   of the FDA was told by someone who is his supervisor, you

9   can't approve this drug period, this cannot be approved,

10  not while we're in office, because it's a contraceptive

11  drug who some people believe is an abortivefasion drug.

12  We don't want it approved.

13      That would certainly be relevant to our

14  constitutional claim.  It's not going to be the

15  administrative record.

16      THE COURT:  But it would be --

17      MR. HELLER:  It's our position --

18      THE COURT:  Your constitutional claims would be

19  -- are litigable in the administrative action.

20      MR. HELLER:  They are.  But it's also our

21  position that we are entitled to, with respect to

22  constitutional claims because constitutional issues --

23      THE COURT:  I don't know why we have to get

24  into the -- that goes to the -- what you're doing is

25  saying is it simply goes to the reasonableness of the

Transcription Plus II          Rosalie Lombardi

93

## Proceedings

1  delay.  But you're basically in effect --

2          MR. HELLER:  Well, he's --

3          THE COURT:  The conversation that you have --

4  the hypothetical that you give is that he is told by

5  someone outside of the agency that they are not to decide

6  this.  And that goes to the reasonableness of the delay.

7          MR. HELLER:  Yes.

8          THE COURT:  I don't think you have to get

9  involved in any issue about --

10         MR. HELLER:  No, no, no.  I'm just suggesting

11 again that --

12         THE COURT:  I don't see that this goes to what

13 separate cause of action this is.

14         MR. HELLER:  No, I am not suggesting that.  I'm

15 just suggesting that again, discovery may bear upon

16 causes of action other than unreasonable delay.

17         THE COURT:  Well, look --

18         MR. HELLER:  Even though it's --

19         THE COURT:  It's not a crime if you take

20 relevant discovery to a particular cause of action if it

21 also has a bearing on the other cause of action, you

22 know, so it has -- it's simply has that bearing.  It

23 doesn't mean that there's something wrong with doing

24 that.  I think it's best not to get --

25         MR. HELLER:  I agree.

94

### Proceedings

1    THE COURT:  -- caught up in confusion here.  I
2  don't have to rule on the constitutional claims and I may
3  never have to.

4    MR. AMANAT:  Is your Honor anticipating issuing
5  a memorandum?  I say that simply because there may be
6  discussions or debates in front of Judge Pohorelsky as to
7  the scope of discovery and he may, well obviously have
8  the transcript of this proceeding, but it --

9    THE COURT:  Well, why don't you do this?  Why
10 don't you -- I don't like to get involved in discovery
11 just because I always hated it when I was a lawyer, but
12 why don't you -- first of all, you should try and reach
13 some agreement in good faith, so that you don't have to -
14 - it may not be necessary to litigate every single
15 discovery request.

16    But you could let me know first what it is and
17 then I will tell you whether I could go to Pohorelsky or
18 not.  I think he told me his law clerk was going to be
19 here and there is also a transcript.  His law clerk is
20 here.  There's also a transcript available of the
21 proceedings but I don't want to delay things to write an
22 opinion.  I may write something but, you know, I am
23 reasonably clear.

24    I don't know what you want to do with the Barr
25 claim.  If you want, I could transfer it to the second

95

## Proceedings

1  circuit.  I don't know whether this is the second circuit

2  or the third circuit, I don't know.

3       MR. AMANAT:  Would there be a basis for

4  concluding that Barr's an indispensable party to this

5  action that needs to be added pursuant to Rule 19?

6       THE COURT:  Tell me what it says.

7       MR. AMANAT:  I'm sorry?

8       THE COURT:  What does Rule 19 say, the

9  indispensable part?

10       MR. AMANAT:  Well, it talks about joinder,

11  indispensable parties and it talks about -- I mean, your

12  Honor's comments earlier suggest that your Honor felt it

13  was difficult, if not impossible to --

14       THE COURT:  Well, to my --

15       MR. AMANAT:  -- adjudicate some of the --

16       THE COURT:  Am I going to have compulsory

17  interpleader of them as a plaintiff?  I mean, I don't

18  quite --

19       MR. AMANAT:  Involuntary plaintiff, I assume

20  that's what they would be.

21       THE COURT:  I don't know.

22       MR. AMANAT:  I am just raising the question,

23  your Honor.  If they're present in their explanation for

24  their behavior is of such critical moment to adjudication

25  to the plaintiff's claims --

**Proceedings**

96

```
 1          THE COURT:  Well, I don't know enough about
 2   interpleader actions to tell you the truth.  I pull down
 3   books when I have to find out specifically what to do.  I
 4   don't know as I sit here precisely whether I -- it's up
 5   to you to insist whether there's some sort of necessary
 6   party or for them to bring on a compulsory interpleader.
 7   It's not up to me.  But I think you should tell me what
 8   you want to do with the cause of -- you don't have to do
 9   it right now, I mean, you could think about it.
10          MR. HELLER:  With what, your Honor?
11          THE COURT:  The cause of action relating to
12   Barr.
13          MR. HELLER:  Well, I think in order to decide
14   whether we want to be viewed as standing in Barr's shoes,
15   we would have to do, I am afraid, some very limited
16   discovery of Barr to find out what their interest is and
17   why they acquiesced the FDA's decision.  I understand
18   there may be some indication of that in the record but
19   given -- I mean, for example --
20          THE COURT:  Well, you know, you can't always
21   assume that what people say in the record is accurate.
22          MR. HELLER:  Right, it's --
23          THE COURT:  They're not going to --
24          MR. HELLER:  As far as I know, it's not under
25   oath.
```

## Proceedings

1    THE COURT:  Aside from that, you know --

2    MR. AMANAT:  It's a submission from their

3    counsel, I believe.

4    MR. HELLER:  Right.

5    THE COURT:  I know.

6    MR. HELLER:  Not from them.

7    THE COURT:  If you assume hypothetically the

8    reasons we've been speculating about it, it's pure

9    speculation, they might not want to say that.

10    MR. HELLER:  But we may need to do that but I

11    mean, my own view is that indeed it is likely that Barr's

12    interests in this drug's being approved or not for over

13    the counter use are primarily commercial and that our

14    interest, the interest of my clients are non-commercial

15    and that's a significant difference.

16    THE COURT:  No, I understand that.

17    MR. HELLER:  Yes.

18    THE COURT:  But that's the first part of giving

19    you third party standing is that you have your own --

20    injury to your own interests and you want to, in addition

21    to that, allege the interest of the third party.  And I

22    think -- we can go around on the circle on this.  You

23    have standing on your own complaints.  The question is --

24    on your own -- on the citizen's petition.  The question

25    is what you want to do about -- this whole issue of third

98

## Proceedings

1  party has been argued and the question is what do I do

2  with that cause of action.  I mean, I don't have to do

3  anything now.  I mean, you could take that limited

4  discovery of Barr and then you could let me know.  It may

5  be that you can't satisfy the "hinderance" prong of this

6  third party standing and then that would take care of

7  that and then you would just be left with what I call

8  sort of a clean case of your own without having to get

9  involved in the --

10       MR. HELLER:  I think we would probably want to

11  do that limited discovery and then expeditiously inform

12  the Court of our view of whether we can make such a

13  sandbar issue or not, depending on the result of that.

14       THE COURT:  Okay.  So, for the moment I will

15  reserve on that.  I am denying the motion to dismiss

16  across the board.  What I do with that case, whether I,

17  for the moment it's without prejudice to renewal, if you

18  don't come up with anything that justifies third party

19  standing and if you do, I think it's got to go to the

20  circuit.  And I deny the motions to dismiss the other

21  causes of action.

22       As I said, I think the -- it seems to me that

23  you could argue it either way, that they've decided it

24  for the purpose of this -- you know, you have to keep

25  reminding yourself that I'm not granting any relief here.

Transcription Plus II          Rosalie Lombardi

99

1   For the purpose of this proceeding, it's whether I throw

2   them out of court.

3          MR. HELLER:  Right.

4          THE COURT:  And for the purpose of throwing

5   them out of court, I think there's a strong enough basis

6   to conclude that there has been a final agency decision

7   on both and that if there hasn't been, it's one that's

8   been unreasonably delayed.  I think there's a sufficient

9   basis, so that they can avoid dismissal of the complaint.

10         Thank you.

11         MR. HELLER:  Thank you for your time,

12  your Honor.

13              (Matter concluded)

14                   -oOo-

15

16

17

18

19

20

21

22

23

24

**C  E  R  T  I  F  I  C  A  T  E**

Transcription Plus II          Rosalie Lombardi

100

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **26th** day of **December** , 2005.

```
------------------------
        Rosalie Lombardi
        Transcription Plus II
```

Transcription Plus II          Rosalie Lombardi